HAMILTON MOORE ET AL. *v.* JOSEPH GANIM ET AL.
(14923)

PETERS, C. J., and CALLAHAN, BORDEN, BERDON, NORCOTT, KATZ
and PALMER, Js.

*(One justice concurring separately, two justices dissenting)*

Argued June 9 and September 20, 1994—decision released June 20, 1995

*Steven R. Berg*, with whom were *Dennis J. O'Brien* and, on the brief, *Maria A. Varone*, for the appellants (plaintiffs).

*Arthur C. Laske III*, assistant city attorney, with whom were *John H. Barton*, associate city attorney, and, on the brief, *Mark T. Anastasi*, city attorney, for the appellees (named defendant et al.).

*Richard Blumenthal*, attorney general, with whom were *Jennifer C. Jaff*, assistant attorney general, and, on the brief, *Richard J. Lynch* and *Hugh Barber*, assistant attorneys general, for the appellees (state of Connecticut et al.).

*Mary-Michelle U. Hirschoff*, for the Connecticut Conference of Municipalities as amicus curiae.

NORCOTT, J. In this expedited appeal, we are asked to determine whether, under the state constitution, the

state of Connecticut has an affirmative obligation to provide its indigent residents with minimal subsistence. The plaintiffs[1] are three individuals who were eligible for general assistance, but whose cash benefits were to be terminated after nine months pursuant to General Statutes (Rev. to 1993) § 17-273b. They instituted this action for declaratory and injunctive relief against the defendants Joseph Ganim, mayor of the city of Bridgeport, Harold Fair, acting director of the Bridgeport department of welfare, and the city of Bridgeport (collectively, Bridgeport). The plaintiffs claim that the statute's durational limit abrogates the state's[2] affirm-

---

[1] The action was instituted by five plaintiffs, who included in their complaint a request to certify the "class of Bridgeport General Assistance recipients who are 'employable' as that term is used in [General Statutes (Rev. to 1993)] § 17-273b; who have received or will receive benefits for a period of nine months; and who for said nine month period have or will have complied with all requirements of the General Assistance program." The trial court deferred ruling on the plaintiffs' motion to certify the class. In this appeal, only three plaintiffs remain: Hamilton Moore, William Simpson and Enrique Velez. A motion to dismiss the other plaintiffs, Francisco Rivera and Russell Scudder, was granted on the ground that they had not verified the allegations of the complaint.

[2] Initially, the plaintiffs claimed that the city of Bridgeport, rather than the state, owed a duty to provide its citizens with a minimal level of subsistence. Municipalities in the state of Connecticut, however, have no independent authority or independent responsibility; they are administrative units of the state and can do only what the state authorizes or delegates them to do. *Wright* v. *Woodridge Lake Sewer District,* 218 Conn. 144, 148, 588 A.2d 176 (1991); *Bottone* v. *Westport,* 209 Conn. 652, 658, 553 A.2d 576 (1989); *Pepin* v. *Danbury,* 171 Conn. 74, 83, 368 A.2d 88 (1976); *State ex rel. Brush* v. *Sixth Taxing District,* 104 Conn. 192, 198, 132 A. 561 (1926). Such a delegation can be made with regard to local matters concerning health, safety and general welfare. *Bottone* v. *Westport,* supra, 658; see generally 17 E. McQuillin, Municipal Corporations (3d Ed. 1993) § 47.04 ("[a] municipal corporation has no natural or moral obligation to support its poor, and its duty to furnish such support or to pay support to them which others furnish is purely statutory").

The state acknowledges that, if this court were to find an affirmative constitutional obligation to provide a minimal level of subsistence, the responsibility for such an obligation would fall primarily upon the state. Hence, we use the term "state" to encompass both the state of Connecticut and the city of Bridgeport, which may secondarily, through delegation, be required to shoulder part of the state's obligation.

ative obligation, under the Connecticut constitution, to provide its indigent citizens with a minimal level of subsistence. The trial court, after a hearing, rejected the plaintiffs' claim that the state had a mandatory constitutional obligation to provide indigent citizens with a minimal level of subsistence and, accordingly, denied the plaintiffs' request for a temporary injunction.

Despite the absence of a final judgment, the plaintiffs sought an appeal directly to the Supreme Court, and the Chief Justice, pursuant to General Statutes § 52-265a, granted certification to appeal.[3] Thereafter, the plaintiffs appealed from the denial by the trial court of their request for a temporary injunction. We conclude that the state constitution does not impose an affirmative duty on the state to provide the benefits claimed by the plaintiffs, and, accordingly, we affirm the order of the trial court.

[3] General Statutes § 52-265a provides: "DIRECT APPEAL ON QUESTIONS INVOLVING THE PUBLIC INTEREST. (a) Notwithstanding the provisions of sections 52-264 and 52-265, any party to an action who is aggrieved by an order or decision of the superior court in an action which involves a matter of substantial public interest and in which delay may work a substantial injustice, may appeal under this section from the order or decision to the supreme court within two weeks from the date of the issuance of the order or decision. The appeal shall state the question of law on which it is based.

"(b) The chief justice shall, within one week of receipt of the appeal, rule whether the issue involves a substantial public interest and whether delay may work a substantial injustice.

"(c) Upon certification by the chief justice that a substantial public interest is involved and that delay may work a substantial injustice, the trial judge shall immediately transmit a certificate of his decision, together with a proper finding of fact, to the chief justice, who shall thereupon call a special session of the supreme court for the purpose of an immediate hearing upon the appeal.

"(d) The chief justice may make orders to expedite such appeals, including orders specifying the manner in which the record on appeal may be prepared."

See also Practice Book § 4176. " 'The "order or decision" to which § 52-265a (a) refers need not be a final judgment. . . .' " *Polymer Resources, Ltd.* v. *Keeney*, 227 Conn. 545, 546–47 n.2, 630 A.2d 1304 (1993), quoting *Moshier* v. *Goodnow*, 217 Conn. 303, 305 n.3, 586 A.2d 557 (1991).

The relevant factual and procedural background is as follows. General assistance is a state mandated program; see General Statutes (Rev. to 1993) § 17-273 (a);[4] providing both financial and medical assistance to indigent people who lack sufficient income or assets and who fail to qualify for other assistance programs.[5] The program is administered by the 169 municipalities of this state,[6] each of which pays the administrative costs and 20 percent of the benefits; the state reimburses the towns for the remaining 80 percent of the benefits.[7] Currently, the flat grant rate for employable recipients is $300 per month, while unemployable recipients

---

[4] General Statutes (Rev. to 1993) § 17-273, now § 17b-116, provides in relevant part: "LIABILITY OF TOWN FOR SUPPORT. REGULATIONS. (a) Each person who has not estate sufficient for his support . . . *shall* be provided for and supported to the extent required under the provisions of this chapter and section 17-3a at the expense of the town in which he resides . . . ." (Emphasis added.) See also General Statutes (Rev. to 1993) § 17-3a, now § 17b-78.

[5] General assistance programs are state run public assistance programs, which operate according to state legislative directives. The programs provide assistance to needy persons who do not qualify for federal categorical assistance, such as Supplemental Security Income (SSI) or Aid to Families with Dependent Children (AFDC), or whose assistance under these programs is inadequate. Because these programs are state run, the scope of the relief provided varies drastically from state to state. See S. Levitan, Programs in Aid of the Poor (6th Ed. 1990) pp. 41–42.

In order to be eligible for general assistance, an applicant must have assets equal to or below $250; General Statutes (Rev. to 1993) § 17-273 (c), now § 17b-116 (c); and must have an income below specified levels. General Statutes (Rev. to 1993) §§ 17-3a and 17-273 (c), now §§ 17b-78 and 17b-117 (c), respectively; see also State Dept. of Income Maintenance, General Assistance Policy Manual (1993 Ed.) § 17-3a-14, c. I, pp. 41–54. In addition, the state requires all applicants to apply for federally funded programs for which they may be eligible. See, e.g., General Statutes (Rev. to 1993) § 17-273c, now § 17b-119 (applicant must first pursue SSI assistance).

[6] As of July 1, 1996, the state, rather than the individual towns, will administer the general assistance program. See General Statutes (Rev. to 1993) § 17-12hh, as amended by Public Acts 1993, No. 93-418, § 6, now § 17b-111.

[7] See General Statutes (Rev. to 1993) § 17-292, as amended by Public Acts 1993, No. 93-418, § 11, now § 17b-134, setting forth the guidelines and procedures for reimbursement of the towns by the state.

receive \$356 per month.[8] General Statutes (Rev. to 1993) § 17-3a (a), as amended by Public Acts 1993, No. 93-418, § 2.[9]

This appeal focuses on the revisions effected by No. 92-16, § 6, of the Public Acts, Special Session, May,

[8] Recipients with no dependents are paid a flat grant rate based on their employability status. Number 92-16, § 2, of the Public Acts, Special Session, May, 1992, effective July 1, 1992, increased the minimum level of financial assistance for single employable persons from \$300 per month to \$314 per month. Effective July 1, 1993, however, the level for single employable persons was decreased to \$300 per month by Public Acts 1993, No. 93-418, § 2. See footnote 9.

Towns may elect to provide greater assistance above this minimum level, but any additional assistance is not reimbursed by the state. See General Statutes (Rev. to 1993) § 17-273 (g).

[9] General Statutes (Rev. to 1993) § 17-3a, as amended by Public Acts 1993, No. 93-418, § 2, now § 17b-78, provides in relevant part: "STANDARDS FOR GRANTING OF GENERAL ASSISTANCE AND MEDICAL ASSISTANCE. AUDITS. RECOVERY OF REIMBURSEMENTS. SANCTIONS. (a) The commissioner of income maintenance shall adopt regulations in accordance with the provisions of chapter 54 establishing mandatory standards for the granting of general assistance financial and medical assistance, including the level of financial assistance to be provided at the expense of the town in such cases, which shall be three hundred dollars per month for a single employable person and three hundred fifty-six dollars per month for a single unemployable person upon determination of his unemployability, subject to the provisions of subsection (b) of section 17-2 and section 17-82n, including the payment of medical bills for persons not receiving general assistance financial aid who are unable to pay such bills over a two-year period, by towns, including standards for investigation and eligibility and extent of need and procedures for record-keeping, including uniform application and billing forms to be used by medical providers as well as towns, and other office practices, and establishing time limits for the determination of eligibility for financial assistance and for the payment of medical bills for persons not receiving general assistance financial aid and for the payment of all medical assistance bills, all with the intent of aiding the towns and any districts established under section 17-273a in the efficient administration of the laws relating to granting of general assistance financial and medical assistance. The commissioner shall inform the towns and such districts of the standards so established and shall advise and assist them in their application thereof. The commissioner may recommend regional areas within which he considers it reasonable for towns to join in the establishment of such districts, and may advise the towns therein of such recommendations and his reasons therefor."

1992 (Spec. Sess. P.A. 92-16),[10] as incorporated in General Statutes (Rev. to 1993) § 17-273b.[11] As amended, § 17-273b provides that "financial assistance granted under this chapter to an employable person[12] *shall* be

[10] Other modifications to the overall welfare system implemented by Spec. Sess. P.A. 92-16 included: (1) changes to the eligibility requirements for receiving financial assistance; § 5; and emergency shelter; § 7; (2) provisions for penalties if an employable recipient failed to accept employment without just cause, or voluntarily quit or was discharged for cause; § 11 (a); (3) amendment of the definitions of employable persons to include substance abusers; § 11 (c); (4) the requirement of towns to develop employability plans for each recipient; § 11 (h); and for the delivery of services; § 17; and (5) a decrease in the percentage, from 90 percent to 85 percent; §§ 14, 16; that the state would reimburse the towns. (Effective July 1, 1993, No. 93-418 of the 1993 Public Acts has reduced from 85 percent to 80 percent the amount that the state would reimburse the towns.)

[11] General Statutes (Rev. to 1993) § 17-273b, now § 17b-118, provides: "LIMITATIONS ON ASSISTANCE TO EMPLOYABLE PERSONS. REGULATIONS. No assistance or care shall be given under this part to an employable person who has not registered with the nearest local employment agency of the labor department, has refused to accept a position for which he is fitted and which he is able to accept, or has refused to participate or wilfully failed to report for work in a work program or training or education program, pursuant to section 17-281a, by the town liable to support such person in accordance with sections 17-273 and 17-292. The provisions of this section shall not apply to any person who cannot register with such employment agency because of being over sixty-five years of age, health or other disability *as determined by the commissioner. On and after July 1, 1992, financial assistance granted under this chapter to an employable person shall be limited to no more than nine months in a twelve-month period. A town may extend the period during which assistance is granted by up to three months for recipients who are in compliance with program requirements. A person determined to be unemployable who is subsequently determined to be employable shall be eligible for the assistance provided to an employable person under the general assistance program from the date he is determined employable. Persons with dependent children under eighteen years of age eligible for assistance under this chapter and ineligible for assistance under chapter 302 shall not be subject to the nine-month durational limit on assistance established pursuant to this section. The commissioner of income maintenance shall adopt regulations, in accordance with the provisions of chapter 54, to implement the provisions of this section.*" (Emphasis indicates language of amendment effected by Spec. Sess. P.A. 92-16, § 6.)

[12] General Statutes (Rev. to 1993) § 17-281a (c), as it incorporates Spec. Sess. P.A. 92-16, § 11, now § 17b-689 (c), defines an "employable person"

limited to *no more than nine months in a twelve-month period.* A town may extend the period during which assistance is granted by up to three months . . . ."[13] (Emphasis added.) Prior to enactment of Spec. Sess. P.A. 92-16, municipalities were obligated by statute to provide benefits to all qualified persons, with no durational limit. See General Statutes (Rev. to 1991) §§ 17-273 and 17-273b. The amended statute limits to nine months the length of time employable persons are eligible to receive financial assistance (nine month rule) but gives each municipality the discretion to elect to extend such aid beyond the required nine month period,[14] in which case the state will continue to reimburse the town for 80 percent of the costs for the final

as "one (1) who is sixteen years of age or older but less than sixty-five years of age; (2) who has no documented physical or mental impairment or who has such an impairment which is expected to last less than six months, as determined by the commissioner, prohibiting him from working or participating in an education, training or other work-readiness program; (3) who is required to register with the labor department, pursuant to section 17-273b; and (4) who is not in full-time attendance in high school."

Although persons who have dependent children under eighteen years of age may be classified as "employable," such persons are not subject to the nine month limit. General Statutes (Rev. to 1993) § 17-273b, now § 17b-118.

[13] The statute also provides that employable persons may not receive the first nine months of benefits unless they register with the state job service, document job searches and, in many cases, perform "workfare" at local job sites to work off their grants. General Statutes (Rev. to 1993) § 17-273b, now § 17b-118. Recipients who fail to comply with these requirements may have their general assistance benefits terminated. General Statutes (Rev. to 1993) § 17-281a, now § 17b-689. The plaintiffs do not challenge any of these other requirements.

In contrast, "unemployable persons," as defined in General Statutes (Rev. to 1993) § 17-281a (c), are not subject to either the nine month durational rule or the workfare requirements. See General Statutes (Rev. to 1993) § 17-273b ("[t]he provisions of this section shall not apply to any person who cannot register with such employment agency because of being over sixty-five years of age, health or other disability as determined by the commissioner").

[14] As of April, 1994, sixty-eight of the 169 towns in the state had elected not to extend benefits beyond the nine month period required by statute.

three months of the year.[15] General Statutes (Rev. to 1993) § 17-273b.

During the three months that terminated recipients are denied cash assistance, they nonetheless remain eligible to receive medical assistance[16] and food stamp benefits.[17] They also may participate in educational programs, job training, job readiness programs and substance abuse treatment programs.[18] Terminated recipients are, however, ineligible to receive special needs grants to pay security deposits; General Statutes (Rev. to 1993) § 17-599, now § 17b-802; and are ineligible for emergency services such as food or housing in state funded emergency shelters. General Statutes (Rev. to 1993) § 17-273d, now § 17b-120. Upon expiration of the three month ineligibility period, recipients may reapply and receive another nine months of all the general assistance benefits, including cash assistance.

[15] Under General Statutes (Rev. to 1993) § 17-273b, the extension is available only to recipients who have complied with program requirements for the full nine month period.

[16] Spec. Sess. P.A. 92-16, § 8. Medicaid is federally funded but administered by the state. See 42 U.S.C. § 1396 et seq.; General Statutes (Rev. to 1993) § 17-134a et seq., now § 17b-260 et seq. (providing for supplemental medical assistance).

[17] Food stamps are available to all households and individuals of limited means who need to supplement their income in order to purchase adequate food. 7 U.S.C. § 2012. The federal government pays the entire cost of the food stamp program. 7 U.S.C. § 2019. The program is implemented by the states; see General Statutes (Rev. to 1993) § 17-12a and General Statutes § 17b-2 (10); which share the administrative costs equally with the federal government. 7 U.S.C. § 2025. There are no categorical eligibility requirements.

[18] Terminated recipients also may participate in certain other social welfare programs, which are funded through grants independent of the general assistance program, including programs for sheltering victims of domestic violence; General Statutes (Rev. to 1993) § 17-580, now § 17b-850; housing for the homeless; General Statutes (Rev. to 1993) § 17-590, now § 17b-800; nutritional assistance for soup kitchens, food pantries and emergency shelters; General Statutes (Rev. to 1993) § 17-599, now § 17b-802; and energy assistance. General Statutes (Rev. to 1993) § 17-591, now § 17b-801; see also 42 U.S.C. § 606 (e) (1).

From July, 1992,[19] until March, 1994, Bridgeport had elected to continue to provide year-round benefits for all eligible general assistance recipients. In January, 1994, however, Bridgeport notified the state department of social services that, as of April 1, 1994, it would discontinue extending benefits beyond the statutorily mandated nine month period. Termination notices were mailed in March, 1994.

The plaintiffs initiated this action seeking declaratory and injunctive relief against Bridgeport to prevent it from terminating the plaintiffs' general assistance benefits. The plaintiffs do not dispute that the state can condition the receipt of benefits upon the fulfillment of specified criteria and can impose reasonable requirements such as requiring recipients to perform workfare, to document their search for work, to register with the department of labor and to accept any job that is offered to them. Indeed, the plaintiffs argue that the state could provide assistance in any form that it chooses, whether that be through shelters and soup kitchens or through monthly assistance checks, as it currently has chosen. The fundamental premise of the plaintiffs' claims is that the state has a constitutional obligation to supply them with subsistence level resources irrespective of the availability of food and shelter from family, friends, charitable organizations, religious institutions and other community sources.

On March 31, 1994, the trial court granted an ex parte temporary restraining order enjoining Bridgeport from terminating general assistance benefits to the plaintiffs pending a hearing, and ordering Bridgeport to show cause as to why a class wide injunction

[19] The relevant portions of Spec. Sess. P.A. 92-16 took effect on July 1, 1992. If a town chose not to provide year-round benefits, the first date on which recipients' general assistance benefits would have been discontinued pursuant to General Statutes (Rev. to 1993) § 17-273b was April 1, 1993, nine months from July 1, 1992.

should not be granted. On April 14, 1994, the state and its department of social services intervened as defendants.

The hearing on the plaintiffs' request for a temporary injunction was held over two days, on April 14 and 15, 1994. At the hearing, the plaintiffs offered the following evidence. First, several terminated general assistance recipients testified that without general assistance, their sole source of income, they were uncertain about how their basic needs would be met during the three month ineligibility period. In particular, these terminated recipients testified that without this support, they would not be able to afford housing. Indeed, three of the five witnesses testified that since their general assistance benefits had been terminated, they had left their former living quarters and had been residing in local shelters.[20] The witnesses also testified, however, that, despite the termination of their general assistance benefits, they continued to receive food stamps and medical benefits, and could continue to participate in

---

[20] Ruben Sanchez testified that because his general assistance benefits had been terminated, he could not afford to rent an apartment and had "slept in a vacant house" for two nights before moving to a shelter. Michael Kennedy testified that as a result of being terminated he left the room he was renting at a friend's house because he could no longer afford to pay the rent, and had moved into the Prospect House shelter. Similarly, William Simpson, a plaintiff in this action, testified that although his general assistance benefits had been reinstated, he could no longer afford to pay rent and had been living in the Prospect House shelter. He stated that he anticipated that he could stay there for the entire three month period of ineligibility.

The other two witnesses, Christine Majkowski and John Geotsa, expressed concern about their future ability to make rent payments. Majkowski testified that she had taken in a roommate to help reduce her housing costs and that for the time being, her landlord had agreed to allow her to stay in her apartment and to make up the rental differential by cleaning the house and office. Geotsa testified that he had to borrow money from friends in order to stay in his apartment, and that he did not know how he could continue with his retraining program without general assistance.

job placement and job retraining programs. No testimony was offered regarding nongovernmental sources of economic aid or benefits in kind, such as churches, synagogues, private shelters and soup kitchens, friends or family.

Next, there was testimony from the coordinators of a number of area shelters[21] who stated that the beds in the homeless shelters were full to capacity[22] and that they had had to turn people away.[23] Although the coordinators "anticipate[d] turning away more than last year because of people not having income for three months," whether the implementation of the nine month rule was the cause of the increase in the number of people seeking shelter was not established.

There was also testimony as to the legislative intent underlying the enactment of Spec. Sess. P.A. 92-16. Witnesses stated that the bill was, in part, the result of the work of an interagency task force established in 1991 by Governor Lowell P. Weicker, Jr., to make recommendations for improvement of the welfare system. In particular, those witnesses stated that the nine month rule was intended to reinforce the principle that general assistance was, as a matter of policy, intended as a temporary program for employable persons and

---

[21] Specifically, the witnesses included Susan Frazier, the coordinator for Friendship Service Center in New Britain, Maria Lutz, the coordinator at Prospect House in Bridgeport, and Pam Hyman, the executive director of Operation Hope in Fairfield.

[22] Furthermore, the plaintiffs pointed out that, as a result of Spec. Sess. P.A. 92-16, employable persons who have received nine months of benefits in the previous twelve month period are statutorily ineligible for beds in state funded homeless shelters. See General Statutes (Rev. to 1993) § 17-273d, now § 17b-120.

[23] Lutz testified that since April 1, 1994, Prospect House had fifteen new people enter the shelter, and that she had to refer three other people to other shelters. Hyman testified that the Operation Hope shelter in Fairfield turned away nine people in March, 1994, and twenty-two people in the first thirteen days of April, 1994. Hyman did not know how many of the people who had been turned away were Bridgeport residents.

had been instituted in order to provide an incentive for people to find employment. See footnote 67. The nine month limit was chosen because it mirrored the average time span for which recipients received general assistance benefits.[24]

Finally, the plaintiffs called as a witness Christopher Collier, a historian and author of numerous articles on the constitutional and legal history of Connecticut, who testified that Connecticut has had a long tradition of supporting its poor. In addition, Collier gave his opinion, based on the philosophical and historical underpinnings of the Connecticut constitution, that the framers of the 1818 constitution intended to incorporate in that document the governmental obligation to provide its citizens with subsistence in times of need.

At the conclusion of the hearing, the court denied the plaintiffs' application for a temporary injunction and vacated the earlier temporary restraining order. In its memorandum of decision, the trial court concluded that the plaintiffs had failed to show a reasonable likelihood of success for their claim of an affirmative state constitutional obligation to provide subsistence benefits.[25] The trial court did not issue any findings of fact, nor did the plaintiffs seek such an articulation.

We are hampered in our consideration of the plaintiffs' constitutional claims in this case because they did

---

[24] The legislature rejected a proposal by the department of social services and the governor that would have imposed a six month durational limit.

[25] In general, a court may, in its discretion, exercise its equitable power to order a temporary injunction pending final determination of the order, upon a proper showing by the movant that if the injunction is not granted he or she will suffer irreparable harm for which there is no adequate remedy at law. *Tomasso Bros., Inc.* v. *October Twenty-Four, Inc.*, 230 Conn. 641, 648, 646 A.2d 133 (1994); *Walton* v. *New Hartford*, 223 Conn. 155, 165, 612 A.2d 1153 (1992); *Berin* v. *Olson*, 183 Conn. 337, 340, 439 A.2d 357 (1981). "In exercising its discretion, the court, in a proper case, may consider and balance the injury complained of with that which will result from interference by injunction." *Moore* v. *Serafin*, 163 Conn. 1, 6, 301 A.2d 238 (1972).

not seek a finding of facts from the trial court, and because they sought and secured an appeal pursuant to § 52-265a without such a factual finding. "A party mounting a constitutional challenge to the validity of a statute must provide an adequate factual record in order to meet its burden of demonstrating the statute's adverse impact on some protected interest of its own, in its own particular case, and not merely under some hypothetical set of facts as yet unproven. Whether a case comes to us by way of reservation or after a final judgment, the rule is the same. We do not give advisory opinions, nor do we sit as roving commissions assigned to pass judgment on the validity of legislative enactments. Determination of the scope and constitutionality of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function. *International Longshoremen's & Warehousemen's Union, Local 37* v. *Boyd*, 347 U.S. 222, 224, 74 S. Ct. 447, 98 L. Ed. 650 (1954)." (Internal quotation marks omitted.) *Motor Vehicle Manufacturers Assn. of the United States, Inc.* v. *O'Neill*, 203 Conn. 63, 75, 523 A.2d 486 (1987); see also *Lehrer* v. *Davis*, 214 Conn. 232, 234–35, 571 A.2d 691 (1990); *State* v. *Zach*, 198 Conn. 168, 176–78, 502 A.2d 896 (1985).

Nonetheless, in order to decide the constitutional questions presented to us pursuant to § 52-265a, we will treat those questions as if they were based on the facts as presented by the plaintiffs' evidence at the hearing for a temporary injunction, supplemented by any additional facts presented in the record that are undisputed. Interpreted most favorably to the plaintiffs, that record shows that the plaintiffs feared that, if general assistance benefits were suspended for the statutory three month period, they would not be able to survive.

In their appeal[26] pursuant to § 52-265a; see foot-
note 3; the plaintiffs claim that the state has an affirm-
ative obligation under the Connecticut constitution to
provide its citizens with a minimal level of subsistence.
According to the plaintiffs, the state constitution
imposes such an affirmative obligation: (1) by constitu-
tionally incorporating preexisting rights in article first,
§ 10;[27] or (2) by preserving unenumerated rights in the
preamble[28] and/or article first, § 1.[29] The plaintiffs con-
cede that, before the implementation of Spec. Sess.
P.A. 92-16, the state had been fulfilling this constitu-
tional obligation. They argue, however, that because
of the implementation of the amendments to § 17-273b,
the state has violated its constitutional duties.

The plaintiffs face a heavy burden in mounting such
a challenge. " 'It is . . . a well settled principle of judi-
cial construction, that before an act of the legislature
ought to be declared unconstitutional, its repugnance
to the provisions or necessary implications of the consti-
tution should be manifest and free from all reasonable

---

[26] After initial oral argument before this court, sitting en banc, we ordered
supplemental briefing and reargument to consider a series of supplemen-
tal questions posed by this court.

[27] Article first, § 10, contained in the Declaration of Rights of the Con-
necticut constitution, provides: "All courts shall be open, and every per-
son, for an injury done to him in his person, property or reputation, shall
have remedy by due course of law, and right and justice administered with-
out sale, denial or delay."

[28] The preamble states: "The People of Connecticut acknowledging with
gratitude, the good providence of God, in having permitted them to enjoy
a free government; do, in order more effectually to define, secure, and per-
petuate the liberties, rights and privileges which they have derived from
their ancestors; hereby, after a careful consideration and revision, ordain
and establish the following constitution and form of civil government."
  The language of the preamble of the 1818 constitution has remained intact
through the subsequent revisions of the constitution.

[29] Article first, § 1, of the Connecticut constitution provides: "All men,
when they form a social compact, are equal in rights; and no man or set
of men are entitled to exclusive public emoluments or privileges from the
community."

doubt. If its character in this regard be questionable, then comity, and a proper respect for a co-ordinate branch of the government, should determine the matter in favor of the action of the latter.' '' *State ex rel. Andrew* v. *Lewis,* 51 Conn. 113, 127–28 (1883), quoting *Hartford Bridge Co.* v. *Union Ferry Co.,* 29 Conn. 210, 227 (1860); see also *State* v. *Ross,* 230 Conn. 183, 236, 646 A.2d 1318 (1994); *State* v. *Breton,* 212 Conn. 258, 269, 562 A.2d 1060 (1989). Thus, "in light of the established presumption in favor of a statute's constitutionality, any person attacking the validity of a lawfully enacted statute bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt." *State* v. *Joyner,* 225 Conn. 450, 460, 625 A.2d 791 (1993); see also *State* v. *Floyd,* 217 Conn. 73, 79, 584 A.2d 1157 (1991); *State* v. *Breton,* supra, 269; *Zapata* v. *Burns,* 207 Conn. 496, 508, 542 A.2d 700 (1988); *State* v. *Dupree,* 196 Conn. 655, 663, 495 A.2d 691, cert. denied, 474 U.S. 951, 106 S. Ct. 318, 88 L. Ed. 2d 301 (1985).

We conclude that the plaintiffs have failed to satisfy their burden. Contrary to the plaintiffs' contention, we are persuaded that article first, § 10, incorporates no governmental obligation to provide minimum subsistence. We further are persuaded that neither the preamble nor article first, § 1, imposes on the government an affirmative constitutional obligation to provide minimal subsistence to the poor. We conclude, therefore, that the trial court properly denied the plaintiffs their requested relief.

I

The plaintiffs first claim that General Statutes (Rev. to 1993) § 17-273b is unconstitutional under article first, § 10, of the Connecticut constitution. They maintain that the statute deprives them of the common law right to bring an action to compel the state to provide aid

to needy persons, a right that they claim existed at the time of the enactment of the 1818 constitution and which therefore became constitutionally incorporated under article first, § 10. We are not persuaded, however, that a needy individual ever had a cause of action to obtain such relief in the courts of this state prior to the enactment of our state constitution in 1818. Accordingly, such a right is not protected by article first, § 10.

Article first, § 10, of the Connecticut constitution provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay." We have interpreted article first, § 10, as a provision protecting access to our state's courts, which does not itself create new substantive rights. *Sanzone* v. *Board of Police Commissioners*, 219 Conn. 179, 195, 592 A.2d 912 (1991); *Doe* v. *State*, 216 Conn. 85, 97–98, 579 A.2d 37 (1990); *Sharp* v. *Mitchell*, 209 Conn. 59, 64, 546 A.2d 846 (1988); *Zapata* v. *Burns*, supra, 207 Conn. 515. The "constitutional right to a remedy for all cognizable injuries does not delegate to the courts the legislative authority to create new rights under the law." *Doe* v. *State*, supra, 104.

We generally have held that article first, § 10, prohibits the legislature from abolishing or significantly limiting common law and certain statutory rights[30] that were redressable in court as of 1818, when the constitution was first adopted, and which were "incorporated in that provision by virtue of being established by law

---

[30] Not all statutory rights that existed before 1818 are automatically incorporated into article first, § 10. Rather, only "statutory *common law* rights" are so enshrined. (Emphasis added.) See *Kelley Property Development, Inc.* v. *Lebanon*, 226 Conn. 314, 331–33, 627 A.2d 909 (1993). Statutory common law rights are rights that were not created as a matter of legislative discretion by the pre-1818 statutes themselves, but rather were already part of the common law and were merely codified by or reflected in those statutes.

as rights the breach of which precipitates a recognized injury . . . ." *Gentile* v. *Altermatt,* 169 Conn. 267, 286, 363 A.2d 1 (1975), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976) (right to recover for injuries suffered in automobile accident rooted in common law action of trespass on the case);[31] *Daily* v. *New Britain Machine Co.,* 200 Conn. 562, 585, 512 A.2d 893 (1986) (right of action at common law to recover for injuries suffered as result of defective product). Common law rights that emerged *after* 1818 " 'may be changed at the will, or even at the whim, of the legislature, unless prevented by [other] constitutional limitations.' " *Gentile* v. *Altermatt,* supra, 283. Common law rights that emerged *before* 1818, however, may be abolished or modified only if the legislature "enacts a reasonable alternative to the enforcement of the right." *Kelley Property Development, Inc.* v. *Lebanon,* 226 Conn. 314, 331, 627 A.2d 909 (1993); *Gentile* v. *Altermatt,* supra, 286; see also *Sanzone* v. *Board of Police Commissioners,* supra, 219 Conn. 198–99 (highway defect statute is reasonable alternative to common law action in negligence). To prove that General Statutes (Rev. to 1993) § 17-273b is unconstitu-

---

[31] In *Gentile,* we recognized two distinct types of rights that are protected by article first, § 10, of the state constitution. The first type of right, which is procedural in nature, concerns "the right to redress for an actionable injury." *Gentile* v. *Altermatt,* supra, 169 Conn. 284. According to this component of the constitutional guarantee, the legislature is prohibited from barring access to a court for the vindication of a legally recognized injury. Because a right to redress is purely procedural, however, it does not prevent the legislature from defining away the underlying injury for which redress was being sought. Id. If article first, § 10, guaranteed nothing more than rights of redress, therefore, it would be reduced to a narrow lesson in legislative drafting because the legislature could always achieve its desired result by rewriting the law to abolish the underlying injury, rather than the right to redress. Accordingly, the protection afforded by article first, § 10, also contains a second substantive component that restricts the legislature's ability to define away certain substantive injuries. Id., 284–87. It is this substantive component of the article first, § 10 guarantee that is at issue in this case.

tional, therefore, the plaintiffs have the burden of establishing that, prior to 1818, individuals could have sued in court to enforce a governmental duty of support.

We have always emphasized that the plaintiffs bear the heavy burden of establishing that "redress [was] available for the type of injury at issue . . . prior to 1818." *Sanzone* v. *Board of Police Commissioners*, supra, 219 Conn. 196. Even though there may be few historical sources upon which the plaintiffs may draw to establish a pre-1818 right,[32] we have firmly held that we will not recognize a constitutionally incorporated right absent a "clear indication" in our history that such a right existed at common law. *Kelley Property Development, Inc.* v. *Lebanon*, supra, 226 Conn. 333. Accordingly, on numerous occasions, we have refused to recognize alleged constitutionally incorporated rights without such convincing support. See *Doe* v. *State*, supra, 216 Conn. 104 (indigent plaintiffs have no pre-1818 right to attorney's fees in civil suits alleging violation of state constitutional right); *Stein* v. *Katz*, 213 Conn. 282, 288–89, 567 A.2d 1183 (1989) (no pre-1818 common law right to recover for wrongful death against defendant's administrator or executor); *Sharp* v. *Mitchell*, supra, 209 Conn. 70 (wrongful death action not "constitutionally incorporated right at the time of the constitution of 1818"); *Dubay* v. *Irish*, 207 Conn. 518, 530, 542 A.2d 711 (1988) (no constitutionally guaranteed right for minor to sue parent; "the plaintiff has failed in his burden to prove that a child had either a statutory or a common law right of action in tort against a parent prior to 1818 when the Connecticut constitution was adopted"); *Zapata* v. *Burns*,

---

[32] Judges in Connecticut were required by statute to give written reasons for their decisions beginning in 1784. L. Lewis, "The Development of a Common Law System in Connecticut," 27 Conn. B.J. 419, 424–25 (1953). Ephraim Kirby's first volume of reports, covering 1785 through May, 1788, was published in 1789.

supra, 207 Conn. 516–17 (no pre-1818 common law negligence action in absence of privity of contract); *Ecker* v. *West Hartford*, 205 Conn. 219, 227, 530 A.2d 1056 (1987) (no constitutional impediment to shortening of statute of limitations for wrongful death because no such civil action was recognized at common law prior to 1818).

In support of their contention that prior to 1818 an indigent person had the right to bring an action in court for redress against the government for failure to render him aid and, therefore, that such a right must exist today, the plaintiffs rely upon pre-1818 statutory and case law, and evidence of two petitions presented to the General Assembly. This authority will not bear the weight that the plaintiffs place on it.

First, although it is evident that Connecticut has a long and laudable history of statutory provisions to aid the poor, the statutes relied upon by the plaintiffs do not clearly support an obligation of the government to provide subsistence benefits to indigent persons that was judicially enforceable against the government by an indigent individual.

The plaintiffs rely heavily on an 1808 statute, entitled "An Act for Maintaining and Supporting the Poor," which was in effect at the time of the drafting and enactment of the 1818 constitution, that provided: "[E]ach town in this state *shall* take care of, support and maintain their own poor." (Emphasis added.) General Statutes (1808 Rev.) tit. CXXX, § 1. This statute, however, did not explicitly authorize a private cause of action for its enforcement. Indeed, when the statute was amended in 1821, the General Assembly specifically provided a remedy that allowed a town to impose a fine on a town selectman for failure to perform his duties. General Statutes (1821 Rev.) tit. 73, c. I, § 5;[33] see also

---

[33] General Statutes (1821 Rev.) title 73, chapter I, entitled "An Act to provide for the support of Paupers," provided in relevant part: "Sect. 5.

*Trumbull* v. *Moss,* 28 Conn. 253, 256 (1859) (town of Stonington brought private cause of action against selectman for failing properly to spend or to account for funds on behalf of town's paupers).

This history demonstrates that the towns had certain statutory duties to provide for the poor who resided therein. The mere existence of a statutory obligation on the part of the town to provide benefits to its indigent individuals does not necessarily mean, however, that there was an equivalent redressable common law right on the part of the indigent individuals. *Kelley Property Development, Inc.* v. *Lebanon,* supra, 226 Conn. 332–33.[34] As a general proposition, unless there is a specific showing to the contrary, it is appropriate to assume that a pre-1818 exercise of legislative authority simply vests similar authority in the General Assembly after 1818. See *State* v. *Lamme,* 216 Conn. 172, 180–81, 579 A.2d 484 (1990).

It shall be the duty of the select-men of every town, whenever a person, not an inhabitant of such town, residing therein, shall become poor and unable to support him or herself, to furnish such pauper, such support as may be necessary, as soon as the condition of such pauper shall come to their knowledge; and each select-man neglecting such duty, shall forfeit the sum of seven dollars, to him who shall prosecute for the same to effect. . . .''

[34] In *Kelley Property Development, Inc.* v. *Lebanon,* supra, 226 Conn. 314, the plaintiff, a real estate developer, sought damages from the town of Lebanon alleging that the town's planning and zoning commission had wrongfully denied its subdivision application. The plaintiff argued, on the basis of two cases from the 1790s, in which damages had been awarded when town selectmen had failed to perform their duties, that a common law cause of action for damages had been incorporated as a constitutional right into the 1818 constitution through article first, § 10. Upon analyzing the cases, we concluded that "[n]either case states whether the basis for the award of damages was a statutory violation or a fundamental common law principle that we would now characterize as having constitutional significance." Id., 332. We further explained that "[i]n the absence of a clear indication . . . that the damages awards in those cases [prior to 1818] redressed rights akin to fundamental constitutional rights, we decline to read these cases as establishing a common law precedent for the existence of a constitutional claim . . . ." Id., 333.

Pre-1818 case law also fails clearly to establish an indigent person's right to judicial redress for denial of government assistance. For support of their proposition that there existed, in 1818, such a common law cause of action, the plaintiffs rely upon *Backus* v. *Dudley*, 3 Conn. 568 (1821), *Salisbury* v. *Harwinton*, 2 Root (Conn.) 435 (1796), and *Somers* v. *Barkhamstead*, 1 Root (Conn.) 398 (1792).[35] All of these cases, however, involved suits by a plaintiff town to recover expenses incurred while supporting a pauper who was a resident of the defendant town. These cases do not establish any right for an indigent person to compel a town or the state to provide particular benefits. Rather, they are concerned only with allocating the cost of payments between competing towns for services actually rendered by a town to the pauper. Rather than establishing an individual right to judicial redress, the cases more plausibly should be read as precursors of the modern statutes that provide for the reimbursement by the state of 80 percent of a town's expense; General Statutes (Rev. to 1993) § 17-292, as amended by Public Acts 1993, No. 93-418, § 11; or of regulations that determine in which town a particular general assistance recipient resides. See General Statutes (Rev. to 1993) §§ 17-273 (b) and 17-292 (c); State Dept. of Income Maintenance, General Assistance Policy Manual (1993 Ed.) c. I, § V, entitled "Residence." Thus, we are unpersuaded that an indigent person could have instituted such an action, before 1818, under the then existing statutory provisions to compel the government to provide subsistence benefits.

---

[35] The plaintiffs also rely on a number of post-1818 cases. *Lyme* v. *East Haddam*, 14 Conn. 394 (1841); *Wallingford* v. *Southington*, 16 Conn 431 (1844); *New Milford* v. *Sherman*, 21 Conn. 101 (1851); *Trumbull* v. *Moss*, supra, 28 Conn. 253; *Fish* v. *Perkins*, 52 Conn. 200 (1884); *Hein* v. *Hein*, 127 Conn. 503, 18 A.2d 374 (1941). Because these cases were instituted after the enactment of the 1818 constitution, and because, in 1821, the statute regarding paupers was significantly revised; General Statutes (1821 Rev.) tit. 73; these cases are inapplicable to our analysis.

Finally, the petitions to the General Assembly of two paupers, Mary Bate[36] and John Pratt,[37] fail to support the plaintiffs' claim. The plaintiffs maintain that, because at the time these petitions were presented there was no constitutional separation of powers, and because the legislature, therefore, had judicial as well as legislative powers, these petitions should be viewed as the functional equivalent of cases brought to court. We disagree.

Although it is true that, prior to the 1818 constitution, the legislature exercised certain judicial powers, as well as its legislative power, it is also true that in the early 1700s when these petitions were brought to the legislature there was also a Superior Court, which had full judicial powers. W. Horton, "Connecticut Constitutional History—1776–1988," 64 Conn. B.J. 355, 359–65 (1990). There is no basis, therefore, to consider these petitions as manifesting requests for judicial rather than legislative relief. In addition, legislative petitions, by definition, are appeals to legislative grace, rather than claims of right based upon an existing controversy. Reading these petitions as requests for legislative, rather than judicial, relief is supported by the

---

[36] "Upon the petition of Mary Bate, complaining that John Bate, sen., of West Haddam, with others, did in a riotous manner, on the first day of May instant, pull down the house where she dwelt, and take away from her almost all the goods that were in the house, leaving her destitute . . . [u]pon consideration whereof, it is Resolved by this Assembly, that the county court in the county of Hartford do, as soon as may be, enquire into the wrong complained of, and do justice thereon; and that in the mean time the town of Haddam take care of the petitioner, Mary Bate, according to the direction of the law concerning the poor of the town." 6 C. Hoadly, The Public Records of the Colony of Connecticut from May, 1717, to October, 1725 (1872) pp. 10–11.

[37] "Upon consideration of the petition of John Pratt of Seybrook: This Assembly grants to the petitioner the sum of thirteen pounds, to be paid out of the publick treasury, towards answering his charges for his subsistence last summer and cure of his lameness." 5 C. Hoadly, The Public Records of the Colony of Connecticut from October, 1706, to October, 1716 (1870) p. 576.

context of the other petitions presented to and considered by the legislature concurrently with those of Bate and Pratt.[38] Therefore, we are unpersuaded by the plaintiffs' argument that these petitions support a judicially cognizable right to redress. On their face, these petitions simply reflect appeals to the benevolence of the legislature.

We conclude that the plaintiffs have failed in their burden to establish that an indigent person had a common law cause of action to compel the state, prior to 1818, to provide a level of minimal subsistence. Contrary to the interpretation suggested by the plaintiffs, we read the historical record as demonstrating that any governmental obligation to provide subsistence benefits prior to 1818 was a matter left to the discretion of the legislature, and was not judicially cognizable at the instance of its individual beneficiaries. Consequently, we conclude that General Statutes (Rev. to 1993) § 17-273b does not violate article first, § 10, of the state constitution.

II

The plaintiffs' second contention is that General Statutes (Rev. to 1993) § 17-273b abrogates an unenumerated constitutional obligation of the state to provide subsistence benefits to all its citizens in need. The plaintiffs argue that such an obligation is implied by the framers' intent "more effectually to define, secure, and perpetuate the liberties, rights and privileges which they have derived from their ancestors" as stated in the constitution's preamble; see footnote 28; and by their reference to the "social compact" in article first, § 1, of the Connecticut constitution. See footnote 29.

---

[38] For example, the legislature granted permission to Thomas Ranny "to sell a parcel of unimproved land" in order to support his widowed mother, and granted the petition of Hannah Bate to pay a debt owed by her deceased husband to her brother. 6 C. Hoadly, The Public Records of the Colony of Connecticut from May, 1717, to October, 1725 (1872) p. 11.

We conclude that the state has no affirmative constitutional obligation to provide minimal subsistence to its poor citizens. Thus, the plaintiffs have failed to prove that, in implementing § 17-273b, the state has violated an unenumerated constitutional obligation.

It is undeniable that "[i]n the area of fundamental civil liberties—which includes all protections of the declaration of rights contained in article first of the Connecticut constitution—we sit as a court of last resort, subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter. In such constitutional adjudication, our first referent is Connecticut law and the full panoply of rights Connecticut residents have come to expect as their due." *Horton* v. *Meskill*, 172 Conn. 615, 641–42, 376 A.2d 359 (1977); see *State* v. *Miller*, 227 Conn. 363, 379–80, 630 A.2d 1315 (1993); *State* v. *Barton*, 219 Conn. 529, 545, 594 A.2d 917 (1991); *State* v. *Lamme*, supra, 216 Conn. 184. In construing the contours of our state constitution, we must "exercise our authority with great restraint" in pursuit of reaching reasoned and principled results. *State* v. *Ross*, supra, 230 Conn. 249. We must be convinced, therefore, on the basis of a complete review of the evidence, that the recognition of a constitutional right or duty is warranted. To guide our inquiry, we have articulated six tools of analysis that should be considered to the extent applicable. *State* v. *Miller*, supra, 380–81; *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992). These factors are: (1) the text of the constitutional provisions at issue; (2) holdings and dicta of this court, and the Appellate Court; (3) federal precedent; (4) sister state decisions; (5) the historical approach; and (6) contemporary economic and sociological, or public policy, considerations. *State* v. *Miller*, supra, 380–81; *State* v. *Diaz*, 226 Conn. 514, 540, 628 A.2d 567 (1993); *State* v. *Geisler*, supra,

685. As the plaintiffs concede, there is no support for their claim to an unenumerated state constitutional duty to provide minimal subsistence benefits in the precedents of this court, or in the precedents of the federal courts and the courts of sister states. The plaintiffs argue, therefore, that the text of the state constitution, its history and contemporary economic and sociological considerations create a constitutional obligation to provide minimal subsistence. We are unpersuaded.

## A

We begin by discussing the precedents of this court, of the courts of our sister states and of the federal courts. As the plaintiffs concede, this court never has held that the state constitution compels the state to provide economic entitlements. Indeed, this court has not even recognized a state obligation to remove obstacles inhibiting the exercise of fundamental rights unless those barriers were constructed by the government. For example, in *Doe* v. *State*, supra, 216 Conn. 104, we concluded that, under article first, § 10, of the state constitution, the state had no responsibility for the payment of attorney's fees for indigent persons in order to ensure them access to the civil court system. We stated that, although the state may not place "obstacles in the path of the plaintiffs' quest to gain access to our courts, the state has no affirmative obligation to remove obstacles that it did not create." Id. Similarly, in *Savage* v. *Aronson*, 214 Conn. 256, 284, 571 A.2d 696 (1990), we rejected the plaintiffs' claim that a reduction in the provision of emergency housing to Aid to Families with Dependent Children (AFDC) recipients from 180 to 100 days per calendar year violated their constitutional right to family unity, pursuant to the third, ninth and fourteenth amendments to the federal constitution and article eighth, §§ 1 and 4, of our state constitution, and their fundamental right to public

school education, pursuant to article eighth, § 1, of our state constitution. We concluded that the hardships faced by the plaintiffs resulted "from the difficult financial circumstances they face, not from anything the state has done to deprive them of" these rights. Id., 287.

Our reluctance to recognize affirmative governmental obligations based on our state constitution is consistent with the holdings of the courts of sister states.[39] See *State* v. *Miller*, supra, 227 Conn. 380–81 (holdings of sister states provide guidance in analysis of claims to constitutional fundamental rights); *State* v. *Geisler*, supra, 222 Conn. 684–85 (same). Although only a few states have explicitly addressed the question, with one exception, other state courts unanimously have refused to recognize affirmative state constitutional rights to subsistence benefits, holding instead that any obligation to support the poor is entirely statutory. See, e.g., Delaware: *Tilden* v. *Hayward*, Docket No. 11297, 1990 LEXIS 140, *55 (Del. Ch. Sept. 10, 1990) ("nothing in our Constitution's language, its history, or in relevant decisions of the Delaware Supreme Court, supports the claim that the State is obligated to provide [the] plaintiffs and members of the plaintiffs' putative class with financial assistance to secure housing"); Illinois: *People ex rel. Heydenreich* v. *Lyons*, 374 Ill. 557, 562,

---

[39] Indeed, Connecticut is one of only twenty-two states that provide statewide general assistance benefits. K. Sack, "Trying to Cut Welfare the Ohio Way," N.Y. Times, April 3, 1995, pp. B1, B2. Many states limit eligibility for general assistance to specific categories, while others restrict the number of months a person may receive assistance. For example, Arizona, Delaware, Hawaii, Louisiana, Massachusetts, New Mexico, North Carolina, Ohio, Oregon, South Carolina, Tennessee, Washington, Wyoming and the District of Columbia have all severely curtailed aid to able-bodied persons without minor children. L. Backer, "Of Handouts and Worthless Promises: Understanding the Conceptual Limitations of American Systems of Poor Relief," 34 B.C. L. Rev. 997, 1044–46 (1993). Most of these states limit general assistance to the disabled and the elderly. Id. In fact, two states, Michigan and Illinois, recently have eliminated their general assistance programs altogether. K. Sack, supra, p. B2.

30 N.E.2d 46 (1940) ("There is . . . no constitutionally imposed obligation upon the State of Illinois or any local governmental unit to support poor persons. Nor is there a common law obligation upon any governmental unit to support the poor and destitute. In short, no legal obligation, in the absence of a statute creating the duty, rests upon either the State government or local units to relieve those in necessitous circumstances."); New Jersey: *L.T.* v. *Dept. of Human Services*, 264 N.J. Super. 334, 342, 624 A.2d 990 (App. Div. 1993) ("[w]e conclude that there is no right under New Jersey's Constitution to government-funded housing"), rev'd on other grounds, 134 N.J. 304, 633 A.2d 964 (1993); *Franklin* v. *Dept. of Human Services*, 225 N.J. Super. 504, 543 A.2d 56, 67 (App. Div.) ("Appellants' theory is that these provisions [of the New Jersey constitution] impose an affirmative obligation upon state government to provide certain necessities of life for indigent persons, including shelter. However, this theory is not supported by the history of these constitutional provisions, their language, or the prior decisions of the Supreme Court of New Jersey."), aff'd, 111 N.J. 1, 543 A.2d 1 (1988); see also West Virginia: *Hodge* v. *Ginsberg*, 172 W. Va. 17, 303 S.E.2d 245 (1983) (discussing whether state was required to provide emergency shelter but never reaching constitutional issue).

This is true even in states with explicit constitutional provisions regarding care for the poor. See, e.g., Kansas:[40] *Bullock* v. *Whiteman*, 254 Kan. 177, 865 P.2d 197, 202 (1993) ("Obviously Article 7, Section 4, does not require state support to anyone who simply claims to be needy. By its terms, the constitutional provision is limited to such provision of the poor as may be pre-

---

[40] The Kansas constitution mandates that counties of the state "provide, as may be prescribed by law, for those [aged, infirm and otherwise misfortunate] inhabitants who . . . may have claims upon the aid of society. . . ." Kan. Const., art. VII, § 4.

scribed by law." [Internal quotation marks omitted.]);[41] see also Alabama[42] (whether constitutional provision includes a right to minimal subsistence undecided); North Carolina[43] (same); Wyoming[44] (same). Indeed, when the Montana Supreme Court subjected statutes limiting the provision of general assistance benefits to heightened scrutiny; *Butte Community Union* v. *Lewis*, 229 Mont. 212, 745 P.2d 1128, 1133 (1987); see also *Butte Community Union* v. *Lewis*, 219 Mont. 426, 712 P.2d 1309 (1986); the constitution was amended to provide the legislature with greater discretion in providing such benefits. Mont. Const., art. XII, § 3 (3), as amended by Constitutional Amend. No. 18 (1988).[45]

---

[41] General assistance in Kansas is available only to: families who do not meet the requirements of AFDC; pregnant women; disabled adults "medically determined to be physically incapacitated" for beyond 30 days; elderly persons; persons in residential drug treatment programs; and persons recently released from state mental hospitals. *Bullock* v. *Whiteman*, supra, 865 P.2d 200; see also Kan. Stat. Ann. § 39-709 (d) (1994). Thus, even if there is a constitutional right to governmental assistance under article 7, § 4, this right would only extend to the aged and infirm, not to employable adults such as the plaintiffs in the present case.

[42] Article IV, § 88, of the Alabama constitution, entitled "Counties to provide for maintenance of the poor," provides: "It shall be the duty of the legislature to require the several counties of this state to make adequate provision for the maintenance of the poor."

[43] Article XI, § 4, of the North Carolina constitution, entitled "Welfare policy; board of public welfare," provides: "Beneficent provision for the poor, the misfortunate, and the orphan is one of the first duties of a civilized and a Christian state. Therefore the General Assembly shall provide for and define the duties of a board of welfare."

[44] Article 7, § 20, of the Wyoming constitution provides: "Duty of legislature to protect and promote health and morality of people.—As the health and morality of the people are essential to their well-being, and to the peace and permanence of the state, it shall be the duty of the legislature to protect and promote these vital interests by such measures for the encouragement of temperance and virtue, and such restrictions upon vice and immorality of every sort, as are deemed necessary to the public welfare."

[45] Article XII, § 3 (3), of the Montana constitution, as amended by Constitutional Amendment No. 18, approved at the general election held on November 8, 1988, and effective January 1, 1989, provides: "The legislature may provide such economic assistance and social and rehabilitative services

New York is the only state that we have discovered that recognizes an affirmative governmental obligation to provide subsistence benefits to its citizens. The New York constitution, however, explicitly provides: "The aid, care and support of the needy are public concerns and shall be provided by the state and by such of its subdivisions, and in such manner and by such means, as the legislature may from time to time determine." N.Y. Const., art. XVII, § 1. This provision, which was added in 1938 in the aftermath of the great depression, was enacted, according to comments made by the drafters on the constitutional convention floor, specifically to create a legally enforceable right requiring the state to provide minimal subsistence benefits. See *Tucker* v. *Toia*, 43 N.Y.2d 1, 8, 371 N.E.2d 449, 400 N.Y.S.2d 728 (1977). Despite a number of cases that have interpreted article XVII, § 1, as embodying a fundamental right to minimal subsistence under the New York state constitution; see, e.g., id.; *McCain* v. *Koch*, 117 App. Div. 2d 198, 502 N.Y.S.2d 720 (1986); there is considerable debate within the New York courts about the enforceability and scope of the right and about what constitutes minimal assistance.[46]

---

for those who, by reason of age, infirmities, or misfortune are determined by the legislature to be in need."

The impetus for the amendment was the Montana Supreme Court's holding in *Butte Community Union* v. *Lewis*, supra, 745 P.2d 1128. Mont. Constitutional Amend. No. 18, preamble ("[w]hereas, the Montana Supreme Court, in a recent decision, determined that the Montana Constitution requires that statutes relating to such assistance and services are reviewable under a heightened scrutiny test"); see also *Harper* v. *Greely*, 234 Mont. 259, 763 P.2d 650 (1988).

[46] See *Bernstein* v. *Toia*, 43 N.Y.2d 437, 373 N.E.2d 238, 402 N.Y.S.2d 342 (1977) (questioning extent to which such right is judicially enforceable and applying rational basis review); *Morillo* v. *New York*, 151 Misc. 2d 837, 850, 574 N.Y.S.2d 459 (1991) (stating in dicta that "[n]either the United States Constitution nor the New York State Constitution requires that the 'government' provide public assistance payments, subsidized housing, homeless shelters, or any of the other myriad of 'benefits' currently being doled out even in the current climate of national recession and municipal desper-

In addition, the courts of many states have indicated in dicta that the right to public assistance is wholly statutory. See, e.g., Arizona: *Allen* v. *Graham*, 8 Ariz. App. 336, 339, 446 P.2d 240 (1968) ("The State has no common law or constitutional duty to support its poor. . . . Aid to needy persons is solely a matter of statutory enactment." [Citations omitted.]); Idaho: *Newland* v. *Child*, 73 Idaho 530, 538, 254 P.2d 1066 (1953) ("Even as to paupers and indigents, there is no constitutional or common-law duty resting upon the state to provide support. The recipient has no vested right to assistance payments. On the contrary, his right thereto is entirely a creature of statute."); Illinois: *Beck* v. *Buena Park Hotel Corp.*, 30 Ill. 2d 343, 346, 196 N.E.2d 686 (1964) ("Moreover there is no legal obligation upon the State to support its poor at all, and from this it necessarily follows that a large degree of discretion rests upon the State when it elects to furnish relief."); Iowa: *Collins* v. *State Board of Social Welfare*, 248 Iowa 369, 375, 81 N.W.2d 4 (1957) ("In approaching the question it should be stated that as to paupers and indigent persons there is no common-law or constitutional duty resting upon the State to provide support, the obligation being a moral rather than a mandatory one. Thus whatever right appellee may have is purely statutory . . . ."); Maine: *Orrington* v. *Bangor*, 142 Me. 54, 57, 46 A.2d 406 (1946) (" 'At common

ation"). As a result of this uncertainty, the New York courts have become intricately involved in defining the contours of this right. See, e.g., *Lovelace* v. *Gross*, 80 N.Y.2d 419, 605 N.E.2d 339, 590 N.Y.S.2d 852 (1992) (constitutional to include grandparent's income in assistance unit); *Bernstein* v. *Toia*, supra, 437 (constitutionality of flat grant system); *Hutchins* v. *Perales*, 122 App. Div. 2d 541, 505 N.Y.S.2d 285 (1986) (constitutional to suspend benefits to assistance unit upon receipt of excess lump sum income by one member); *Woods* v. *Fahey*, 84 App. Div. 2d 619, 444 N.Y.S.2d 252 (1981) (whether benefits can be suspended for failing to report to work assignment); *Barie* v. *Lavine*, 48 App. Div. 2d 36, 367 N.Y.S.2d 587 (1975), aff'd, 40 N.Y.2d 565, 357 N.E.2d 349, 388 N.Y.S.2d 878 (1976) (definition of need under constitution); *Jeffreys* v. *Jeffreys*, 38 App. Div. 2d 431, 330 N.Y.S.2d 550 (1972) (whether divorce costs must be covered by welfare).

law, public authorities were not liable for the support of paupers. The obligation of towns . . . in reference to their support originates solely in statutory enactment . . . .' "); Nebraska: *Elliott* v. *Ehrlich*, 203 Neb. 790, 796–98, 280 N.W.2d 637 (1979) ("Welfare benefits are not a fundamental right and neither the state nor the federal government is under any sort of constitutional obligation to guarantee minimum levels of support. . . . Welfare benefits are a matter of statutory entitlement for persons qualified to receive them."); *Mary Lanning Memorial Hospital* v. *Clay County*, 170 Neb. 61, 64, 101 N.W.2d 510 (1960) (" 'There is no common-law liability upon a county to support poor and indigent persons. Any liability must arise by a statute imposing the duty upon the county . . . .' "); Nevada: *County of Lander* v. *Board of Trustees*, 81 Nev. 354, 358, 403 P.2d 659 (1965) ("A county's obligation to support indigents, paupers, and poor people results only from a statutory provision imposing such a legal obligation."); New Hampshire: *New Hampshire Children's Aid Society* v. *Morgan*, 107 N.H. 246, 248, 221 A.2d 238 (1966) ("It is settled law in this jurisdiction that the obligation of a town or county to support the poor is wholly statutory."); *Merrimack County* v. *Derry*, 107 N.H. 212, 212–13, 219 A.2d 703 (1966) ("There is no obligation at common law upon the State or any of the instrumentalities of government to furnish relief to the poor. . . . The whole matter is purely statutory and 'where the statute imposes no liability, there is none.' " [Citations omitted.]); Ohio: *Dept. of Public Welfare* v. *Hogan*, 143 Ohio St. 186, 188–89, 54 N.E.2d 781 (1944) ("In reaching a decision in this case it is to be borne in mind that there is no constitutional or common-law duty on the part of the state or any governmental unit to support poor and destitute persons. The whole matter of relief for the needy is purely statutory."); Pennsylvania: *Kratzer* v. *Dept. of Public Welfare*, 85 Pa.

Commw. 318, 481 A.2d 1380, 1382 (1984); ("Despite petitioner's assertion to the contrary, there is no constitutional right to receive public assistance."); South Dakota: *Sioux Valley Hospital Assn.* v. *Bryan*, 399 N.W.2d 352, 355 (S.D. 1987) ("It is well settled that the County's duty to the poor flows not from the common law but from state statutes."); *State ex rel. Strutz* v. *Perkins County*, 69 S.D. 270, 273, 9 N.W.2d 500 (1943) ("The obligation to support poor persons results not from the common law, but from statutes providing for their care from public funds."); Vermont: *St. Johnsbury* v. *Granby*, 124 Vt. 367, 369, 205 A.2d 422 (1964) ("The furnishing of relief to poor persons in need of assistance by municipalities is governed by statute. There are no common-law liabilities and there are no equities between towns respecting the care and support of paupers. The whole matter is purely statutory and where the statute imposes no liability, there is none.").

Finally, our hesitation to articulate affirmative governmental obligations based on our state constitution also is consonant with federal precedent.[47] In the area of economic and social policy, the United States Supreme Court has held that the United States constitution neither requires the government to remove nongovernmentally imposed impediments to the exercise of fundamental rights by indigent persons; *Harris*

---

[47] It is well established that federal precedent can guide, but does not limit, the interpretation of our state constitution. *State* v. *Miller*, supra, 227 Conn. 380; *Daly* v. *DelPonte*, 225 Conn. 499, 513, 624 A.2d 876 (1993); *State* v. *Geisler*, supra, 222 Conn. 684–85; *State* v. *Marsala*, 216 Conn. 150, 159–60, 579 A.2d 58 (1990); *State* v. *Lamme*, supra, 216 Conn. 184. Federal constitutional and statutory law "establishes a minimum national standard for the exercise of individual rights and does not inhibit state governments from affording higher levels of protection for such rights. *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 57, 469 A.2d 1201 (1984); see also *Pruneyard Shopping Center* v. *Robins*, 447 U.S. 74, 80–81, 100 S. Ct. 2035, 64 L. Ed. 2d 741 (1980); *State* v. *Barton*, supra, 219 Conn. 546; *State* v. *Lamme*, supra, 184.

v. *McRae*, 448 U.S. 297, 316, 100 S. Ct. 2671, 65 L. Ed. 2d 784, reh. denied, 448 U.S. 917, 101 S. Ct. 39, 65 L. Ed. 2d 1180 (1980); nor compels the government to provide funding for indigent persons' basic necessities such as housing. *Lindsey* v. *Normet*, 405 U.S. 56, 74, 92 S. Ct. 862, 31 L. Ed. 2d 36 (1972). For example, in *Harris*, the court observed: "Although the liberty protected by the Due Process Clause affords protection against unwarranted government interference . . . it does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom. To hold otherwise would mark a drastic change in our understanding of the Constitution." *Harris* v. *McRae*, supra, 317–18 (state receiving federal medicaid funds is not obligated to pay for medically necessary abortions); see also *DeShaney* v. *Winnebago County Dept. of Social Services*, 489 U.S. 189, 196, 109 S. Ct. 998, 103 L. Ed. 2d 249 (1989) ("the Due Process Clauses generally confer no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual"); *Bowen* v. *Gilliard*, 483 U.S. 587, 598–99, 107 S. Ct. 3008, 97 L. Ed. 2d 485 (1987) (social welfare programs are voluntary and decision to alter level of benefits is left to discretion of legislature); *Youngberg* v. *Romeo*, 457 U.S. 307, 317, 102 S. Ct. 2452, 73 L. Ed. 2d 28 (1982) ("[a]s a general matter, a State is under no constitutional duty to provide substantive services for those within its border"); *Maher* v. *Roe*, 432 U.S. 464, 477–78, 97 S. Ct. 2376, 53 L. Ed. 2d 484 (1977) (state's choice to fund indigent's childbirth costs does not obligate it to fund elected abortions); *Lindsey* v. *Normet*, supra, 74 (no affirmative obligation under due process clause of fourteenth amendment to provide adequate housing); *Thomas* v. *Sullivan*, 922 F.2d 132 (2d Cir. 1990) (no fundamental right to receipt

of benefits from government); *Wideman* v. *Shollowford Community Hospital, Inc.*, 826 F.2d 1030 (11th Cir. 1987) (no duty based on either federal constitution or statutes requiring states or counties to provide medical care for medically indigent); *Jackson* v. *Joliet*, 715 F.2d 1200, 1203 (7th Cir. 1983), cert. denied, 465 U.S. 1049, 104 S. Ct. 1325, 79 L. Ed. 2d 720 (1984) (police do not have affirmative obligation to render aid under due process clause); *Fox* v. *Custis*, 712 F.2d 84 (4th Cir. 1983) (state has no constitutional duty to provide protection from parolee); *Bowers* v. *DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) (state has no affirmative duty to protect private citizen from actions of released mental patient where state played no active role in placing injured person in position of danger; "there is no constitutional right to be protected by the State against being murdered by criminals or madmen").

Rather, the United States Supreme Court uniformly has indicated that issues of public policy concerning government assistance programs are properly within the province of the legislative branch. *Harris* v. *McRae*, supra, 448 U.S. 318 ("[w]hether freedom of choice . . . warrants federal subsidization is a question for Congress to answer, not a matter of constitutional entitlement"); *Maher* v. *Roe*, supra, 432 U.S. 479 ("when an issue involves policy choices as sensitive as those implicated by public funding of nontherapeutic abortions, the appropriate forum for their resolution in a democracy is the legislature"); *Lindsey* v. *Normet*, supra, 405 U.S. 74 ("[a]bsent constitutional mandate, the assurance of adequate housing . . . [is a] legislative, not judicial, [function]").[48]

---

[48] There are, of course, federal constitutional limits on the state's ability to place conditions upon the receipt of general assistance. Laws regulating the receipt of benefits are subject to strict scrutiny if they condition the receipt of benefits upon suspect criteria or if they impermissibly burden the exercise of fundamental rights. See, e.g., *Memorial Hospital* v. *Maricopa County*, 415 U.S. 250, 94 S. Ct. 1076, 39 L. Ed. 2d 306 (1974)

B

We next examine the text of the Connecticut constitution. The plaintiffs concede that nothing in that text expressly obligates the government to provide subsistence benefits to the poor. Despite the lack of an express provision, the plaintiffs argue that the rights enumerated in the state constitution are not exhaustive. They contend that if a right or duty is deeply rooted in the traditions and "collective conscience" of the citizens of Connecticut, it should be recognized as fundamental and should be protected as an unenumer-

(durational residence requirement violates equal protection clause because it impinges on indigent's right to interstate travel); *Shapiro* v. *Thompson*, 394 U.S. 618, 89 S. Ct. 1322, 22 L. Ed. 2d 600 (1969) (same). In addition, when laws involving welfare benefits have been challenged as violative of equal protection, the United States Supreme Court has determined whether there is a rational basis for those laws. See *Schweiker* v. *Wilson*, 450 U.S. 221, 101 S. Ct. 1074, 67 L. Ed. 2d 186 (1981) (subjecting to rational basis review, and upholding, statute that denied social security benefits to otherwise eligible individuals because they were receiving institutional care); *Jefferson* v. *Hackney*, 406 U.S. 535, 92 S. Ct. 1724, 32 L. Ed. 2d 285, reh. denied, 409 U.S. 898, 93 S. Ct. 178, 34 L. Ed. 2d 156 (1972) (subjecting to rational basis review, and upholding, state regime that failed fully to fund state component of AFDC program); *Dandridge* v. *Williams*, 397 U.S. 471, 487, 90 S. Ct. 1153, 25 L. Ed. 2d 491, reh. denied, 398 U.S. 914, 90 S. Ct. 1684, 26 L. Ed. 2d 80 (1970) (subjecting to rational basis review state statute that set maximum AFDC grant level without regard to number of children in family; upholding statute after determining that "the Constitution does not empower this Court to second-guess state officials charged with the difficult responsibility of allocating limited public welfare funds among the myriad of potential recipients"). Finally, once individuals acquire a property interest in the continued receipt of benefits, the distribution or severance of benefits is subject to procedural due process limitations. See *Goldberg* v. *Kelly*, 397 U.S. 254, 90 S. Ct. 1011, 25 L. Ed. 2d 287 (1970) (welfare benefits may not be terminated without prior evidentiary hearing); *Shapiro* v. *Thompson*, supra, 618 (invalidating one year residency requirement for welfare benefits as violative of fundamental right to travel). Because the plaintiffs have not alleged that the general assistance program is conditioned on suspect criteria, impinges on the exercise of other fundamental rights, denies them equal protection of the laws, or deprives them of statutorily created property interests, however, these other lines of federal cases are inapposite to the plaintiffs' claim.

ated right under the state constitution. See generally note, "Unenumerated Rights Clauses in State Constitutions," 63 Tex. L. Rev. 1321 (1985). The plaintiffs maintain that the right to subsistence benefits is so fundamental that it was, in the words of one constitutional scholar discussing some commentators' views of the federal constitution, "deemed [by the framers] too obvious to require elaboration" in the text of the constitution. L. Tribe, American Constitutional Law (2d Ed. 1988) § 15-3, p. 310. Although we do not foreclose the possibility that unenumerated rights may inhere in our state constitution, we are unpersuaded that our constitution obligates the state to provide its citizens with economic subsistence benefits.

This court, unlike our federal counterpart,[49] has not, to date, recognized a fundamental right under our state constitution[50] that was not either explicitly enumerated or implied by virtue of the due process guarantee of

[49] The United States Supreme Court has recognized a number of implicit fundamental rights guaranteed by the federal constitution including the right to travel interstate; *Shapiro* v. *Thompson,* supra, 394 U.S. 629–31; the right to vote; *Harper* v. *Virginia Board of Elections,* 383 U.S. 663, 667, 86 S. Ct. 1079, 16 L. Ed. 2d 169 (1966); the right to marry; *Zablocki* v. *Redhail,* 434 U.S. 374, 98 S. Ct. 673, 54 L. Ed. 2d 618 (1978); the right to abortion; *Planned Parenthood of Southeastern Pennsylvania* v. *Casey,* 505 U.S. 833, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992); *Roe* v. *Wade,* 410 U.S. 113, 93 S. Ct. 705, 35 L. Ed. 2d 147 (1972), reh. denied, 410 U.S. 959, 93 S. Ct. 1409, 35 L. Ed. 2d 694 (1973); the right to marital privacy; *Griswold* v. *Connecticut,* 381 U.S. 479, 85 S. Ct. 1678, 14 L. Ed. 2d 510 (1965); the freedom of association; *National Assn. for the Advancement of Colored People* v. *Alabama,* 357 U.S. 449, 78 S. Ct. 1163, 2 L. Ed. 2d 1488 (1958); and the right to procreate. *Skinner* v. *Oklahoma,* 316 U.S. 535, 62 S. Ct. 1110, 86 L. Ed. 1655 (1942).

[50] This court has, however, recognized a number of textually based rights to be fundamental under our state constitution. *State* v. *Ayala,* 222 Conn. 331, 347, 610 A.2d 1162 (1992) (fundamental right to bail); *State* v. *Mooney,* 218 Conn. 85, 117, 588 A.2d 145, cert. denied, 502 U.S. 919, 112 S. Ct. 330, 116 L. Ed. 2d 270 (1991) (fundamental right to speedy trial under article first, § 8); *State* v. *Lamme,* supra, 216 Conn. 177 (fundamental right to fair trial under article first, §§ 8 and 9); *Horton* v. *Meskill,* supra, 172 Conn. 648-49 (fundamental right to education under article eighth, § 1).

article first, § 9. See *State* v. *Ross*, supra, 230 Conn. 246 (cruel and unusual punishment prohibited by due process clause); *Kohlfuss* v. *Warden*, 149 Conn. 692, 695, 183 A.2d 626, cert. denied, 371 U.S. 928, 83 S. Ct. 298, 9 L. Ed. 2d 235 (1962) (common law rule against double jeopardy "necessary to the due process guaranteed by article first, § 9, of our constitution"). As noted above, the plaintiffs concede that the right for which they advocate is not explicitly enumerated elsewhere in the constitution. The plaintiffs also do not make a claim under the due process clauses.

In the past, we have rejected challenges to welfare legislation under various clauses of the state constitution, concluding that in this state, any duty to support the poor is wholly statutory rather than constitutionally compelled. For example, in *Savage* v. *Aronson*, supra, 214 Conn. 284, we held that one's difficult financial circumstance does not, in and of itself, create an entitlement to a benefit, nor does the fact that the benefit has been made available for a length of time create an unqualified right to continue to receive such benefits. We stated that " '[t]he prospective right to support . . . [is] clearly subject to modification by law, be it through judicial decree, state legislation, or congressional enactment.' " Id., 285; see also *Middlesex Memorial Hospital* v. *North Haven*, 206 Conn. 1, 5, 535 A.2d 1303 (1988) ("A town is under no common-law obligation for the support of paupers. Its sole liability in this respect is imposed by statute, and it is not liable for a pauper's support any farther than statute makes it so. . . ." [Citation omitted; internal quotation marks omitted.]); *William W. Backus Hospital, Inc.* v. *Norwich*, 146 Conn. 686, 689, 155 A.2d 916 (1959) (city's liability to make payments on behalf of indigents was purely statutory); *State* v. *Bristol*, 139 Conn. 469, 471, 95 A.2d 78 (1953) (holding town liable, at statutory rate, to state hospital for caring for

mentally ill pauper whose legal settlement was that town); *Beacon Falls* v. *Seymour*, 44 Conn. 210, 214 (1876) ("Towns are under no common law obligation for the support of paupers. All their liability in this respect is imposed by statute. They are not liable, therefore, for the support of paupers any farther than the statute makes them so.").

We are especially hesitant to read into the constitution unenumerated affirmative governmental obligations. In general, the declaration of rights in our state constitution was implemented not to impose affirmative obligations on the government, but rather to secure individual liberties against direct infringement through state action. "It is evident that the concern which [led] to the adoption of our Connecticut Declaration of Rights, as well as the bill of rights in our federal constitution, was the protection of individual liberties against infringement by government." *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 61, 469 A.2d 1201 (1984); see also *State* v. *Griswold*, 67 Conn. 290, 310, 34 A. 1046 (1896) (guarantees of declaration of rights "were designed to protect the citizen against the State"). Evidence of this concern can be found in article first, § 3 (religious liberty), §§ 4 and 5 (free speech and press), § 7 (search and seizure), § 8 (rights of accused), § 9 (freedom from unwarranted arrest), § 11 (taking of private property), § 12 (writ of habeas corpus), § 13 (attainder), § 14 (right to assemble and petition), and § 15 (right to bear arms).

The text of our constitution makes evident the fact that its drafters have been explicit when choosing to impose affirmative obligations on the state. See, e.g., Conn. Const., art. VIII, § 1. ("[t]here shall always be free public elementary and secondary schools in the state"). Indeed, the history of article eighth, § 1, is particularly instructive in the present case. This explicit textual provision, and its counterparts, article eighth,

§ 2 (system of higher education), and § 4 (school fund), are the only constitutional provisions, recognized to date, that impose affirmative obligations on the part of the state to expend public funds to afford benefits to its citizenry. Other provisions, such as those in article first, protect individuals from state intrusion. Our statutes concerning public education, like those providing for the poor, date back to 1650 and the Ludlow Code. See part II C of this opinion. Nonetheless, although the school fund was perpetuated by the provisions of article eighth, § 2, of the 1818 constitution, it was not until the 1965 constitutional convention that the specific mandates of article eighth, § 1, for free public elementary and secondary education, and of article eighth, § 2, for a system of higher education, were incorporated into our constitution. According to its proponents at the convention, the purpose of article eighth, § 1, was to give "our system of free public education . . . the same Constitutional sanctity" as our bill of rights. 3 Proceedings of the Connecticut Constitutional Convention (1965) p. 1039. Thus, although the framers of the education provision looked to the historical statutory tradition of free public education in this state to support its explicit inclusion in the state constitution, they did not consider this tradition in and of itself to create a state constitutional obligation. Id., pp. 1039–40. To the contrary, they found it appropriate to amend the constitution in order to give public education constitutional status.[51]

---

[51] Despite the reading of *Horton* v. *Meskill*, supra, 172 Conn. 646–48, offered by the concurrence, it was by no means clear that, prior to 1965, there was a *constitutional right* to "free public elementary and secondary schools in the state" as declared by article eighth, § 1, of our constitution. Such a reading incorrectly suggests that article eighth, § 1, was for all practical and legal purposes, superfluous to the decision in *Horton.* It also incorrectly suggests that when the members of the 1965 constitutional convention adopted article eighth, § 1, it was simply for reasons of cosmetics or codification, and that the new provision had no substantive content that was not already clearly embodied in the constitution. Such unsubstantial motives

Additionally, the framers of our constitution explicitly provided for constitutional protection to certain discrete groups in order to deal with specific social problems. See, e.g., Conn. Const., art. I, § 20; Conn. Const., amend. XXI (protecting against discrimination on the basis of religion, race, color, ancestry, national origin, sex or physical or mental disability). Although not dispositive, it is instructive that the framers created no specific constitutional obligation to the indigent, nor did they provide any special protection for the indigent as a discrete group. Such omissions suggest that the framers of our state constitution did not intend to constitutionalize Connecticut's policy of supporting its indigent. See also J. Newman, "The 'Old Federalism': Protection of Individual Rights by State Constitutions

are inconsistent with the serious task of constitutional amendment embarked upon by the members of the 1965 convention, and with the remarks by the delegate who offered and explained the resolution that became article eighth, § 1. "In July I submitted a resolution No. 109 which pertained to the subject of education, actually it was the only resolution I did introduce and the statement of purpose of that resolution of mine was *that our system of free public education have a tradition acceptance on a par with our bill of rights and it should have the same Constitutional sanctity*. It was because our Constitution had no reference to our school system that I submitted my resolution and of course others were aware of the same omission in our Constitution and other similar resolutions were submitted. I became aware of this in the decade of the fifties when I served on a board of education and was surprised to find that Connecticut with its traditional good education had no reference to it in the Constitution. When I use the word 'good education' I am quoting, because if I may I would like to quote from the Connecticut code of 1650 which others I believe call the Ludlow Code. Quote 'a good education of children is a singular of behoove and benefit to any Commonwealth' so we do have the tradition which goes back to our earliest days of free good public education and we have h[ad] good public schools so that this again is not anything revolutionary, it is something which we have, it is which is practically all Constitutions in the States of our nation and Connecticut with its great tradition *certainly ought to honor this principle*. . . . I can't possibly see any dispute over the principle involved, *it is such a basic principle that it should be in the Constitution*. I suggest that we vote for it in the amendment form." (Emphasis added.) 3 Proceedings of Connecticut Constitutional Convention (1965) pp. 1039–40, remarks of delegate Simon J. Bernstein.

in an Era of Federal Court Passivity," 15 Conn. L. Rev. 21, 28 (1982) ("[l]ike its federal counterpart, [the Connecticut constitution] is not the source of remedies for every societal defect").

The plaintiffs argue, nevertheless, that a constitutional obligation to support the indigent is implied by the framers' intent "more effectually to define, secure, and perpetuate the liberties, rights and privileges which they have derived from their ancestors." Conn. Const., preamble. They claim that this provision is evidence that the constitution was founded on the principle of the social compact, as expounded by John Locke, and on natural law.[52] As additional support for their contention, the plaintiffs point to the reference in article first, § 1, to the "social compact"; see footnote 29; as well as to the pre-1818 statutes that they believe enforced natural rights. See part II C of this opinion.

The social compact theory posits that all individuals are born with certain natural rights and that people, in freely consenting to be governed, enter a social compact with their government by virtue of which they relinquish certain individual liberties in exchange "for the mutual preservation of their lives, liberties, and estates." J. Locke, "Two Treatises of Government," book II (Hafner Library of Classics Ed. 1961) ¶ 123, p. 184; see also 1 Z. Swift, A System of the Laws of the State of Connecticut (1795) pp. 12–13. The plaintiffs argue that the right to a governmentally provided minimal subsistence is one such right acquired by the people upon entering into the social compact.

---

[52] Natural law is a theory of jurisprudence that contends that "law has its origin and justification in absolute standards of right and wrong, so that while its specific implementation may vary . . . there is an underlying continuity arising from the conformity of the specific statutes and decisions to the absolute standard. It is a corollary of this theory that those specific laws which are not in conformity with the underlying general principles are not, strictly speaking, laws at all." W. Aspell, "Natural Law in the Connecticut Tradition," 31 Conn. B.J. 105 (1957).

Natural law clearly occupied a prominent position in both our colonial jurisprudence and the minds and hearts of the framers of our constitution. The Fundamental Orders were premised on natural law,[53] as were the Laws of the Colony of Connecticut of 1672.[54] According to Professor Collier, "to Connecticut jurists, common law meant more than judicial precedent and case law; it included natural law as well." C. Collier, "The Connecticut Declaration of Rights Before the Constitution of 1818: A Victim of Revolutionary Redefinition," 15 Conn. L. Rev. 87, 94 (1982).[55] Indeed, many of our early decisions harkened to the legal principle that the government is limited in its action by fundamental notions of what is morally right. See, e.g., *Booth* v. *Woodbury*, 32 Conn. 118, 127 (1864) ("principles of natural justice"); *Welch* v. *Wadsworth*, 30 Conn. 149, 155 (1861) ("But the power of the legislature in this respect is not unlimited. They can not entirely disregard the fundamental principles of the social compact. Those principles underlie all legislation, irrespective of

---

[53] "[A]nd well knowing where a people are gathered together the word of God requires that to maintain the peace and union of such a people there should be an orderly and decent Government established according to God, to order and dispose of the affairs of the people at all seasons as occasion shall require . . . ." Fundamental Orders of 1638, reprinted in Conn. Register and Manual (1956) p. 24.

[54] "We have endeavored not only to Ground our Capital Laws upon the Word of God, but also all our other Laws upon the Justice and Equity held forth in that Word, which is a most perfect Rule." Laws of the Colony of Connecticut (1672) preface, p. A2.

[55] See also J. Root, 1 Root's Reports, pp. x–xi (1789–93) (natural law "defines the obligations and duties between husbands and wives, parents and children, brothers and sisters, between the rulers and the people, *and the people or citizens towards each other*: This is the Magna Charta of all our natural and religious rights and liberties, and the only solid basis of our civil constitution and privileges—in short, it supports, pervades and enlightens all the ways of man, to the noblest ends by the happiest means, when and wherever its precepts and instructions are observed and followed—the usages and customs of men and the decisions of the courts of justice serve to declare and illustrate the principles of this law . . . ." [Emphasis added.]).

constitutional restraints, and if the act in question is a clear violation of them, it is our duty to hold it abortive and void."); *Goshen* v. *Stonington*, 4 Conn. 209, 225 (1822) ("vested rights").

Nevertheless, we must take care not to put undue emphasis on the language of the preamble to the constitution, the reference to the "social compact" in article first, § 1, or the natural law theory. At the 1818 constitutional convention, there was little substantive debate concerning the content or language of the preamble; it was simply unanimously approved as drafted.[56] W. Horton, "The Annotated Debates of the 1818 Constitutional Convention," 65 Conn. B.J. SI-21, SI-24 (1991); W. Horton, "Connecticut Constitutional History—1776–1988," 64 Conn. B.J. 355, 371 (1990). Indeed, the entire declaration of rights, of which article first, § 1, is a part, was not a matter of great controversy or interest at the convention. See W. Horton, 64 Conn. B.J. 359–65. Rather, the focus of the convention was on the separation of powers and the disestablishment of the Congregational church. Id. Moreover, as we recently have recognized, even the constitutional framers may not have viewed natural law as " 'a kind of constitutional law or a source for constitutional rights not protected by a written constitution.' " *State* v. *Joyner*, supra, 225 Conn. 469, quoting P. Hamburger, "Natural Rights, Natural Law, and American Constitutions," 102 Yale L.J. 907, 938 (1993). Rather, natural law may have been understood to permit "variations in civil laws 'to accommodate the different circumstances in which such laws would operate.

---

[56] Although there are no official records of the debate at the 1818 constitutional convention, two newspapers, the Connecticut Courant and the Connecticut Journal, were granted permission to report on the proceedings. W. Horton, "Annotated Debates of the 1818 Constitutional Convention," 65 Conn. B.J. SI-1, SI-5 (1991); see also J. Trumbull, Historical Notes on the Constitutions of Connecticut and on the Constitutional Convention of 1818 (1873).

Consequently, constitutions and other civil laws could restrain natural liberty in varying degrees and ways and, nonetheless, could still be said to comport with natural law.' " *State* v. *Joyner*, supra, 469, quoting P. Hamburger, supra, 102 Yale L.J. 937.[57]

For the purposes of this opinion, we assume that the framers believed that individuals would continue to possess certain natural rights even if those rights were not enumerated in the written constitution. On the basis of this assumption, we will not draw firm conclusions from the silence of the constitutional text. The mere fact that the framers intended some unenumerated natural rights to survive the drafting of the written constitution, however, does not give us carte blanche to recognize new constitutional rights as inherent in natural law. Rather, in determining whether unenumerated rights were incorporated into the constitution, we must focus on the *framers'* understanding of whether a particular right was part of the natural law, i.e., on the framers' understanding of whether the particular right was so fundamental to an ordered society that it did not require explicit enumeration. We can discern the framers' understanding, of course, only by examining the historical sources. We turn, therefore, to the history of the alleged right to governmentally provided support.

C

The plaintiffs argue that Connecticut's history and tradition of caring for the indigent, taken as a whole, supports a conclusion that the framers believed that the state had an inherent duty to provide subsistence

---

[57] See also *Supreme Court of New Hampshire* v. *Piper*, 470 U.S. 274, 281 n.10, 105 S. Ct. 1272, 84 L. Ed. 2d 205 (1985) (rejecting natural rights theory); *Hague* v. *Committee for Industrial Organization*, 307 U.S. 496, 511, 59 S. Ct. 954, 83 L. Ed. 1423 (1939); L. Tribe, supra, § 15-3, p. 1310 (natural law has been rendered a "historical curiosity").

benefits to the needy, and therefore we must recognize under our state constitution an unenumerated duty to provide such support. The plaintiffs concede that the state's duty was minimal. They argue, however, that both the writings of our principal eighteenth century jurists and our 350 year history of enacting statutes to provide for the indigent demonstrate that the state had a duty at least to provide "a warm, secure place to sleep at night, adequate food, minimal clothing and personal effects, and some level of medical care." We conclude, to the contrary, that the historical record is not properly read to create such a duty.

The writings of jurists in temporal proximity to the adoption of the 1818 constitution provide the strongest basis for the plaintiffs' argument for an unenumerated constitutional obligation derived from principles of natural law. In particular, both Chief Justice Zephaniah Swift and Judge Jesse Root referred to an obligation of the government to support the indigent. For example, Chief Justice Swift wrote: "The selectmen are bound to provide necessaries for all the inhabitants of the town, who are incapable of supporting themselves. Towns are obliged to support their respective inhabitants, whether living in the town to which they belong, or any other town, either with or without a certificate, who may need relief. . . . [T]he law has made provision for support of the poor, so that every one may know where to call for his bread in the hour of want." 1 Z. Swift, supra, pp. 119–21. Similarly, Judge Root stated: "The poor and indigent in all countries, call not only for private charity, but for support and assistance from the government, and to give scope to the exercise of benevolence, the most noble and godlike virtue . . . . It is the duty of every government to protect and to provide for the poor; the laws of the state therefore humanely enact and ordain . . . that every town shall take care of, provide for and maintain, its own

poor." J. Root, 1 Root's Reports, p. xxviii (1789–93). In interpreting our state constitution, the statements of both jurists are entitled to significant weight. See, e.g., *State* v. *Chapman*, 227 Conn. 616, 628, 632 A.2d 674 (1993); *State* v. *Joyner*, supra, 225 Conn. 467; *State* v. *Oquendo*, 223 Conn. 635, 650, 613 A.2d 1300 (1992).

Although both Swift and Root believed that the government had an obligation to support the indigent, neither jurist's writings can be read to entitle the plaintiffs to relief. Swift and Root provided only the faintest outlines of what they considered to be the government's obligation. They did not delimit the various means by which the government could choose to fulfill that obligation. Beyond referring to the "necessaries" of life, they did not explain what level of support had to be provided. Indeed, they did not even establish who was to be considered one of "the poor." Their silence on each of these issues implies what the remainder of the historical sources also strongly suggests: that the historical record, taken in its entirety, is too ambiguous and contradictory to provide a basis from which we, with any reasonable degree of confidence, can infer an implied unenumerated fundamental constitutional obligation to provide minimal subsistence.

Connecticut's first statute relating to assistance to the poor was included in the Ludlow Code of 1650,[58] the first recorded code of laws of our state. Statutory language regarding maintenance of the poor thereafter

---

[58] The Code of 1650 of the General Court of Connecticut, also known as the "Ludlow Code," provides: "POORE. *It is ordered by this courte and authority thereof,* That the courte of magistrates shall have power to determine all differences about lawfull settling, and providing for pore persons, and shall have power to dispose of all unsettled persons, into such townes as they shall judge to bee most fitt, for the maintenance and imployment of such persons and familyes, for the ease of the countrye." (Emphasis in original.) The Code of 1650 of the General Court of Connecticut (S. Andrus pub. 1822) p. 80.

can be traced through the colonial laws of 1672[59] and 1702,[60] the first statutes of the state of Connecticut

[59] The laws of the Connecticut Colony of 1672 provided: "It is Ordered by the Authority of this Court; That every Town within this Colony, shall maintaine their own poor: and if any that have Reliefe from any Town, do not imploy their children as they ought, towards the getting of a lively hold, or if there be any Family that cannot or do not provide Competently for their Children, whereby they are exposed to want and extreamity, it shall be in the power of the Select men of each Town with advice of the next Magistrate, to place out such Children, into good Families where they may be better brought up and Provided for.

"It is also Ordered; That if any person come to live in any Town in this Government, and be there received and entertained three months, if by sickness, lameness or the like, he comes to want reliefe; he shall be provided for by that Town wherein he was so long entertained, and shall be reputed their proper charge, unless such person have within the said three months been warned by the Constable, or some one or more of the Select men of that Town, not there to abide without leave first obtained of the Town, and certifie the same to the next Court of Assistants, who shall otherwise Order the charge arising about him according to Justice." Book of the General Laws for the People Within the Jurisdiction of Connecticut (1672) p. 57.

[60] The laws of the Connecticut Colony of 1702 provided in part: "Be it Enacted . . . That each Town within this Colony shall maintain their own poor; and the Select-men or Overseers of the Poor . . . shall at times keep the Town Stock; who shall have full power to disburse or expend what they shall judge meet from time to time for the relief and supply of any of the poor belonging to their Town, so far as Five Pounds will extend; and if more be needful, the said Select-man or Overseers, or the major part of them, shall with the advice of the Assistants . . . disburse what shall be by them judged needful for the relief of the poor as aforesaid . . . for the supplying their Poor, or any of them with Victuals, Cloathing, Firewood, or any other thing necessary for their support or subsistance. And if any Select-man, Overseer or other person or persons, shall have any of the Town Stock in his or their hand or hands, and do neglect or refuse to give a just accompt upon Oath of what he hath expended as aforesaid, and what is in his Custody, upon ten days warning, before an Assistant or Justice of the Peace when called to it by the Town, and to return what is not expended to and for the use aforesaid to the Town, he or they shall be committed to the Goal, there to remain at his or their own Cost and Charge, until he or they shall give such account, and make return as aforesaid.

"And it is further Enacted by the Authority aforesaid, That if any poor person or persons, that have had or shall have relief or supplies from any Town, shall suffer their Children to live idly or mispend their time in loitering, and neglect to bring them up or imploy them in some honest Calling, which may be profitable unto themselves, and the publick; Or if there shall

in 1784,[61] the 1808 statutory revisions[62] and the post-constitution statutes of 1821,[63] to today's current stat-

be any Family that cannot, or do not provide competently for their Children, whereby they are exposed to want and extremity: It shall and may be lawful for the Select men and Overseers of the Poor in each Town, and they are hereby ordered and impowred, with the assent of the next Magistrate or Justice of the Peace, to bind any poor Children belonging to such Town to be Apprentices, where they shall bee convenient: A man Child until he shall come to the age of Twenty one years; and a Woman Child to the age of Eighteen years, or time of Marriage: which shall be as effectual to all intents and purposes, as if any such Child were of full age, and by Indenture of Covenant had bound him or her self.

"And further it is Enacted by the Authority aforesaid, That if any person or persons shall come to live in any Town in this Colony, and be there received and entertained by the space of three months, and if by Sickness, lameness or the like, he or they come to want relief, every such person or persons shall be provided for by that Town wherein he or they was so long entertained, at their own proper charge; unless such person or persons have within the said three months, been warned by the Constable, or some one or more of the Select-men of that Town, to depart and leave the place: which if the said Constable, or any one or more of the Select men shall do, and thereof certifie the next Court of Assistants to be held in this Colony, the said Court of Assistants shall and may otherwise order the defraying of the Charge arising about such person or persons." Acts and Laws of His Majesties Colony in Connecticut in New England (B. Green & J. Allen pubs. 1702) pp. 94–95.

[61] General Statutes (1784) pp. 193, 228–29. These statutes were identical in all material respects with those laws enacted in 1702.

[62] General Statutes (1808 Rev.) tit. CXXX, §§ 1 through 5, pp. 552–53. The relevant provisions of this statute are reprinted in the text, infra.

[63] It was not until 1821 that the statute began to resemble General Statutes (Rev. to 1993) § 17-273. General Statutes (1821 Rev.) title 73, chapter 1, provided in relevant part: "AN ACT TO PROVIDE FOR THE SUPPORT OF PAUPERS. . . .

"Sect. 2. All poor and impotent persons, who have not estate sufficient for their support, and have no relations of sufficient ability, who are obliged by law to support them, shall be provided for, and supported, at the expense of the town where they belong. And it shall be the duty of every town to maintain and support all the poor inhabitants belonging to the town, whether residing in it, or in any other town in the state.

"Sect. 3. The select-men of each town, shall be overseers of the poor; and it shall be their duty, at the expense of the town, to provide for all paupers belonging to it, food, clothing, fire-wood, and all other articles necessary for their subsistence . . . ." See also General Statutes (1821 Rev.) tit. 65.

utes.[64] While Connecticut's 350 year statutory history obviously demonstrates a longstanding policy of assisting the indigent, the mere existence of a 350 year statutory history does not necessarily show that the framers intended to incorporate that policy in our constitution as a fundamental constitutional right. Notably absent from the statutes is any evidence that there was an inherent obligation on the part of the towns, other than that mandated by the colonial government, to care for the indigent. These statutes failed to provide a clear articulation of the basis of such a duty, and they fail to provide specific guidance as to the extent of the government's obligation. In particular, the statutes show that in the entire period before the constitution of 1818, local elected officials had wide discretion to decide the nature of, amount of and eligibility criteria for receiving such assistance. For example, while a statute in effect at the time of the adoption of the 1818 constitution first provided that "each town in this state shall take care of, support and maintain their own poor," the statute went on to provide that the selectmen "shall have full power to expend or disburse out of the town stock or treasury, *what they shall judge meet and necessary from time to time,* for the relief, supply and support of any of the poor belonging to their town, so far as to the amount of seventeen dollars: and if more be needful, the said selectmen or overseers, or the major part of them shall, with the advice of the authority of that town, (if any there be) expend and disburse *what shall be by them judged needful* for the relief of the poor, as aforesaid." (Emphasis added.) General

---

[64] General Statutes (1838 Rev.) tit. LII, c. II, III; General Statutes (1849 Rev.) tit. XLII, §§ 13 through 31; General Statutes (1854 Rev.) tit. XLII, §§ 13 through 30; General Statutes (1866 Rev.) tit. L; General Statutes (1888 Rev.) §§ 3295 through 3319; General Statutes (1902 Rev.) §§ 2476 through 2500; General Statutes (1918 Rev.) §§ 1623 through 1629; General Statutes (1930 Rev.) §§ 1693 through 1716; General Statutes (1949 Rev.) §§ 2584 through 2609; General Statutes (1958 Rev.) §§ 17-82 through 17-135; General Statutes (Rev. to 1995) §§ 17b-75 through 17b-219.

Statutes (1808 Rev.) tit. CXXX, §§ 1 and 2, entitled
"An Act for Maintaining and Supporting the Poor."
The laws and statutes from previous years contained
similar provisions. See footnotes 59 through 61. More-
over, the towns were required to support only those
persons who were settled in a town.[65]

Indeed, although Connecticut has a long history of
supporting its indigent, the main purpose of many of
the preconstitutional poor relief statutes may have been
to relieve others of the social problems caused by
paupers by isolating and punishing the indigent, rather
than to meet any fundamental constitutional obligation
to the indigent. For example, selectmen had the power
to bind out children as apprentices or servants if the
children "live idly, or mispend their time . . . loiter-
ing," or where a family "cannot, or do[es] not provide
competently for [its] children." General Statutes (1808
Rev.) tit. CXXX, § 5.

In addition, indigent persons could be confined to
workhouses or could be contracted out as laborers for
the benefit of the town. General Statutes (1808 Rev.)
tit. CLXXVI, entitled "Work-houses." As the pream-
ble to the 1808 workhouse statutes states, one express
purpose of poorhouses was to confine and punish the

---

[65] In order to gain settlement, persons were required to receive permis-
sion to settle in a town, or had to have lived in the town for a specified
period of time before receiving assistance from the town. See, e.g., Gen-
eral Statutes (1784) p. 193 (imposing three month requirement); Acts and
Laws of His Majesties Colony in Connecticut in New England (B. Green
& J. Allen pubs. 1702) p. 95 (imposing three month requirement); see also
*Wallingford* v. *Southington*, 16 Conn. 431, 434 (1844) (by statute, in order
to gain settlement person must live in town for period of six years without
becoming chargeable to town for support); *Backus* v. *Dudley*, supra, 3 Conn.
568 (town has right to remove paupers by warrant who were not inhabi-
tants of town); E. Capen, "The Historical Development of the Poor Law
of Connecticut," in 22 Columbia Studies in History, Economics and Public
Law (Columbia U. Press 1905) pp. 26–34, 68–74. Persons without settle-
ment were supported by the state. See General Statutes (1808 Rev.) tit.
XCI, § 11; General Statutes (1784) p. 228.

poor: "WHEREAS there are frequently divers persons who wander about, and are vagabond, idle, and dissolute persons, begging and committing many insolences: and many are guilty of profane and evil discourse, and other disorders, to the corruption of manners, the promotion of idleness, and the detriment of good order and religion. For preventing of which, and for the better regulation of such evil and disorderly persons, and punishing such rudeness and misbehavior . . . ." General Statutes (1808 Rev.) tit. CLXXVI, c. 1.

In workhouses, the "masters or keepers" of the house could punish the indigent by "putting fetters or shackles upon them, and by moderate whipping, not exceeding ten stripes at one time . . . and from time to time, in case they be stubborn, disorderly or idle . . . [the master or keeper] may abridge them of their food . . . until they be reduced to better order and obedience . . . ." General Statutes (1808 Rev.) tit. CLXXVI, c. 1, § 21; see also E. Capen, "The Historical Development of the Poor Law of Connecticut," in 22 Columbia Studies in History, Economics and Public Law (Columbia U. Press 1905) (describing harsh treatment of poor in preconstitutional era). Not only would these poor laws undoubtedly violate contemporary civilized standards of decency, but they would also arguably violate several federal constitutional provisions. See, e.g., U.S. Const., amend. XIII (abolishing involuntary servitude); U.S. Const., amend. XIV (right to travel).

The wide discretion of the selectmen in providing support for the indigent, and the harsh, as well as beneficent, effect of the ways in which that support was provided, are further evidenced by case law in "reasonable temporal proximity to the adoption of the constitution of 1818." *State* v. *Joyner*, supra, 225 Conn. 462 (such case law "enhance[s] our understanding of the original intent of the constitutional framers"); see,

e.g., *New Milford* v. *Sherman*, 21 Conn. 101 (1851) (selectman has power to order pauper be taken to poorhouse); *Lyme* v. *East Haddam*, 14 Conn. 394 (1841) (support provided for only nine days); *Backus* v. *Dudley*, supra, 3 Conn. 573 (town has "right to restrain [a pauper's] locomotion, and place him where his support would be most cheap and convenient"). Indeed, in this case, the plaintiffs have conceded the breadth of such discretion.

Unlike cases in which the constitutional history of a right has been helpful in clarifying the intent of the framers; see, e.g., *Horton* v. *Meskill*, supra, 172 Conn. 647 (pre-1965 statutes implementing education requirement evidence of legislature's intent to codify state duty to educate its children); the poor laws relied upon by the plaintiffs are broad, ambiguous, highly discretionary and provide little guidance as to the intent of the framers. As discussed above, many of the poor laws provided for harsh treatment of the indigent. On the other hand, there are numerous statements in the historical sources that go beyond a right to minimal subsistence. See, e.g., *Trumbull* v. *Moss*, supra, 28 Conn. 256 ("[i]t is the humane purpose of our law in relation to the support of paupers, to prevent as far as possible any person, under any circumstances, from suffering for the necessaries of life"). We see no principled method by which we can define a constitutional right to subsistence based on such a cryptic and contradictory history.

The plaintiffs suggest that the right be defined by ascertaining the lowest common denominator and by making that the constitutional obligation. The plaintiffs offer no justification for choosing this standard, as opposed to a more expansive articulation. Nor is there persuasive support for such a position in the history on which the plaintiffs rely. An attempt by this

court to choose a minimal standard would be an act of judicial conjecture, and not constitutional interpretation.

Thus, we conclude that the historical record merely begs the question of what the intended reach of these statutes was; it does not define who should be considered indigent, nor does it elucidate what level of services would amount to minimal subsistence. Such an undefined and discretionary grant of support is insufficient to provide a basis for defining the modern personal right or state affirmative obligation that the plaintiffs claim. Without an objective referent to guide the definition of such a right and obligation and without further support that the framers intended to impose a constitutional obligation on the state, we are unprepared to translate a longstanding policy regarding the poor into an affirmative constitutional obligation.

D

Finally, the plaintiffs argue that contemporary economic and sociological considerations mandate that we recognize a constitutional governmental obligation to provide subsistence benefits. See *State* v. *Miller*, supra, 227 Conn. 380–81 (current economic and sociological considerations should be factor in evaluating state constitution); *State* v. *Geisler*, supra, 222 Conn. 685 (same). The plaintiffs argue that because general assistance is a program of last resort and because those who qualify for such assistance are without viable alternatives to sustain themselves, human decency and morality mandate that we recognize a constitutional governmental duty to provide such assistance.

We note that the plaintiffs' argument that the state has a constitutional obligation to provide minimal subsistence is inherently contradictory. On the one hand, the plaintiffs claim that the governmental obligation to provide subsistence benefits is an unenumerated fun-

damental duty and, therefore, subject to strict scrutiny.[66] Under this standard, all "[s]tatutes impinging upon fundamental rights 'are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest.' *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U.S. 432, 440, 105 S. Ct. 3249, 87 L. Ed. 2d 313 (1985); *Horton* v. *Meskill,* supra, 172 Conn. 640." *Broadley* v. *Board of Education*, 229 Conn. 1, 9 n.16, 639 A.2d 502 (1994); see also *Daly* v. *DelPonte*, 225 Conn. 499, 515, 624 A.2d 876 (1993); *In re Juvenile Appeal (83–CD)*, 189 Conn. 276, 285, 455 A.2d 1313 (1983). On the other hand, the plaintiffs concede that the state may condition the receipt of benefits upon meeting certain statutory eligibility criteria. See, e.g., General Statutes (Rev. to 1993) § 17-273 (c) (must have assets below $250); General Statutes (Rev. to 1993) §§ 17-3a and 17-273 (c) (must have income below specified levels); General Statutes (Rev. to 1993) § 17-273b (must perform workfare to be eligible). We find the concurrent adherence to these two positions to be untenable.

In essence, the plaintiffs are arguing that we recognize a limited fundamental duty to provide subsistence benefits—under which the state would be allowed to impose certain eligibility criteria, but under which the state is not allowed to limit general assistance benefits to nine months in a twelve month period. We see no basis for making such a distinction, nor do the plaintiffs offer one. If we were to recognize a fundamental duty to provide subsistence benefits, any limitation on the receipt of those benefits would necessarily be subject to strict scrutiny and would necessarily fail because

[66] Although the plaintiffs have suggested that the standard of review could be some intermediate level of scrutiny, to impose a lower standard of review would belie the idea that the right is fundamental and, therefore, implied in our constitution. The plaintiffs have offered no support in our case law, or in federal case law or the law of any sister state, to suggest that any court has engaged in such an analysis.

economic interests alone never constitute a compelling state interest. *Graham* v. *Richardson*, 403 U.S. 365, 375–76, 91 S. Ct. 1848, 29 L. Ed. 2d 534 (1971); *Barannikova* v. *Greenwich*, 229 Conn. 664, 690, 643 A.2d 251 (1994) ("preservation of the state fisc was not a compelling interest"). Thus, the imposition of any condition, even an eligibility requirement, would necessarily deprive certain persons of benefits that might be deemed to constitute minimal subsistence, and would in all likelihood fail the strict scrutiny test. This economic and public policy consideration counsels against our recognition of a fundamental duty under our state constitution to provide subsistence benefits.

Because we conclude that General Statutes (Rev. to 1993) § 17-273b does not impinge on a fundamental state constitutional right, we next consider whether the purpose of the challenged legislation is a legitimate one and whether the particular enactment is designed to accomplish that purpose in a fair and reasonable way. See *Pierce* v. *Albanese*, 144 Conn. 241, 249, 129 A.2d 606, appeal dismissed, 355 U.S. 15, 78 S. Ct. 36, 2 L. Ed. 2d 21 (1957). " 'The constitutional issue is whether legislative classifications or discriminations bear "a rational relationship to a legitimate state end and [are] based on reasons related to the pursuit of that goal." *Gentile* v. *Altermatt*, [supra, 169 Conn. 295].' *Caldor's, Inc.* v. *Bedding Barn, Inc.*, [177 Conn. 304, 314–15, 417 A.2d 343 (1979)]." *United Illuminating Co.* v. *New Haven*, 179 Conn. 627, 637, 427 A.2d 830, appeal dismissed, 449 U.S. 801, 101 S. Ct. 45, 66 L. Ed. 2d 5 (1980); see also *Campbell* v. *Board of Education*, 193 Conn. 93, 105, 475 A.2d 289 (1984).

We believe that § 17-273b survives this less exacting test of constitutionality because the statute is a valid legislative attempt to reform part of the welfare system by creating additional incentives for employment and independence. Like § 2 of title CXXX of the Gen-

eral Statutes of 1808, which limited monetary support to $17 but allowed the towns to exceed that limit if they deemed it necessary, § 17-273b limits the duration of support to nine months but allows the towns to exceed that limit if they deem it necessary. The underlying legislative debate on this measure supports such an interpretation. It indicates that a principal purpose of the statute was to attempt to create stronger incentives for employable people to find jobs. See 35 H.R. Proc., Pt. 23, 1992 Sess., p. 7626, remarks of Representative Joseph D. Courtney ("perhaps one way of finding some savings, since there were other addbacks occurring during the budget process, was to reduce the grant level for employables to give that additional incentive to go out and fin[d] work"); 35 H.R. Proc., Pt. 24, 1992 Sess., pp. 8053–54, remarks of Representative Joseph D. Courtney ("[B]ut most fundamentally is the much more concerted effort which will be made to move able-bodied employable recipients of this program into work. . . . First of all, it will put limits on what the program will pay. There will be an end of the road for able-bodied recipients which the[y] must, at that point, contend with the fact that they either are going to have to do better in their efforts to find employment or they will lose cash benefits.").[67] Indeed, at the same time that § 17-273b was amended to impose the nine month limit on benefits, funding was increased for other programs designed to benefit indigent people.[68]

---

[67] Witnesses at trial confirmed that general assistance was, as a matter of policy, intended as a temporary program for employable persons and had been instituted in order to provide an incentive for people to find employment. Jocelyn Watrous, a program supervisor in the general assistance unit of the department of social services, testified: "The feeling was that we had gotten away from general assistance being a temporary program for employable people."

[68] This increased funding included: a $2 million grant to enhance substance abuse treatment; a $76 million grant to the seventeen largest towns to fund enhanced employability plans; $7 million to the department of labor to fund

Therefore, we conclude that this welfare scheme, including General Statutes (Rev. to 1993) § 17-273b, is both rational and related to a legitimate state purpose, thus satisfying rational basis review. Our state and nation's continuing attempt to grapple with the complex societal problem of poverty is indicative of the intricacies of the problem. On the one hand, as we already have noted, some legislators believe that the best way to help the indigent is to limit entitlement programs. On the other hand, as the plaintiffs argue here, other people contend that such policies are misguided, as they will only increase malnutrition, crime, substance abuse and general human suffering. A statute is not irrational, however, for purposes of determining its constitutionality simply because it works an imperfect solution to the intricate problem that it attempts to correct. *Geduldig* v. *Aiello*, 417 U.S. 484, 495, 94 S. Ct. 2485, 41 L. Ed. 2d 256 (1974) (a state " 'may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind' "); *Azizi* v. *Thornburgh*, 908 F.2d 1130, 1135 (2d Cir. 1990); *Faraci* v. *Connecticut Light & Power Co.*, 211 Conn. 166, 171–72, 558 A.2d 234 (1989).

As we have noted in other contexts, we are extremely hesitant to choose sides in this policy debate and to enshrine one policy choice as a matter of constitutional law. *Doe* v. *State*, supra, 216 Conn. 105; *Quinnett* v. *Newman*, 213 Conn. 343, 347, 568 A.2d 786 (1990). Although we are sympathetic to the plight of indigent persons, "the Constitution does not provide judicial remedies for every social and economic ill." *Lindsey* v. *Normet*, supra, 405 U.S. 74. The difficulty of defin-

the subsidized transitional employment program, which provides subsidized job training and employment; and $2 million to fund public shelters. Spec. Sess. P.A. 92-16, §§ 11, 22, 24. The specific appropriations for the various components of welfare reform were line items in the 1992 appropriations bill. See Special Acts 1992, No. 92-13.

ing the scope of such a right, or of deciding what is the appropriate government response, illustrates the realistic limitations of a judicial decree in a case of this nature. The decision over the allocation of limited public funds is fraught with judgments of morality, "policy and value over which opinions are sharply divided." *Maher* v. *Roe,* supra, 432 U.S. 479. The manner in which the state intends to deal with problems such as poverty and the amount of money it is prepared to allocate are public policy issues that are best addressed by the General Assembly. The legislature, as opposed to the judiciary, is better equipped to effectuate a balance among the differing needs of various groups of indigent persons and between the needs of all indigent persons and others in the state. See, e.g., *Kelley Property Development, Inc.* v. *Lebanon,* supra, 226 Conn. 339 ("principle of separation of powers [compels] . . . judicial deference to legislative resolution of conflicting considerations of public policy"); *Doe* v. *State,* supra, 105 (same); *Quinnett* v. *Newman,* supra, 347 (same). Moreover, "[w]e should not forget that 'legislatures are ultimate guardians of the liberties and welfare of the people in quite as great a degree as the courts.' " *Maher* v. *Roe,* supra, 479–80, quoting *Missouri, Kansas & Texas Ry. Co.* v. *May,* 194 U.S. 267, 270, 24 S. Ct. 638, 48 L. Ed. 971 (1904) (Holmes, J.). Thus, we conclude that judicial prudence counsels against injection of our views into an ongoing policy debate.

The state of Connecticut has a 350 year tradition of providing for its needy. That this statutory tradition is not enshrined in our state constitution does not shake our confidence that the people of Connecticut, to whom the legislature must answer, will not retreat from this tradition and suddenly forsake the poorest among us. This state's long and laudable history of care and concern for its poor stands as a testament to its commitment. While our analysis has resolved the plaintiffs'

constitutional claims against them, we remain convinced that the elected leaders of this state will not abandon the needy.

In sum, we conclude that the Connecticut constitution does not compel the state to provide the cash assistance to which these plaintiffs claim to be entitled. Consequently, we affirm the trial court's determination that General Statutes (Rev. to 1993) § 17-273b, which imposes a nine month limit on the receipt of general assistance benefits, does not violate the state constitution.

The judgment is affirmed.

In this opinion CALLAHAN, BORDEN and PALMER, Js., concurred.

PETERS, C. J., concurring. I agree with part I of the majority opinion and I concur in the result reached with respect to part II. I would arrive at that result, however, by a different route.

Contrary to the view of the majority, I am persuaded that the Connecticut constitution includes a governmental obligation to provide a minimal safety net to our poorest residents. As all of our historical sources indicate, the framers of our constitution believed that the government that they were establishing would not be permitted to stand idle while people, without food, shelter, clothing or medical care, were left to die in the streets. In addition, an impressive array of contemporary sociological, economic and legal texts support the recognition of such a governmental duty.

The existence of a minimal government obligation has always been so framed, however, as to afford elected officials substantial discretion both to choose the manner in which the obligation will be implemented and to impose reasonable conditions on the provision

of support. In light of these limitations on the constitutional obligation to provide support, the plaintiffs were not entitled to injunctive relief without making at least a preliminary showing that General Statutes (Rev. to 1993) § 17-273b, as applied to them, exceeded the large degree of discretion retained by the state. In my view, the plaintiffs in this case did not meet this demanding burden of proof. I, therefore, concur in the judgment that the trial court's denial of the plaintiffs' motion for a preliminary injunction must be affirmed.

## I

The Connecticut constitution concededly contains no express provision obligating government to provide minimal subsistence. In my view, however, our constitution includes unenumerated constitutional rights that encompass a constitutional obligation on government to act. My conclusion depends upon the proper resolution of two distinct issues: (1) insofar as the state constitution includes unenumerated constitutional rights, must these unenumerated rights be confined to rights that arise under the umbrella of the due process clause? and (2) must unenumerated constitutional rights be categorically limited to "negative" rights—i.e., rights to be free from governmental intrusion—or may they also encompass affirmative rights—i.e., rights to demand governmental protection?

## A

Our case law and our state constitutional history, text and theory already demonstrate that the constitution protects unenumerated rights. We have no express state constitutional provisions to afford protection against "cruel and unusual punishment" or against "double jeopardy." Nevertheless, we have held that both rights are constitutionally protected. *State* v. *Ross*, 230 Conn. 183, 246, 646 A.2d 1318 (1994); *Kohlfuss* v.

*Warden,* 149 Conn. 692, 695, 183 A.2d 626, cert. denied, 371 U.S. 928, 83 S. Ct. 298, 9 L. Ed. 2d 235 (1962).

Recently, we have characterized both of these unenumerated constitutional rights as elements of the due process guaranteed by article first, §§ 8 and 9, of the state constitution, a guarantee that the plaintiffs here do not invoke. That characterization, however, is a historical oversimplification. We never have held (and could not have held) that the framers of our written constitution enumerated a right to "due process" with the intent also of protecting unenumerated rights such as the rights against double jeopardy and cruel and unusual punishment. It is only in the second half of the twentieth century that either of the latter concepts has been denominated a right of due process. See E. Peters, "Common Law Antecedents of Constitutional Law in Connecticut," 53 Albany L. Rev. 259, 261 (1989); see also *Benton* v. *Maryland,* 395 U.S. 784, 794–96, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (1969) (incorporating fifth amendment prohibition of double jeopardy into fourteenth amendment right to due process); *Robinson* v. *California,* 370 U.S. 660, 666, 82 S. Ct. 1417, 8 L. Ed. 2d 758 (1962) (same for eighth amendment prohibition of cruel and unusual punishment); *Kohlfuss* v. *Warden,* supra, 149 Conn. 695. The cases recognizing state constitutional rights against double jeopardy and cruel and unusual punishment, therefore, cannot be read for the proposition that unenumerated rights will be recognized *only* when they are directly attached to the due process clause or some other particular constitutional phrase.

Instead, the case law in this state has subscribed to a broader proposition—that the framers did not intend our written state constitution to be an all-encompassing exhaustive enumeration of individual rights. Although

we did not expressly recognize this proposition in the so-called "due process" cases, we repeatedly have done so in the past.

In 1861, for example, in deciding whether a retroactive act infringed the defendant's rights, we explicitly held that the enumeration of particular rights in our written constitution did not preclude the existence of other quasi-constitutional rights: "Nor can it be claimed that the act in question conflicts with any provision of the constitution of this state. There is nothing in any of the provisions of that constitution which can restrain the legislature from passing retrospective laws; and it is their practice every year to do so, and not unfrequently acts which affect antecedent vested rights. But the power of the legislature in this respect is not unlimited. They can not entirely disregard the fundamental principles of the social compact. Those principles underlie all legislation, irrespective of constitutional restraints, and if the act in question is a clear violation of them, it is our duty to hold it abortive and void." *Welch* v. *Wadsworth,* 30 Conn. 149, 155 (1861).

We again adhered to this position in 1895: "[U]nlike the constitutions of many States, [our constitution] contains no specific limitations on the exercise of legislative power, except some slight restrictions in one or two recent amendments. The limitations, however, are no less real, and perhaps more effective, than if phrased in specific terms. . . . No legislative Act is law, that clearly and certainly is obnoxious to the principle of equality in rights thus solemnly made the condition of all exercise of legislative power. It is patent that not everything that can be called a right is included in this guaranty. The protected rights are those that inhere in 'the great and essential principles of liberty and free government' recognized in the course of events that resulted in our independence, and established by the adoption of our Constitution. The language used is pur-

posely broad, as the language in reference to the absolute power of legislation is broad; and the relation of limitation to power can, in the nature of things, be settled only through specific applications as emergencies arise." *State* v. *Conlon*, 65 Conn. 478, 489, 33 A. 519 (1895).

This court's longstanding recognition of unenumerated constitutional rights reflects this state's unique constitutional history. Of the thirteen original states, Connecticut was the second to last to adopt a written state constitution, failing to do so until 1818. The historical record suggests that, when Connecticut joined the Union as a state, Connecticut citizens did not see an immediate need to draft a written state constitution, because Connecticut already had a consensually adopted framework for how the government would be "constituted," and that framework already had been in effect for more than one hundred fifty years. That framework—a "constitution" in the older, broader sense of the word—was based on principles contained in various written documents of the Connecticut colony such as the Fundamental Orders of 1639, the Ludlow Code of 1650 and the Charter of Charles II of 1662, as well as on unwritten principles of natural law. See generally 1 Z. Swift, A System of the Laws of the State of Connecticut (1795) pp. 55–59;[1] H. Cohn, "Connecticut Constitutional History 1636–1776," in H. Cohn & W. Horton, Connecticut's Four Constitutions

---

[1] Chief Justice Swift wrote: "Some visionary theorists, have pretended that we have no constitution, because it has not been reduced to writing, and ratified by the people. It is therefore necessary, to trace the constitution of our government to its origin, for the purpose of showing its existence, that it has been accepted and approved of by the people, and is well known and precisely bounded." 1 Z. Swift, supra, p. 55. Swift went on to explain how Connecticut's "constitution" descended from the voluntary agreement of the settlers in the early seventeenth century to form a government, and how that social compact had endured through both monarchical rule and independence. Id., pp. 55–59.

(1988) (Four Constitutions) pp. 1–15; W. Horton, "Connecticut Constitutional History 1776–1988," in Four Constitutions, supra, pp. 18–19; C. Collier, "The Connecticut Declaration of Rights Before the Constitution of 1818: A Victim of Revolutionary Redefinition," 15 Conn. L. Rev. 87, 94 (1982); E. Peters, supra, 53 Albany L. Rev. 259. Our early judges relied on these "constitutional" principles to decide legal disputes and to provide a remedy for misconduct by the executive branch of government. See E. Peters, supra, 261–64; see also C. Collier, supra, 15 Conn. L. Rev. 94 ("to Connecticut jurists, common law meant more than judicial precedent and case law; it included natural law as well").

Approximately thirty years after Connecticut attained statehood, its citizens finally decided that it was necessary to adopt a written state constitution, and a convention for that purpose was assembled. The historical record suggests that there were three main reasons that the constitutional convention was thought necessary: (1) to disestablish the Congregational church; (2) to create a tripartite government involving the separation of powers and a system of checks and balances;[2] and (3) to expand the suffrage to all white males who paid taxes or had served in the militia.[3] See generally

---

[2] Before 1818, Connecticut had what is now known as a "parliamentary" system of government. The General Assembly was the final source of most power in the state. The governor was merely the presiding officer of the upper house of the General Assembly, then known as the Council. The other members of the Council, known as the assistants, exercised powers of all three branches: executive when assisting the governor, legislative in passing bills, and judicial in that the Council sat as the Supreme Court of Errors. W. Horton, supra, Four Constitutions, pp. 19–22.

[3] Before 1818, for all practical purposes, the only people eligible for the suffrage were adult white males who owned land. Because of shifts from an agricultural to a more industrial economy, the proportion of landowners in the population decreased throughout the latter part of the eighteenth

W. Horton, supra, Four Constitutions, pp. 19–23; W. Horton, "Annotated Debates of the 1818 Convention," 65 Conn. B.J. SI-3, SI-4 (1991) (Constitutional Debates). The constitution that was adopted accomplished each of these goals, and it further placed into one written document many of the ideals that had been reflected in the seventeenth century texts or in the common law.

Nothing in either the 1818 constitution itself nor the history surrounding its adoption, however, suggests that it was intended to supersede or displace other aspects of the preexisting "constitution" of the state that, by 1818, were thought to be inherent in the structure of Connecticut society and government.[4] Indeed, the text of the constitution in several places strongly suggests that the framers desired to retain and merely to improve upon the preexisting legal framework. For example, the preamble to the constitution provides that "[t]he People of Connecticut acknowledging with grati-

and early part of the nineteenth centuries, and, by 1816, fewer than one half of the adult white male residents of Connecticut were eligible to vote. W. Horton, supra, Four Constitutions, pp. 22–23.

[4] For example, in voting for the adoption of the Bill of Rights, a majority of the delegates to the constitutional convention implicitly rejected the view of several delegates that "such a detailed specification of individual rights was superfluous and tended to abridge them, because all governmental powers not granted by the constitution were reserved to the people." *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 60, 469 A.2d 1201 (1984); see Constitutional Debates, supra, 65 Conn. B.J. SI-16–SI-24, remarks of Governor John Treadwell, Alexander Wolcott and Judge Stephen Mitchell. As this court previously has noted, the majority of delegates likely was moved by "the political sentiment of that time that the basic liberties of the people should be enshrined in a written constitution to ensure their protection from governmental infringement." *Cologne* v. *Westfarms Associates*, supra, 60. There is no evidence, however, that any delegate believed that the enumerated rights were meant to be the *only* rights the constitution would protect. Indeed, one delegate who expressly had argued that the framers should "not undertake to tell the people their rights—they could not be enumerated" went on to vote for the constitution anyway. Constitutional Debates, supra, 65 Conn. B.J. SI-22, remarks of Judge Stephen Mitchell.

tude, the good providence of God, in having permitted them to enjoy a free government; do, in order more effectually to define, secure, and perpetuate the liberties, rights and privileges which they have derived from their ancestors; hereby, after a careful consideration and revision, ordain and establish the following constitution and form of civil government." Similarly, the preamble to the Bill of Rights provides "[t]hat the great and essential principles of liberty and free government may be recognized and established, WE DECLARE . . . ."

Our state's constitutional text and unique constitutional history are not, however, the only reasons that we have been, and should continue to be, open to recognizing unenumerated rights. Such openness also is demanded by the theory of constitutionalism itself. "[A] constitution intended to endure for ages to come . . . [must] be adapted to the various crises of human affairs." *McCulloch* v. *Maryland*, 17 U.S. (4 Wheat.) 316, 415, 4 L. Ed. 579 (1819), quoted in *Cologne* v. *Westfarms Associates*, 192 Conn. 48, 80, 469 A.2d 1201 (1984) (*Peters, J.*, dissenting). "Although state constitutions are more readily amended than is the federal constitution, state judges bear an independent responsibility for making state constitutions adaptable to current conditions." E. Peters, "State Constitutional Law: Federalism in the Common Law Tradition," 84 Mich. L. Rev. 583, 586 (1986). Without such adaptations, cultural and technological changes will disable courts from discharging their constitutional responsibility for protecting the democratic framework that the constitution establishes. See *Cologne* v. *Westfarms Associates*, supra, 70 (*Peters, J.*, dissenting) (discussing need to recognize free speech protections in modern mall, which is modern analogue to eighteenth century public green and appropriate place for public discourse).

B

The state constitution, furthermore, affords no reasonable basis for limiting the recognition of unenumerated constitutional rights to "negative rights."[5] When the framers of the 1818 constitution expressly enumerated rights in the written constitution, they provided both negative and affirmative rights. See, e.g., Conn. Const. (1818) art. I (Bill of Rights), and art. VIII, § 2 (now art. VIII, § 4) ("[t]he fund, called the SCHOOL FUND, shall remain a perpetual fund, the interest of which shall be inviolably appropriated to the support and encouragement of the public, or common schools throughout the state, and for the equal benefit of all the people thereof"); *Horton* v. *Meskill*, 172 Conn. 615, 646–48, 376 A.2d 359 (1977) (relying on preconstitutional history of support of public schools and article VIII, § 4, to declare that constitution creates fundamental right to education). The preamble to the constitution also speaks of both types of rights. See Conn. Const., preamble (expressing framers' desire "more effectually to define, secure, and perpetuate the liberties, rights and *privileges* which they have derived from their ancestors" [emphasis added]). The social compact that was serving as Connecticut's "constitution" before 1818 was understood to provide certain affirmative rights. See infra and part II B of this opinion. Finally, the history of our constitution's adoption does not demonstrate any intent to preserve unenumer-

---

[5] As the majority notes, in *Cologne* v. *Westfarms Associates*, supra, 192 Conn. 61, this court stated that the rights enumerated in article first of the state constitution only protect individuals against government action. Contrary to the majority's implication, however, our statement in *Cologne* was not meant to distinguish between rights against government action and rights to government action; in that case, we merely enunciated a difference between rights against *government* action and rights against *private* action. Moreover, even if *Cologne* could be read to suggest that the rights enumerated in article first are purely "negative" rights, that case certainly does not decide that *un*enumerated rights also would be so limited.

ated negative rights but to abrogate unenumerated affirmative rights.[6]

Even more importantly, the constitutional theory that supports the recognition of unenumerated rights applies equally whether those rights are affirmative or negative rights. The drafters of the constitution intended to create a constitutional framework that would protect democratic values whatever the future circumstances. See *Cologne* v. *Westfarms Associates*, supra, 192 Conn. 79–80 (*Peters, J.*, dissenting). That original intention should not be frustrated by an unwarranted distinction between affirmative and negative unenumerated rights.

The history of the 1965 constitutional convention, during which article eighth, § 1, was added to our constitution, does not detract from the conclusion that the constitution continues to protect unenumerated affirmative rights. As the majority correctly notes, several delegates to that convention argued that the constitution should be amended so that it would provide an express right to public elementary and secondary edu-

---

[6] At least one constitutional convention delegate appeared to anticipate early in the convention that the provision of certain enumerated negative rights in the Bill of Rights might lead to confusion as to whether there remained unenumerated affirmative obligations. Governor John Treadwell, a federalist delegate to the convention, suggested that instead of having a Bill of Rights that specified only the rights of the people, "it might be provided what the legislature *may* do, what they *may not* do, and what they *shall* do; the powers of the executive and judiciary might be enlarged, and the rights of the people, to do this, should be incorporated under the several distinct heads. Such a list of distinct propositions [in the Declaration of Rights], it was improper to pass by themselves; it would be more advantageous, as well as systematical, to apportion the rights to be incorporated under their distinct heads." (Emphasis added.) Constitutional Debates, supra, 65 Conn. B.J. SI-17. Governor Treadwell's suggestion obviously was not adopted, and he voted against the constitution as drafted. Id., SI-7 n.10. One possible interpretation of the other delegates' rejection of Governor Treadwell's suggestion is that they did not believe that the structure of the constitution would create the problem that he feared.

cation. See 3 Proceedings of 1965 Connecticut Constitutional Convention pp. 1039–68. The statements of those delegates, however, do not demonstrate that the delegates believed that rights not expressly enumerated were without constitutional protection. Nearly all of the delegates who discussed the right to education spoke of the right as if it already existed; many expressed surprise that the right was not already enumerated; and the sole question was whether a universally agreed upon principle should be expressly enumerated in the new constitution. See id. The statements therefore show only that, having had the issue of education brought to their attention, and in light of the state of constitutional jurisprudence in 1965, the delegates thought it prudent expressly to enumerate a previously unenumerated right to guarantee its recognition. There is no evidence that the delegates believed that the right to education should be the only previously unenumerated right incorporated into the 1965 constitution; nor is there evidence that the delegates even examined the historical record relating to the existence of other such rights. The 1965 reenactment of the 1818 constitution, with only minor changes, therefore, must be read to preserve the earlier framers' understanding that the constitution was not an all-inclusive document.[7]

In determining what claims rise to the level of unenumerated constitutional rights and assessing the scope of such rights, we must exercise judicial constraint. Because we cannot rely on a specific text in recognizing unenumerated rights, we must take care

---

[7] Our decision in *Horton* v. *Meskill*, supra, 172 Conn. 615, moreover, makes clear that the 1965 constitutional amendment was not necessary to create a fundamental constitutional right to education. In that case, we recognized the existence of the right to education based only on the pre-1818 history of educational funding and the provision in the constitution of 1818 that there was to be a perpetual school fund, and not on the constitutional provisions that had been added in 1965. See id., 646–48.

not to extend such rights beyond the contours that the historical record supports. Our exercise of constraint does not, however, warrant a refusal to recognize the existence of unenumerated affirmative constitutional rights.

## II

The conclusion that our constitution embodies affirmative as well as negative unenumerated constitutional rights does not itself resolve the principal issue in this appeal. The majority concludes that, even if there are unenumerated affirmative obligations inherent in our state constitution, there is no basis for a constitutional obligation to support poor people under any circumstances. I disagree.

The plaintiffs have offered considerable historical evidence that, before the promulgation of the Connecticut constitution of 1818, the governmental authorities in this state recognized their obligation to provide minimal subsistence to those who were in dire need of help. The majority does not dispute the accuracy of the historical picture painted thereby but declares that this history has no constitutional significance, because it finds the historical record relating to an obligation for support of the poor to be "ambiguous and contradictory." In particular, the majority argues that the historical sources are ambiguous and contradictory as to whether the government supported the poor out of a sense of constitutional duty, charity or punitiveness. The majority further argues that the historical sources are ambiguous and contradictory as to the level of support that the government was obligated to provide, because some of the sources do not specify a particular level of support and others suggest that the government had to provide a level of support above the minimum for which the plaintiffs contend. These arguments are unpersuasive.

## A

The test that we apply to interpret our state constitution requires us to consult, inter alia, history. See *State* v. *Geisler*, 222 Conn. 672, 685, 610 A.2d 1225 (1992). In rejecting the historical sources because the legislators' motivations and the scope of the alleged right were "ambiguous and contradictory," the majority makes that test meaningless, for two reasons.

First, history of legislative motivations is *always* ambiguous and contradictory. Even with the most complete sources, we never will be able to say for *certain* that persons framing our constitution, drafting our statutes or interpreting our common law more than two hundred years ago had a unitary and specific intent. The purpose of the historical inquiry under *Geisler*, therefore, is not to determine to an absolute certainty what motivated people to take particular actions, but rather to make a *prediction* about what *most likely* motivated people to take those actions. Ambiguity is the beginning, not the end, of that inquiry.

Second, the mere fact that the historical record is ambiguous as to the *scope* of a constitutional obligation tells us nothing about the *existence* of such an obligation, because the scope of *every* constitutional principle is ambiguous *by design*. All constitutions—whether enumerated or unenumerated—attempt to set out only "ambiguous" governing principles, so that those principles are general enough to be adapted to fit the very different facts and circumstances that may exist in the future. The scope of constitutional principles, in other words, can never be predetermined, but always must be left for future determination on a case-by-case basis. See, e.g., *Nielsen* v. *Kezer*, 232 Conn. 65, 74–75, 652 A.2d 1013 (1995) (scope of principle of separation of powers); *Woodcock* v. *Journal Publishing Co.*,

230 Conn. 525, 536–37, 646 A.2d 92 (1994) (scope of defenses to libel action based on first amendment); *State* v. *Cosgrove*, 181 Conn. 562, 583–84, 436 A.2d 33 (1980) (scope of rights afforded by confrontation clause); *State* v. *Conlon*, supra, 65 Conn. 489 (calling for case-by-case analysis of boundaries between legislative actions and unenumerated rights).

It is true that a well established jurisprudential doctrine counsels us to construe ambiguous constitutional principles narrowly. We rely on that doctrine when, in deciding constitutional challenges to particular government conduct, we demand proof that the conduct violates the constitution "beyond a reasonable doubt." See, e.g., *State* v. *Ross*, supra, 230 Conn. 236; *State* v. *Joyner*, 225 Conn. 450, 460, 625 A.2d 791 (1993); *State ex rel. Andrew* v. *Lewis*, 51 Conn. 113, 127–28 (1883).

That jurisprudential doctrine, however, does not and cannot apply to our initial decision of whether a constitutional principle *exists in the abstract*—i.e., without reference to a particular government action. In resolving the initial question of whether any constitutional principle exists, we cannot require proof of its existence "beyond a reasonable doubt"; historiography tells us that such proof is impossible. We also cannot demand an unambiguous definition of the scope of the constitutional principle; constitutional theory tells us that such a definition can be constructed only on a case-by-case basis.

It is only *after* we have determined that a constitutional principle exists that we must scrutinize it carefully, to determine whether it bars the particular government action being challenged. See, e.g., part IV of this opinion; see also *Horton* v. *Meskill*, supra, 172 Conn. 648–50 (*first* determining that constitution provides right to education; *then* determining whether legislative fund-

ing mechanism violates constitution beyond a reasonable doubt). If we demand unambiguous history before deciding that rights exist, our search for such rights necessarily will become a pro forma exercise that leads to a foregone conclusion.[8]

### B

Despite its intrinsic ambiguities, the historical record persuades me that in Connecticut, before 1818, it was understood that the government had an inherent duty to ensure that no one who complied with reasonable conditions would be left to starve or freeze in the streets. That duty is sufficiently embedded in our history to warrant its constitutional recognition.

The existence of the constitutional obligation to provide minimal subsistence is demonstrated most clearly by the writings of our two most preeminent eighteenth century jurists, Chief Justice Swift and Judge Root.[9] Both Swift and Root expressly stated that the government had an "obligation" or a "duty" to help the poor. For example, Swift wrote that "[t]he selectmen are bound to provide necessaries for all the inhabitants of the town, who are incapable of supporting themselves. Towns are obliged to support their respective inhabitants, whether living in the town to which they belong, or any other town, either with or without a certificate, who may need relief . . . ." 1 Z. Swift, supra, p. 119. Root further explained that this govern-

---

[8] The majority's reasoning would be the equivalent of stating that, if our written constitution did not explicitly enumerate a right to "due process," we would be forced to declare that there was no such right because some parts of the historical record did not specify exactly why such a right was being recognized, and because other parts of the historical record lent themselves to more generous interpretations of the alleged right than others.

[9] As the majority notes, we repeatedly have treated these writings as authoritative when examining the common law antecedents of our constitutional law. See, e.g., *State* v. *Chapman*, 227 Conn. 616, 628, 632 A.2d 674 (1993); *State* v. *Joyner*, supra, 225 Conn. 467; *State* v. *Oquendo*, 223 Conn. 635, 650, 613 A.2d 1300 (1992).

mental obligation was prestatutory and that the statutes merely implemented the obligation. As Root wrote: "[T]he highest character given of any ruler on earth is, that he judgeth the people in his righteousness, and the poor with judgment; that he delivereth the needy when they cry, and the poor that hath no helper; that he dealeth bread to the hungry, and delivereth him that is ready to perish. It is the *duty* of every government to protect and to provide for the poor; the laws of the state *therefore* humanely enact and ordain . . . that every town shall take care of, provide for and maintain, its own poor." (Emphasis added.) J. Root, 1 Root's Reports, pp. xxviii (1789–93).

The governmental obligation also is reflected—either implicitly or explicitly—in every codification of the statutes of Connecticut, beginning with the Ludlow Code of 1650, and continuing to the present day—an unbroken line stretching for nearly 350 years. See footnotes 58 through 64 of the majority opinion (reprinting statutes). Contrary to the majority's suggestion, moreover, these statutes *do* contain "evidence that there was an inherent obligation on the part of the towns, other than that mandated by the colonial government, to care for the indigent." An obligation to support the poor was not expressly imposed by statute until 1672. See footnote 59 of the majority opinion (reprinting statute of 1672). Nevertheless, the Ludlow Code reflects that, even before 1650, there were disputes between the towns about where indigent persons had been "lawfully settled," and it was necessary to establish a procedure by which the general court could decide these disputes. See footnote 58 of the majority opinion (reprinting Ludlow Code). Such disputes would only have surfaced, of course, if the towns *already* were operating under the assumption that they were obligated to support poor people who had been settled in their towns, but not poor people from other towns. The

Ludlow Code is thus consistent with the interpretation of Judge Root that the duty to support the poor preceded the enactment of statutes explicitly requiring such support.[10]

The existence of some kind of governmental obligation is entirely consistent with the observation of the majority that "in the entire period before the constitution of 1818, local elected officials had wide discretion to decide the nature of, amount of and eligibility criteria for receiving" governmental assistance. During the relevant time period, elected officials even had the power to impose various harsh conditions on the provision of support. Neither type of discretion, however, undermines the premise that the government retained some obligation to support the poor.

Beginning in 1702, the laws and statutes explicitly gave elected officials discretion to decide who was eligible for support, how much support was necessary, and the form of such support. See footnotes 60 through 63 of the majority opinion (reprinting statutes). Nevertheless, the laws and statutes also provided in unambiguous terms that there was a baseline obligation to maintain the poor at a level of minimum subsistence. For example, a 1702 law provided that "each Town within this Colony shall maintain their own poor; and the Select-men or Overseers of the Poor (where any such are Chosen) shall at times keep the Town Stock;

---

[10] The statutes reenacting the governmental duty to support the poor in 1821 and thereafter; see footnotes 63 and 64 of the majority opinion; further demonstrate that, by the time the written constitution was adopted, the support of the poor was firmly entrenched as a civil, and not a religious, duty. In 1821, the statutes were amended with the intent of implementing the constitutional disestablishment of the Congregational church and the theory of separation of church and state. See General Statutes (1821 Rev.) preface (1824 Ed.) pp. x–xi; see also *Snyder* v. *Newtown*, 147 Conn. 374, 385, 161 A.2d 770 (1960) (relying on 1821 statute to determine meaning of constitutional prohibition against compulsory support of a church).

who shall have full power to disburse or expend what they shall judge meet from time to time for the relief and supply of any of the poor belonging to their Town, so far as Five Pounds will extend; and if more be needful, the said Select-men or Overseers, or the major part of them, shall with the advice of the Assistants (if there be any in the Town) disburse what shall be by them judged needful for the relief of the poor as aforesaid . . . for the supplying their Poor, or any of them with Victuals, Cloathing, Fire-wood, or any other thing necessary for their support or subsistance." Acts and Laws of His Majesties Colony in Connecticut in New England (B. Green & J. Allen pubs. 1702) p. 94; see footnote 60 of the majority opinion. Except for changes in the applicable dollar amounts, the statute of 1808, which was in effect when the constitution was enacted, was to the same effect. General Statutes (1808 Rev.) tit. CXXX; see pp. 606–607 of the majority opinion.

Throughout the eighteenth century, the statutes also afforded the towns wide authority to impose conditions on support. For example, a town that "was bound by law to support a person, had a right to restrain his locomotion, and place him where his support would be most cheap and convenient." *Backus* v. *Dudley*, 3 Conn. 568, 573 (1821). In particular, a town could place its employable poor into workhouses; it could require them to work in exchange for food; and it could impose corporal punishment on them if they did not work. A town even was permitted to separate families, binding out the children of the poor as apprentices or servants. General Statutes (1808 Rev.) tit. CXXX, § 5, and tit. CLXXVI, § 21; see pp. 607 and 608, respectively, of the majority opinion.

The towns' historical discretion to impose conditions on the provision of support demonstrates that the towns' obligation was not unlimited, but it does not demonstrate that the obligation did not exist. The stat-

utes explicitly recognized the underlying obligation of the towns to "maintain their own poor; and . . . [to supply] their Poor, or any of them with Victuals, Cloathing, Fire-wood, or any other thing necessary for their support or subsistance." Acts and Laws of His Majesties Colony in Connecticut in New England, supra, p. 94; see footnote 60 of the majority opinion. The majority's construction of these statutes as having been designed merely to punish and isolate the poor cannot be reconciled with the fact that the statutes do not merely establish workhouses and provide for the binding out of children but also expressly state the underlying obligation to provide support of some kind.

The historical evidence shows, therefore, that, at the time of the adoption of the 1818 constitution, a governmental obligation to support the poor had served as the implicit or explicit premise of more than 168 years of legislation. This obligation was understood to be fundamental to the organization of our state and inherent in natural law. The obligation was in no way absolute, as elected officials had wide discretion to decide how that obligation would be implemented or to impose conditions on the provision of support. Nevertheless, if a person met the applicable conditions and criteria and otherwise would have no other means to survive, support could not be denied.[11]

---

[11] The majority is correct that a series of our post-1818 cases contain a dictum to the effect that "[a] town is under no common-law obligation for the support of paupers. Its sole liability in this respect is imposed by statute, and it is not liable for a pauper's support any farther than statute makes it so. . . ." (Citation omitted; internal quotation marks omitted.) *Middlesex Memorial Hospital* v. *North Haven*, 206 Conn. 1, 5, 535 A.2d 1303 (1988); *William W. Backus Hospital, Inc.* v. *Norwich*, 146 Conn. 686, 689, 155 A.2d 916 (1959); *State* v. *Bristol*, 139 Conn. 469, 471, 95 A.2d 78 (1953); *Beacon Falls* v. *Seymour*, 44 Conn. 210, 214 (1876).

These statements, however, have neither much weight nor much relevance. In none of the cases in which the court issued the dictum was the court even asked to decide whether the common law provided rights greater

## III

Recognition of this limited, conditional governmental obligation is supported not only by the historical record, but also by contemporary considerations of law and public policy. The majority declines to address most of these contemporary considerations on the grounds that (1) any judicial recognition of a right to minimal support will invalidate all general assistance eligibility requirements, and (2) the choice to provide such support is a question of "morality, 'policy and value' " that is reserved to the legislature. I disagree with the majority that recognition of the constitutional right asserted here will fetter legislative attempts to establish reasonable eligibility requirements. Moreover, in my view, our duty to construe the state constitution requires us to undertake the plenary analysis outlined in *State* v. *Geisler*, supra, 222 Conn. 684–85, which includes consideration of issues of morality, policy and value. Contemporary economic, sociological, legal and moral considerations overwhelmingly support the recognition of a qualified right to some limited form of governmental assistance to assure minimal support for our poor citizens.

---

than those contained in the statute: in each case, the plaintiff's *only* argument was that the statute required the town to reimburse the plaintiff for support that had been provided. Indeed, none of these cases even reviewed the common law before enunciating the dictum. In addition, all the cases significantly postdate the drafting of our written constitution.

Even were we to assume that the court's enunciation of the dictum grew out of a considered and reasoned interpretation of our law, none of the cases could be read to decide the issue now before us—whether, in the absence of any contemporary statute requiring support, the constitution would require the government to maintain a minimal safety net for the poor. The dicta suggest only that the common law imposes no obligation to support the poor "any further than statute" already imposed at the time the cases were decided. The dicta are thus consistent with the result I reach in this case—that the statute adequately fulfills the government's constitutional obligation. See part IV of this opinion.

A right to governmental support is even more important today than it was 350 years ago, when our forebears recognized the right. In their largely agricultural society, with a vast, unsettled western frontier, paid work presumably was available to everyone who wanted it. In today's postindustrial society, on the other hand, almost all jobs that pay a living wage require skills or educations that many poor people neither possess nor have the economic resources to acquire. There also is no longer any opportunity to "go west," homestead new land, and grow the food necessary for survival. See A. Amar, "Forty Acres and a Mule: A Republican Theory of Minimal Entitlements," 13 Harv. J. L. & Pub. Policy 37, 41 (1990) (comparing today's "safety net" to nineteenth century "safety valve" of western frontier).

Finding a governmental obligation of minimal subsistence in the constitution also is justified by our contemporary notions about democracy and universal suffrage. Although the constitution of 1818 did not so provide, our state constitution now extends the suffrage to all adults, regardless of race, gender, or economic circumstances.[12] Individuals who have no food, clothing, shelter or medical care will, in all likelihood, be severely hampered in their ability to vote or otherwise to participate in the political process. The right to minimal subsistence can therefore be justified as necessary to ensure that the unsheltered poor—a truly discrete and insular minority group—have access to the political process. See generally F. Michelman, "Wel-

---

[12] The constitution of Connecticut, article sixth, § 1, as amended by article nine of the amendments, provides: "Every citizen of the United States who has attained the age of eighteen years, who is a bona fide resident of the town in which he seeks to be admitted as an elector and who takes such oath, if any, as may be prescribed by law, shall be qualified to be an elector."

fare Rights in a Constitutional Democracy," 1979 Wash. U. L.Q. 659, 676–78 (arguing that right to subsistence is one of rights properly enforceable by courts as "representation-reinforcing" under Professor John Ely's analysis); see also J. Ely, Democracy and Distrust: A Theory of Judicial Review (1980); L. Tribe, American Constitutional Law (2d Ed. 1988) p. 778.

These contemporary economic circumstances and contemporary conceptions of democracy already have led the international community to incorporate a right to subsistence into the international law of human rights. For example, article 25 (1) of the Universal Declaration of Human Rights declares that "[e]veryone has the right to a standard of living adequate for the health and well-being of himself and of his family, including food, clothing, housing and medical care and necessary social services, and the right to security in the event of unemployment, sickness, disability, widowhood, old age or other lack of livelihood in circumstances beyond his control." Universal Declaration of Human Rights (1948), U.N. Doc. A/811, reprinted in Basic Documents on Human Rights (3d Ed. 1992) pp. 21, 26 (Basic Documents).

Article 11 (1) of the International Covenant on Economic, Social and Cultural Rights (International Covenant), which supersedes the Universal Declaration of Human Rights for the 104 states that are parties to it,[13] similarly provides that "[t]he States Parties to the present Covenant recognize the right of everyone to an adequate standard of living for himself and his family, including adequate food, clothing and housing, and to the continuous improvement of living conditions. The States Parties will take appropriate steps to ensure the realization of this right . . . ." International Cov-

[13] This figure is as of 1991. B. Stark, "Economic Rights in the United States and International Human Rights Law: Toward an 'Entirely New Strategy,'" 44 Hastings L.J. 79, 80–81 n.8 (1993).

enant on Economic, Social and Cultural Rights, Jan. 3, 1976, 993 U.N.T.S. 3, reprinted in Basic Documents, supra, pp. 114, 118; see also Centre for Human Rights, United Nations, Right to Adequate Food as a Human Right (1989); The Right to Food: Guide Through Applicable International Law (K. Tomasevski ed. 1987); Symposium, "The Right to Food: The International Perspective," 30 Howard L.J. 223 (1987); The Right to Food (P. Alston & K. Tomasevski eds. 1984).

Although the United States is not a party to the International Covenant, and although no right to subsistence may yet apply to this country as part of customary international law; see, e.g., R. Bard, "The Right to Food," 70 Iowa L. Rev. 1279, 1289 (1985); the wide international agreement on at least the hortatory goals identified in the human rights documents strongly supports the plaintiffs' claim. See B. Stark, "Economic Rights in the United States and International Human Rights Law: Toward an 'Entirely New Strategy,' " 44 Hastings L.J. 79 (1992) (arguing that International Covenant should be read to inform United States state courts' interpretation of state constitutions); comment, "Human Rights and Basic Needs: Using International Human Rights Norms to Inform Constitutional Interpretation," 34 U.C.L.A. L. Rev. 1195 (1987) (same); see also Boehm v. Superior Court, 178 Cal. App. 3d 494, 502, 223 Cal. Rptr. 716 (1986) (relying on Universal Declaration of Human Rights to interpret state statutory duty to support poor); cf. Sterling v. Cupp, 290 Or. 611, 617 n.9, 622 and n.21, 625 P.2d 123 (1981) (relying on Universal Declaration of Human Rights to interpret state constitutional provision relating to treatment of prisoners).

Finally, the writings of many of this country's leading constitutional scholars support the recognition of the right to minimal subsistence. See, e.g., A. Amar, supra, 13 Harv. J. L. & Pub. Policy 37; C. Black, "Fur-

ther Reflections on the Constitutional Justice of Liveli-hood," 86 Colum. L. Rev. 1103 (1986); P. Edelman, "The Next Century of Our Constitution: Rethinking Our Duty to the Poor," 39 Hastings L.J. 1 (1987); F. Michelman, supra, 1979 Wash. U. L.Q. 659; F. Michel-man, "In Pursuit of Constitutional Welfare Rights: One View of Rawls' Theory of Justice," 121 U. Pa. L. Rev. 962 (1973); L. Tribe, supra, p. 778.

To be sure, there are scholars who dispute that such a right should be recognized. Most of their objections, however, center on problems with finding such a right in the *federal* constitution. They point to limitations of the federal constitutional text, to the constitutional the-ory that the federal government is a government of limited powers and to the absence of a history of fed-eral support for the poor until the 1930s. See, e.g., *Bowers* v. *DeVito*, 686 F.2d 616, 618 (7th Cir. 1982) (Posner, J.) (federal constitution "is a charter of nega-tive liberties . . . it does not require the federal government or the state to provide services"); R. Bork, "Commentary—The Impossibility of Finding Welfare Rights in the Constitution," 1979 Wash. U. L.Q. 695; H. Monaghan, "Commentary—The Constitution Goes to Harvard," 13 Harv. C.R.-C.L. L. Rev. 117 (1978); R. Winter, "Poverty, Economic Equality, and the Equal Protection Clause," 1972 Sup. Ct. Rev. 41.

The only scholarly objections that appear relevant to our inquiry—and indeed, the only objections that the majority expresses—are that recognizing a right to gov-ernmental support will be: (1) judicially unmanageable, as it will force judges to decide the constitutionality of every change to the welfare program and to second-guess policy judgments of the legislature; and (2) coun-terproductive, as it will decrease poor people's incen-tives to become self-sufficient and thereby extend the cycle of poverty. See, e.g., R. Bork, supra, 1979 Wash U. L.Q. 699–701; R. Ellickson, "The Untenable Case

for an Unconditional Right to Shelter," 15 Harv. J. L. & Pub. Policy 17 (1992); S. Neilson, "Right to Shelter Under the Connecticut Constitution," 67 Conn. B.J. 441 (1993).

Such objections do not foreclose the recognition of a limited constitutional right that obligates government to provide only minimal subsistence but reserves to government broad discretion about the manner in which such an obligation is to be implemented. The history of the right to subsistence teaches us that, although there is a minimal obligation to provide support, elected officials have discretion to determine who is eligible for support, to fix the level of support, to determine the means by which support is to be provided, and to impose conditions on the provision of support, such as the condition that recipients perform work or acquire other skills.[14] Judicial intervention will not be warranted to enforce the constitutional obligation except in the most extreme cases—where individuals demonstrate that: (1) without government support, they actually will be unable to secure the necessaries of life such that they will face a grave threat to their health or welfare; and (2) for reasons beyond their control, they could not comply with the conditions the statute imposes. Judicial intervention to enforce a constitutional obligation only in such narrowly defined circumstances of severe deprivation meets all legitimate jurisprudential objections. See, e.g., R. Ellickson, supra, 15 Harv. J. L. & Pub. Policy 17; note, "Making Shelter Work: Placing Condi-

[14] Of course, there may be constitutional limitations on the types of conditions that the legislature may impose on the provisions of benefits. See, e.g., footnote 48 and p. 608 of the majority opinion (discussing constitutional rights to travel and equal protection and the constitutional prohibition of involuntary servitude); see also note, " 'Unconscionable' Conditions: A Contractual Analysis of Conditions on Public Assistance Benefits," 94 Colum. L. Rev. 193, 196–220 (1994). These limitations already constrain the actions of the legislature, however, and do not depend on whether we recognize a right to minimal subsistence.

tions on an Employable Person's Right to Shelter," 100 Yale L.J. 491 (1990).

In sum, our constitutional framers, the contemporary academy, and the international community all support the conclusion that the government may not stand idle while its poorest residents die in the streets because of lack of food, shelter, clothing or medical care. The government has wide discretion in implementing its constitutional obligation and in imposing reasonable conditions on the provision of minimal support. The government, nonetheless, has a constitutional obligation to provide minimal subsistence.

## IV

The existence of the government's constitutional obligation to provide minimal subsistence is a necessary but not a sufficient predicate for the plaintiffs' cause of action. I would affirm the trial court's denial of a temporary injunction in this case because, in my view, on the facts presented, the plaintiffs have failed to prove that General Statutes (Rev. to 1993) § 17-273b was an improper exercise of the legislature's broad discretion to implement its obligation to provide minimal subsistence.

On its face, § 17-273b is entirely consistent with historical limitations on governmental support. Like the laws and statutes of 1702 and 1808, which limited monetary support to a particular dollar amount but allowed the towns to exceed that limit if they thought it necessary; see part II B of this opinion; § 17-273b limits the duration of some benefits to nine months but allows the towns to exceed that limit if they think it necessary. Moreover, at the same time that § 17-273b was amended to impose the nine month limit on those benefits, funding was increased for other programs designed to benefit poor people. See footnote 68 of the majority opinion (describing programs).

Similarly, the intent behind the nine month limit is consonant with, rather than in abrogation of, the governmental obligation to care for the poor. As one legislator explained, and as witnesses at trial confirmed, the statute was designed to help poor people in the long run, by creating stronger incentives for employable people to find jobs and thus breaking the cycle of dependence on welfare. Legislators reasonably could have believed that it was better to provide full benefits for nine months, so as to encourage recipients to seek employment during the three month hiatus, rather than to provide benefits for twelve months at a lower monetary amount. See, e.g., 35 H.R. Proc., Pt. 24, 1992 Sess., pp. 8053–54, remarks of Representative Joseph D. Courtney ("[B]ut most fundamentally is the much more concerted effort which will be made to move able-bodied employable recipients of this program into work. . . . First of all, it will put limits on what the program will pay. There will be an end of the road for able-bodied recipients which the[y] must, at that point, contend with the fact that they either are going to have to do better in their efforts to find employment or they lose cash benefits."); id., Pt. 23, p. 7626, remarks of Representative Joseph D. Courtney ("perhaps one way of finding some savings, since there were other addbacks occurring during the budget process, was to reduce the grant level for employables to give that additional incentive to go out and fin[d] work"); see also footnote 67 of the majority opinion (discussing trial testimony).

In this case, furthermore, there is no evidence of record that, because of the enactment of § 17-273b, any plaintiff has in fact been unable to secure the specific "necessaries" of life to which he or she might be constitutionally entitled as a matter of minimal subsistence. There is no evidence that, as a result of the statutory scheme at issue, any plaintiff faced or now faces a grave threat to his or her health or welfare due to the lack

of any of these life necessities. The plaintiffs have, therefore, not demonstrated that they are entitled to relief.

I respectfully concur in affirming the judgment of the trial court.

BERDON, J., with whom KATZ, J., joins, dissenting. So there is no confusion as to what this case *(Moore)* and *Hilton* v. *New Haven,* 233 Conn. 701, 661 A.2d 973 (1995) *(Hilton),* are about, let me first state what they are not about. These cases are not about the right of the poor to housing, and they are not about the right to welfare benefits or the right to receive monetary aid from either the state or local government. These cases are not about the extent of the legislature's discretion to determine the level of care that is to be given in order to meet the needs of the poor. And these cases are not about the right of able-bodied persons, who are able to work and for whom there is work, to be on the "dole."

Rather, these cases are about the state constitutional right of the poorest of the poor, when they are destitute and homeless, to the most basic shelter—a cot in a dormitory style barrack—so that they can survive the elements in the dead of the winter and be free from physical suffering and abuse on the street. They are about the right of the poor to the most basic subsistence, such as nourishment at a soup kitchen, when they otherwise have no food and are subject to serious health risks. And they are about the right of this destitute class of persons to minimal, essential medical care.[1] Put sim-

[1] The plaintiffs in these cases do not allege that the state or towns have abrogated their right to receive essential medical care. It is clear, however, that essential medical care is a vital component of the fundamental right to minimal subsistence. Therefore, I refer to the right to minimal subsistence as including shelter, food and essential medical care even though medical care has not been raised as an issue.

ply, these cases are about the state government's obligation to provide the minimal subsistence necessary for *humane survival* to those of its population who are utterly impoverished.

Connecticut has recognized, from the time the colony first came into existence in the middle of the seventeenth century, that the government must provide these survival needs for the indigent. This history demonstrates that the collective conscience of our people requires that these provisions be made for the poor. Furthermore, it is clear that this historic right of the poor, which equates to the right to humane survival, is absolutely fundamental and is implicit under our state constitution. Therefore, any legislative act that restricts the right to the minimal subsistence necessary for such survival must withstand constitutional scrutiny.

The *Hilton* and *Moore* cases, which were argued together before this court, include identical classes of plaintiffs—persons who are destitute.[2] Although the *Hilton* case focuses solely on the right to shelter and the *Moore* case on the more general right to minimal subsistence, I will meld the analysis of these cases together because they essentially raise the same issues in challenging the state constitutionality of General Statutes (Rev. to 1993) §§ 17-273b and 17-273d, as

---

[2] The plaintiffs in *Hilton* brought, and the trial court certified, that case as a class action on behalf of themselves and similarly situated individuals in the city of New Haven who were then or would in the future become homeless. The representatives of the class are Herbert Hilton, Steven McEwen, Bobby Walker, Star Williams, Deidre Colburn and Janet Cardin, homeless individuals who all have been denied shelter.

The plaintiffs in *Moore* are Hamilton Moore, Francisco Rivera, Russell Scudder, William Simpson and Enrique Velez, poor people who otherwise had complied with the requirements to receive general assistance benefits; see General Statutes (Rev. to 1991) § 17-273b; but whose benefits were terminated for a three month period in accordance with No. 92-16 of the 1992 Public Acts, Special Session, May, 1992. See footnote 3 of this dissent. Although the *Moore* plaintiffs sought to have this action certified as a class action, the trial court deferred action on class certification.

these statutes incorporated No. 92-16, §§ 6 and 7, of the 1992 Public Acts, Special Session, May, 1992 (Spec. Sess. P.A. 92-16).[3]

The plaintiffs in these cases claim that the Connecticut constitution requires the state, through its cities and towns (towns), to provide *minimal subsistence* to persons who are utterly impoverished, and that Spec. Sess. P.A. 92-16 is inconsistent with this obligation. Specifically, the plaintiffs argue that Spec. Sess. P.A. 92-16 unconstitutionally allows towns, in two circumstances, to condition the provision of minimal subsistence on factors without regard to whether a person's humane survival is threatened. First, the act links the availability of shelter to the receipt of general assistance benefits without regard to the circumstances facing the indigent person.[4] Second, the act permits towns to cease providing general assistance benefits, including an allowance for food, to a person who received those benefits for nine of the previous twelve months.

It is clear to me that the preamble to our state constitution establishes an implicit right of destitute persons of Connecticut to receive those things necessary for minimal subsistence—minimal shelter, food and essential medical care. Article first, § 10, of our state constitution protects this right from infringement and provides the mechanism for the enforcement of the right. The towns, to which the state has delegated its obligation to care for the poor, may fulfill their constitutional obligation either by directly or indirectly

---

[3] Citations herein to Spec. Sess. P.A. 92-16 may refer, as the context requires, either to § 17-273b or § 17-273d, as those statutes were amended by the public act, or to the text of the public act itself.

[4] The plaintiffs in the *Hilton* case also argue that, apart from violating the constitutional right to shelter, the city of New Haven has violated § 17-273d, as it incorporates Spec. Sess. P.A. 92-16, by failing to provide sufficient space in city shelters for all of the homeless who qualify under the amended statute.

providing minimal shelter, food and essential medical care, or by furnishing cash payments to the needy individuals. In no event, however, may towns refuse to provide any assistance or provide a level of assistance that does not allow a human being to survive in a humane manner. Furthermore, towns may not be allowed to evade this obligation after providing assistance for only a portion of the year. A human being, after all, cannot survive in a humane manner, or at all, if he is forced to forgo all shelter, food and essential medical care for three out of twelve months.

The state may, however, establish reasonable requirements as a precondition for persons to receive these entitlements. The state, for example, may require able bodied poor persons to participate in workfare programs, to perform work for municipalities and the state or to participate in job training and other educational programs in order to make them more employable. Furthermore, the state need not furnish minimal subsistence, either in-kind or monetary, to a person who is employable *and* for whom employment is available. However, to the extent that Spec. Sess. P.A. 92-16 permits towns to escape their constitutional responsibilities, and to the extent that the defendants have refused to provide minimal subsistence, the state constitutional rights of the plaintiffs have been infringed.

In a case such as this, where seven justices have produced three separate opinions, and where only a bare majority have found no state constitutional right to minimal subsistence necessary for humane survival, it is fruitful to summarize these opinions of my colleagues and my overall concerns about them before proceeding to a more detailed analysis. The majority opinion, which represents the views of only four justices, holds that a person does not have a state constitutional right to minimal subsistence. Chief Justice Peters, in her concurring opinion, helps to bring into sharp focus the posi-

tion of these four justices and of the consequences of their departure from this state's 350 year history. As Chief Justice Peters points out, the majority would constitutionally allow government *"to stand idle while people, without food, shelter, clothing or medical care, were left to die in the streets."* (Emphasis added.)

I am not willing, as are four justices today, to wash away the rich constitutional history of this state merely because the right is difficult to define and because "[t]he decision over the allocation of limited public funds is fraught with judgments of morality, policy and value over which opinions are sharply divided." (Internal quotation marks omitted.) Nor am I willing to attribute to these poor persons an improper motive to get a free ride simply because they seek to compel the state to make shelters available so that they can survive the elements and avoid the crime of the streets. No one who has other choices available would opt instead for a state provided cot in a dormitory style barrack, with all its accompanying indignities. Finally, I am unwilling to characterize the fundamental right to humane survival merely as another claim for economic equality unprotected by the state constitution. Those who "take their lessons from life itself"[5] surely can understand that a right evidenced by the collective conscience of the people of this state and spanning four centuries has been transformed into a firmly rooted constitutional right of fundamental value.

Moreover, I disagree with the majority's decision to address the constitutional issues initially in *Moore,* where there is a limited factual record because of the nature of that litigation,[6] and then to bootstrap that

---

[5] L. Tribe, American Constitutional Law (2d Ed. 1988) p. 779; see footnote 61 of this dissent.

[6] The plaintiffs in *Moore* initiated the action before their benefits were terminated, seeking declaratory and injunctive relief against Bridgeport to prevent the city from implementing the provisions of Spec. Sess. P.A.

state constitutional ruling into *Hilton*, which has been certified as a class action and for which there is a complete factual record. The certified class of plaintiffs in *Hilton* consists of persons who are homeless and who have been forced to endure the dead of winter in abandoned houses with no beds and no heat, or in the outdoors, where they have been subject to physical abuse while attempting to use park benches as their beds.

The concurring opinion of the Chief Justice, on the other hand, concludes that there is a state constitutional right to minimal subsistence. Although I agree with much of the scholarly constitutional analysis contained in the concurrence, I disagree both with its formulation of the extremely limited quality of this right and with its conclusion that there is an insufficient record in either *Moore* or *Hilton* to sustain the appeals of these poor plaintiffs.

First, the concurrence contends that the constitutional right to subsistence does not arise until poor persons prove that, as a result of a statute enacted by the legislature, they "will be unable to secure the necessaries of life such that they will face a grave threat to their health or welfare" and "for reasons beyond their control, they could not comply with the conditions the statute imposes." *Peters, C. J.*, concurring, p. 640. As I will demonstrate in this dissent, this was not the standard our ancestors demanded, nor should it be the one to which we adhere today. More importantly, such a standard loses sight of the nature of the constitutional right and of the complete deprivation of benefits caused

92-16. The trial court, acting ex parte, granted a temporary restraining order to that effect to preserve the status quo until it could hold a hearing on the application for a temporary injunction. After a two day hearing, the trial court denied the temporary injunction and vacated its earlier restraining order. It was from that minimal record that the plaintiffs appealed directly to this court pursuant to General Statutes § 52-265a. See footnote 3 of the majority opinion; see generally part I B of this dissent.

by Spec. Sess. P.A. 92-16. That act relieves towns, under any and all circumstances, of their responsibility of caring for their poor for a period of three months out of every year, and restricts the availability of shelter only to those receiving general assistance benefits. When a poor person has no shelter in the dead of winter, or no food to survive, or is in desperate need of medical care, is that poor person first to consult with a lawyer and bring a legal action? The right is, simply, a right to humane survival. We should not require a poor person to establish, as a preliminary matter, that he cannot survive. Indeed, if that were the case, the existence of the right could become moot, and the nature of the right meaningless. Rather, in this class action we should engage in a facial review of the constitutionality of the statute, as we do for other statutes that may intrude on fundamental constitutional guarantees. See, e.g., *State* v. *Cavallo*, 200 Conn. 664, 670, 513 A.2d 646 (1986) ("[w]here, however, a challenged statute, if vague, could intrude on fundamental constitutional guarantees such as first amendment rights, we will refuse to enforce the statute if we find that it is unconstitutionally vague on its face").

Second, I disagree that the record in these cases does not support the constitutional claims of the plaintiffs. The concurrence disregards the fact that the *Hilton* case is a class action and that the record in that case clearly indicates not only that the named plaintiffs were faced with imminent bodily harm as a result of the city's failure to furnish shelter,[7] but also that at least one

---

[7] Statistics of death among the unsheltered homeless are not available. See footnote 11 of this dissent. Nevertheless, I take judicial notice of the recent deaths of two homeless individuals that occurred while this action was pending before this court. In Stratford, a homeless man in his sixties was found beaten and stabbed to death in an ill-kempt state park known as a "haven for the homeless." (Internal quotation marks omitted.) P. Dilger, "Homeless Man Found Slain in Park," New Haven Register, May 15, 1995, p. 1. In Middletown, a fifty-one year old homeless man drowned after he

member of the plaintiff class had failed to qualify for assistance under the statute for "reasons beyond [his] control."[8]

fell asleep on, and then tumbled off, a ledge overlooking the Connecticut River. L. Held, "Remembering a Friend Called 'Night Train,' " The Middletown Press, May 11, 1995, pp. A1, A8. Although these newspaper accounts do not reveal whether these men were without shelter due to the failure of the respective towns to maintain sufficient shelters for the homeless, common sense suggests that when people are forced to sleep on the streets, some deaths inevitably will result.

[8] In accordance with its formulation of the right, which requires that a person demonstrate an attempt to comply with the relevant statutory provisions, the concurrence concludes that only a limited portion of the evidence before the trial court is relevant to the constitutional claims of the plaintiffs. Rather than considering the testimony of the eight homeless individuals and several other experts who testified in detail in 1989 about the extent of the problem of homelessness in New Haven and the devastating adverse effects of being homeless and being denied emergency shelter, the concurrence considers only the testimony of the six individuals who testified after the enactment of Spec. Sess. P.A. 92-16. As I have indicated, I disagree with the concurrence's interpretation of the state constitutional right, and with the evidentiary burden that this formulation forces upon a poor person who seeks to enforce the right.

Nevertheless, even under the formulation of the concurrence, it appears that at least one plaintiff has satisfied this burden of proof. Thomas Baines is a member of the certified class of plaintiffs in *Hilton*, which was identified as "[a]ll individuals in the City of New Haven who are now or in the future will become homeless, i.e., without a place to live on a temporary or permanent basis, and who request emergency shelter." Baines testified in 1993, after the passage of Spec. Sess. P.A. 92-16, that without a state provided shelter, he would be forced to live in abandoned buildings, cars or a cemetery. He also testified that he had tried to obtain general assistance benefits, and thereby qualify for shelter under Spec. Sess. P.A. 92-16. He was turned down, however, for the sole reason that a typographical error on his prison release record, printed by the New Haven police department, had misspelled his name as "Barns."

Certainly, even the concurrence would agree that Baines needed shelter and that he had failed to qualify under the statute for reasons beyond his control. The concurrence, however, seems to dismiss Baines because he failed to appeal the city's denial of general assistance benefits. Apparently, the concurrence holds that a person not only needs to attempt to comply with the statute, but also must exhaust his administrative and judicial remedies by appealing adverse decisions with respect to the statutory requirements. Only after doing so, according to the concurrence, may the person invoke his constitutional right to minimal subsistence. I cannot help but wonder, however, what such a person would do for food and shelter during that lengthy appeal process.

# I

## FACTS

The *Hilton* and *Moore* cases involve the same classes of plaintiffs and the same constitutional issue, and the consequences of the defendants' action are mostly the same in each. The cases, however, present somewhat different factual backgrounds and arrive at this court with different procedural histories. An accurate presentation of these cases, therefore, requires us to look separately at (1) the history of the *Hilton* case, (2) the history of the *Moore* case, and (3) what is at stake in both.[9]

## A

The *Hilton* case was instituted in response to the decision by the city of New Haven in 1989 to discontinue the operation of one of its three shelters for the homeless. Evidence at trial showed that these shelters had been filled to capacity every night from January, 1989, until this action was brought in April, 1989. Indeed, the shelters were so crowded during this time that as many as fifteen people each night were turned away because there was no room for them. Despite this demonstrated need for homeless shelters, the city of New Haven announced it would close one of the three shelters, which offered a cot, blanket and pillow for seventy-five people every night, as well as a meal at night and in the morning.

The plaintiffs brought this class action seeking an injunction that would prevent the city from closing the

---

[9] I do not attempt to recount every procedural event that followed the filings of these two actions by the plaintiffs. The majority sets forth these procedural histories in sufficient detail, and repeating them in detail here would serve no useful purpose. Rather, I limit my discussion to the pertinent facts and procedural details that resulted directly in the termination of minimal subsistence to the plaintiffs.

shelter and require it to provide adequate emergency shelter to the homeless. On December 27, 1989, the trial court, *DeMayo, J.*, issued the injunction, concluding that General Statutes (Rev. to 1989) § 17-273, now § 17b-116, required the city to furnish emergency shelter to the homeless. The court also ordered the defendants to submit a plan " 'outlining the process by which the . . . order will be implemented.' " The case remained pending in the trial court for the next three years. The city finally filed a plan that was approved by the trial court in May, 1992.

In July, 1992, however, Spec. Sess. P.A. 92-16 became effective. The effect of this statute, in part, was to restrict the obligation of towns to provide shelter for the homeless. The act was incorporated in General Statutes (Rev. to 1993) § 17-273d to require towns to provide shelter only to those persons who received general assistance benefits and were homeless for one of six reasons.[10] In response to this amendment, New Haven asked the trial court to reconsider its issuance of the injunction. On November 6, 1992, the trial court ordered the city to submit a revised plan for compliance with Spec. Sess. P.A. 92-16 and retained jurisdiction to assure that the city did so. The trial court also concluded that the Connecticut constitution does not guarantee a right to shelter. Both parties appealed from the decision of the trial court. On May 26, 1993, the trial court approved a compliance plan drafted by the city that required the city to provide shelter only to the categories of people enumerated under the

---

[10] Carmen Rodriguez, the homeless coordinator of New Haven, testified that, according to a survey conducted by her office in April, 1993, a substantial percentage of the homeless in New Haven do not qualify for emergency shelter under § 17-273d, as that statute was amended by Spec. Sess. P.A. 92-16. Her study indicated that of the seventy-nine homeless persons interviewed, only thirty-seven were recipients of general assistance and only two met the specific shelter eligibility criteria under Spec. Sess. P.A. 92-16.

revised statute. The city then promptly closed a shelter that had offered space for fifty homeless persons every night. As a result, several of the homeless plaintiffs were deprived of shelter.

## B

The *Moore* case was brought in April, 1994, in response to the decision by the city of Bridgeport, pursuant to Spec. Sess. P.A. 92-16, to cease paying general assistance benefits to 750 persons who had received general assistance for nine months. "General assistance is a state run program designed to aid individuals and their families who have insufficient income or assets to meet their essential needs." *Barannikova* v. *Greenwich*, 229 Conn. 664, 672, 643 A.2d 251 (1994). General assistance benefits are administered by the towns and are monetary benefits of last resort for the poor and needy in Connecticut. See id. Benefits are available only to a person "who has not estate sufficient for his support, and has no relatives of sufficient ability who are obliged by law to support him . . . ." General Statutes (Rev. to 1993) § 17-273 (a), now § 17b-116 (a).

Prior to the enactment of Spec. Sess. P.A. 92-16, General Statutes (Rev. to 1991) § 17-273b set forth the following additional requirements for a person to be eligible to receive benefits. This statute prevented "an employable person" from receiving general assistance benefits if he or she had failed to register with the nearest public employment agency, had refused to accept a job offer, or had refused to participate in a training program. The statute, however, did not limit the amount of time that a person otherwise in compliance with program requirements could receive general assistance benefits.

Special Session P.A. 92-16 changed this statute dramatically. The act required towns to pay general assist-

ance benefits to employable persons for only nine months out of a twelve month period, without regard to whether employment for that person was available. Although a town could decide to extend benefits for the final three months, the statute did not require it to do so. On April 1, 1994, the city of Bridgeport elected to cease paying general assistance benefits to 750 employable persons who had been receiving benefits for the previous nine months and who otherwise were in full compliance with the program requirements.

The plaintiffs brought this action on behalf of themselves and the other 750 persons on April 15, 1994. They challenged the constitutionality of Spec. Sess. P.A. 92-16 and sought an injunction barring the city of Bridgeport from terminating their general assistance benefits. At the hearing on the injunction, several of the plaintiffs testified that they had tried to obtain work, but that none was available for them. Without the general assistance benefits, they testified, they would be completely destitute. Moreover, as a result of Spec. Sess. P.A. 92-16, their inability to receive general assistance also meant that towns need not provide them with a cot in a homeless shelter. The trial court, *Vertefeuille, J.*, however, denied the injunction and, as a result, several of the plaintiffs became homeless. The plaintiffs took this appeal from the decision of the trial court.

C

These two cases dramatically demonstrate how Spec. Sess. P.A. 92-16 has the potential to force the poor and impoverished of Connecticut into homelessness, without any income or provision for the basic necessities of shelter, food and essential medical care. In order to appreciate the full effects of Spec. Sess. P.A. 92-16, it is important to understand what it means to be without shelter and the other things necessary for humane

survival. In short, the combination of Spec. Sess. P.A. 92-16 and the actions of the city of New Haven and the city of Bridgeport worked to plunge some Connecticut citizens into the tragedy and despair of living, sleeping and eating on the streets.

The lives and health of the unsheltered homeless are seriously threatened by exposure to the elements. They are exposed to ambient cold or heat that may lead to hypothermia or hyperthermia, either of which may be fatal.[11] R. Bingham, R. Green & S. White, The Homeless in Contemporary Society (1987) p. 109. The unsheltered homeless seek refuge from the elements anywhere they can find it, including trash compactors and garbage bins. M. Hombs, American Homeless (1990) p. 29. The named plaintiff in the *Hilton* case, Herbert Hilton, testified that he has been forced to sleep in parks and abandoned houses in the dead of winter, wrapping himself in discarded rugs and lighting

---

[11] At oral argument and in its brief filed on August 30, 1994, the city of New Haven advanced the proposition that the unsheltered homeless suffer this condition as a result either of their own fault or their own choice. Moreover, the city argued that the plaintiffs in the *Hilton* case have greatly exaggerated the severity of the living conditions of the homeless. The implication the city sought to make, of course, was that unsheltered homelessness is not a life threatening condition. These arguments defy common sense. They suggest that a human being would voluntarily submit to living on the streets during the winter, surrounded by garbage and debris and subject to predatory crime and personal danger. These propositions are wholly without merit.

Homelessness goes hand in hand with a high rate of mortality. The United States Interagency Council on the Homeless reported in 1991, for example, that "the death rate for homeless males in each age group is roughly five times that of non-homeless males." Interagency Council on the Homeless, 1990 Annual Report (1991) p. 34. The report went on to emphasize that the results reported were obtained from studies of homeless individuals living in shelters, and that "the non-service-using homeless" are at even greater risk. Id., p. 36. In addition, untold numbers of homeless persons have frozen to death. See, e.g., M. Hombs, American Homeless (1990) p. 28. Statistics of death among the unsheltered homeless, however, are otherwise unavailable. My research has revealed no study on the subject and such data is not included on death certificates in Connecticut.

small fires to avoid freezing to death. Deidre Colburn, another plaintiff in the *Hilton* case, spent sleepless nights in abandoned houses after being refused a cot at a shelter. She suffered depression and weight loss due to her degrading living conditions.

Renee Boyd, the case manager of the Homeless Health Care Project of the Hill Health Center in New Haven, testified that the filthy conditions in which the unsheltered homeless are forced to live cause and exacerbate health problems such as respiratory ailments, viruses, fevers and muscular diseases. Infectious diseases are rampant among the homeless. The most serious of these are acquired immune deficiency syndrome (AIDS), tuberculosis[12] and sexually transmitted diseases. Staff of the U.S. Commission on Security and Cooperation in Europe, Homelessness in the United States (August 1990) p. 24. A recent study of the homeless revealed that serious dental problems also were pervasive among them. Id.; see J. Momeni, Homelessness in the United States (1989) p. 225.

Of course, the unsheltered homeless have no facilities in which to bathe and groom themselves.[13] They suffer a very high frequency of skin disorders and infestations, including dermatitis, ulcers, boils, scabies and hair or body lice. R. Bingham, R. Green & S. White, *supra*, 109. When an unsheltered homeless person receives an injury, maggots often infest the wound. Id.[14]

---

[12] There has been an alarming worldwide resurgence of tuberculosis in recent years. F. Ryan, How the Battle Against Tuberculosis Was Won and Lost (1993) pp. 389–90. Experts estimate that 10 million Americans are infected with the disease and that homelessness and social deprivation have contributed substantially to its spread. Id., p. 397.

[13] Colburn testified that being homeless and unsheltered means "being dirty [and] not being able to wash." The only way she could clean herself was to take sponge baths in hospital restrooms. She had no place to shower or bathe thoroughly.

[14] Boyd testified to the ailments of the homeless she had commonly observed. She stated that "the highest percentage of medical problems is

Many of the unsheltered homeless suffer from mental illness, and others exhibit symptoms of mental illness that may not have a physiological cause. The life of the homeless is such "that many chronically homeless people appear to be mentally ill when in reality they manifest symptoms reflective of their environment. The homeless who appear paranoid while living on the street . . . may be quite realistic in their fear of being robbed, beaten, abused, or killed. Add to this the physiological stresses resulting from poor nutrition, lack of sleep, and exposure, and it is no wonder that many homeless people manifest some psychopathological symptoms . . . . Remove these problems and the symptoms may quickly abate . . . ." F. Redburn & T. Buss, Responding to America's Homeless: Public Policy Alternatives (1986) pp. 79–80. Additionally, it has been observed that homeless people often act strangely as a kind of self-defense mechanism. They wish to keep other people, including potential aggressors, away. Id., p. 80; A. Baum & D. Burnes, A Nation in Denial (1993) p. 67.

Finally, the unsheltered homeless are often linked to crime, both as those committing the illegal acts and as the targets of the criminal acts of others. Many of the unsheltered homeless commit petty crimes in order to

diseases of the skin . . . . People have a lot of injuries to their feet, blisters and stuff from walking, not being able to stay in one place. . . . The next was the mental disorders, which would include chronic psychosis, alcoholism [and] cocaine abuse. Following that would be diseases of the respiratory system, which would be asthma, bronchitis [and] pneumonia. We see people who constantly are sick with colds and fevers . . . just [from] being outside all the time. . . . And next would be diseases of the muscles and connective tissues, which means that some people have not been treated for the injuries and later on the effects of those injuries turn into something more serious."

Cynthia DeLouise, the executive director of Columbus House, an emergency shelter in New Haven, testified about her deep concern for the physical well-being of homeless people who are denied shelter. She stated that "it's difficult enough to be homeless and be discriminated against because of your homelessness, but I think, and my fear is, that many individuals will, could die on the streets, will be hurt on the streets . . . ."

"acquire basic necessities such as food, shelter and clothing"; F. Redburn & T. Buss, supra, p. 50; or to escape their miserable conditions, hoping that they may be able to spend the night in a warm, safe jail cell rather than on the icy and dangerous streets. Id., pp. 50–51. Colburn, for example, testified that she once was arrested for trespassing when she tried to spend the night in an abandoned building after being turned away from shelters. The life of an unsheltered homeless person also makes him or her personally vulnerable and a frequent target of criminal aggressors.[15] For example, both heterosexual and homosexual rapes are common. It is estimated that the incidence of rape is twenty times greater for the homeless than for the general population. R. Bingham, R. Green & S. White, supra, p. 109. In Los Angeles, several homeless men were murdered, apparently for no reason, by stabbing and slashing. F. Redburn & T. Buss, supra, p. 40. The plaintiffs in *Hilton* gave compelling testimony about their own experiences suffering from the constant threat of mugging, assault and rape. One of the plaintiffs, Janet Cardin, testified that she has been forced to endure the unwanted touches and sexual propositions of strangers who approached her as she tried to steal just a few hours of sleep at night on the New Haven Green. The psychological damage that results from such attacks can last for years.

In essence, the unsheltered homeless—the plaintiffs in these cases—exist under living conditions that no member of a civilized society should have to endure. They lack shelter, they lack food and they lack the ability to obtain the subsistence human beings require in

---

[15] Brother Denys Cormier, the executive director of a soup kitchen in downtown New Haven, testified at trial in the *Hilton* case that some of the homeless often sleep at soup kitchens during the day so they will not fall asleep outside at night, because they are terrified at what will happen to them in the darkness in our streets, in our alleys, or in our parks.

order to survive in a humane manner. This appalling result, of which Spec. Sess. P.A. 92-16 and the actions of New Haven and Bridgeport were a direct cause, not only fails to meet contemporary standards of human decency, but also violates our state constitution.

II

STATE CONSTITUTIONAL ADJUDICATION

It is now beyond debate that while the federal constitution establishes a minimum level of fundamental rights, the states, in interpreting their own state charters of liberty, are free to afford their citizens greater rights and privileges. See *State* v. *Joyce*, 229 Conn. 10, 15–16, 639 A.2d 1007 (1994). Indeed, this court has stated that "[i]n the area of fundamental civil liberties—which includes all protections of the declaration of rights contained in article first of the Connecticut constitution—we sit as a court of last resort, subject only to the qualification that our interpretations may not restrict the guarantees accorded the national citizenry under the federal charter. In such constitutional adjudication, our first referent is Connecticut law and the full panoply of rights Connecticut residents have come to expect as their due. Accordingly, decisions of the United States Supreme Court defining fundamental rights are persuasive authority to be afforded respectful consideration, but they are to be followed by Connecticut courts only when they provide no less individual protection than is guaranteed by Connecticut law." *Horton* v. *Meskill*, 172 Conn. 615, 641–42, 376 A.2d 359 (1977).

In recent years this court has embraced this doctrine and held that our state constitution provides greater protection of individual rights than does its federal counterpart. See, e.g., *State* v. *Morales*, 232 Conn. 707, 657 A.2d 585 (1995) (rejecting federal "bad faith" requirement in criminal cases where police fail to pre-

serve evidence); *Daly* v. *DelPonte*, 225 Conn. 499, 624 A.2d 876 (1993) (holding that laws that discriminate against the physically disabled must withstand strict scrutiny); *State* v. *Marsala*, 216 Conn. 150, 579 A.2d 58 (1990) (rejecting federal "good faith" exception to the exclusionary rule); *Fasulo* v. *Arafeh*, 173 Conn. 473, 378 A.2d 553 (1977) (requiring periodic judicial review of the civil commitment of mental patients).[16]

Indeed, in order to develop our state constitutional jurisprudence in a principled manner, we have adopted a methodology that we follow as an aid to interpreting the true meaning of our state charter of liberty. See *State* v. *Geisler*, 222 Conn. 672, 684–86, 610 A.2d 1225 (1992).[17] The plaintiffs in these cases have appropriately raised their claims under the state constitution.

---

[16] In *Fasulo*, this court made it clear that "[t]he due process clause of the Connecticut constitution shares but is not limited by the content of its federal counterpart." *Fasulo* v. *Arafeh*, supra, 173 Conn. 475.

[17] "In order to construe the contours of our state constitution and reach reasoned and principled results, the following tools of analysis should be considered to the extent applicable: (1) the *textual approach*; see, e.g., *Stolberg* v. *Caldwell*, 175 Conn. 586, 597–98, 402 A.2d 763 (1978), appeal dismissed sub nom. *Stolberg* v. *Davidson*, 454 U.S. 958, 102 S. Ct. 496, 70 L. Ed. 2d 374 (1981) ('Unless there is some clear reason for not doing so, effect must be given to every part of and each word in the constitution.'); (2) *holdings and dicta of this court, and the Appellate Court*; see, e.g., *Doe* v. *Maher*, 40 Conn. Sup. 394, 448-49, 515 A.2d 134 (1986) (trial court used strict scrutiny to analyze sex discrimination claim based on the equal protection clause of the state constitution, relying, in part, on dicta from the Connecticut Supreme Court regarding what standard would be used once Connecticut's equal rights amendment was adopted); (3) *federal precedent*; see, e.g., *State* v. *Lamme*, 216 Conn. 172, 184, 579 A.2d 484 (1990) ("The adoption of federal constitutional precedents that appropriately illuminate open textured provisions in our own organic document in no way compromises our obligation independently to construe the provisions of our state constitution.'); (4) *sister state decisions* or sibling approach; see, e.g., *State* v. *Gethers*, 197 Conn. 369, 386–87, 497 A.2d 408 (1985); *Cologne* v. *Westfarms Associates*, [192 Conn. 48, 58–59, 469 A.2d 1201 (1984)]; (5) the *historical approach*, including the historical constitutional setting and the debates of the framers; see, e.g., *State* v. *Lamme*, supra, 178–80; *Cologne* v. *Westfarms Associates*, supra, 60–62; *Palka* v. *Walker*, 124 Conn. 121, 126, 198 A. 265 (1938); and (6) *economic/sociological considerations*. See *State* v. *Bar-*

## III

### THE STATE CONSTITUTIONAL RIGHT TO MINIMAL SUBSISTENCE NECESSARY FOR HUMANE SURVIVAL

The state constitution, which was first formally adopted in 1818,[18] does not explicitly provide for the right of the poor to receive subsistence from the towns. Nevertheless, we have previously recognized that there are some rights that are so fundamental they need not be explicitly set forth in the state constitution. *State v. Conlon*, 65 Conn. 478, 489, 33 A. 519 (1895) ("It is patent that not everything that can be called a right

*ton,* [219 Conn. 529, 546, 594 A.2d 917 (1991)]; *State v. Dukes,* [209 Conn. 98, 115, 547 A.2d 10 (1988)]; see generally *State v. Jewett,* 146 Vt. 221, 500 A.2d 233 (1985); M. Margulies, 'Connecticut's Free Speech Clauses: A Framework and an Agenda,' 65 Conn. B.J. 437 (1991) (an analytical framework for state constitutional analysis in the context of the free speech clauses); E. Peters, 'State Constitutional Law: Federalism in the Common Law Tradition,' 84 Mich. L. Rev. 583 (1986) (book review)." *State v. Geisler,* supra, 222 Conn. 684–86.

"The *Geisler* factors serve a dual purpose: they encourage the raising of state constitutional issues in a manner to which the opposing party—the state or the defendant—can respond; and they encourage a principled development of our state constitutional jurisprudence. Although in *Geisler* we compartmentalized the factors that should be considered in order to stress that a systematic analysis is required, we recognize that they may be inextricably interwoven. See, e.g., *State v. Joyce,* 229 Conn. 10, 16 n.7, 639 A.2d 1007 (1994). Finally, not every *Geisler* factor is relevant in all cases. See, e.g., *State v. Miller,* 227 Conn. 363, 381, 630 A.2d 1315 (1993)." *State v. Morales,* supra, 232 Conn. 716 n.10.

[18] Scholars have consistently recognized that, although Connecticut did not have a document formally designated as a state constitution prior to 1818, we did have fundamental law that guaranteed the rights of our citizens. C. Collier, "The Connecticut Declaration of Rights Before the Constitution of 1818: A Victim of Revolutionary Redefinition," 15 Conn. L. Rev. 87, 89–90 (1982); H. Cohn, "Connecticut Constitutional History: 1636–1776," 64 Conn. B.J. 330 (1990); W. Horton, "Connecticut Constitutional History: 1776–1988," 64 Conn. B.J. 355 (1990).

Unfortunately, the proceedings of the constitutional convention of 1818 were not recorded. See J. Trumbull, Historical Notes on the Constitutions of Connecticut and on the Constitutional Convention of 1818 (1901).

is included in [the declaration of rights]. The protected rights are those that inhere in 'the great and essential principles of liberty and free government' recognized in the course of events that resulted in our independence . . . . The language used is purposely broad . . . ."). Indeed, we have recognized several fundamental rights to be implicit in our state charter of liberty, including the right to be free from cruel and unusual punishment; *State* v. *Ross*, 230 Conn. 183, 246, 646 A.2d 1318 (1994), cert. denied,    U.S.   , 115 S. Ct. 1133, 130 L. Ed. 2d 1095 (1995); the right of a criminal defendant to be present when the court charges the jury; *State* v. *Simino*, 200 Conn. 113, 128, 509 A.2d 1039 (1986); and the right to be free from double jeopardy. *Kohlfuss* v. *Warden*, 149 Conn. 692, 695, 183 A.2d 626, cert. denied, 371 U.S. 928, 83 S. Ct. 298, 9 L. Ed. 2d 235 (1962); see also *Doe* v. *Maher*, 40 Conn. Sup. 394, 422–25, 515 A.2d 134 (1986) (recognizing as implicit in our state constitution a person's fundamental right to privacy).

The preamble and article first, § 10, of the Connecticut constitution provide the textual framework for the implicit right of the poor to minimal subsistence and its enforcement. The preamble provides: "The People of Connecticut acknowledging with gratitude, the good providence of God, in having permitted them to enjoy a free government; do, in order more effectually to define, secure, and perpetuate the liberties, *rights and privileges which they have derived from their ancestors*; hereby, after a careful consideration and revision, ordain and establish the following constitution and form of civil government."[19] (Emphasis added.) Section 10 of article first of the Declaration of Rights provides: "All courts shall be open, and every person, for an injury done to him in his person, property or reputa-

---

[19] Identical language appears in the preamble to the Constitution of 1818.

tion, shall have remedy by due course of law, and right and justice administered without sale, denial or delay."[20]

The plain language of the preamble makes clear that the framers intended our constitution to perpetuate and protect the rights and privileges of the people that were *firmly rooted in the law and customs* of Connecticut prior to the adoption of the state's first formal charter of liberty. The framers provided in article first, § 10, that the court will be open to enforce these rights. In order to determine the scope of the rights and privileges encompassed in these open-ended constitutional provisions, therefore, we must begin by examining the state of the law as it existed prior to 1818. See *State v. Ross*, supra, 230 Conn. 46–47. Indeed, this is the crucial step in our state constitutional analysis.

We look primarily at two sources in order to determine the state of the law as it existed in 1818 and prior thereto: law codified in statutory form and the common law. For example, with respect to those rights that are incorporated in our state constitution's civil due process clause, we have stated that "all rights derived by statute and the common law extant at the time of the adoption of article first, § 10, are incorporated in that provision by virtue of being established by law as rights the breach of which precipitates a recognized injury, thus being exalted beyond the status of common-law or statutory rights of the type created subsequent to the adoption of that provision." *Gentile v. Altermatt*, 169 Conn. 267, 286, 363 A.2d 1 (1975), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976); *Kelley Property Development, Inc. v. Lebanon*, 226 Conn. 314, 331, 627 A.2d 909 (1993); *Sanzone v. Board of Police Commissioners*, 219 Conn. 179, 195,

---

[20] Identical language appears in article first, § 12, of the constitution of 1818.

592 A.2d 912 (1991); *Dubay* v. *Irish,* 207 Conn. 518, 529, 542 A.2d 711 (1988); see *Lynn* v. *Haybuster Mfg., Inc.,* 226 Conn. 282, 289, 627 A.2d 1288 (1993); *Sharp* v. *Mitchell,* 209 Conn. 59, 64, 546 A.2d 846 (1988); *Ecker* v. *West Hartford,* 205 Conn. 219, 234, 530 A.2d 1056 (1987); *Butzgy* v. *Glastonbury,* 203 Conn. 109, 122, 523 A.2d 1258 (1987); *Daily* v. *New Britain Machine Co.,* 200 Conn. 562, 585, 512 A.2d 893 (1986); *Warner* v. *Leslie-Elliott Constructors, Inc.,* 194 Conn. 129, 133 n.3, 479 A.2d 231 (1984). In making a determination of whether a right is so firmly rooted in the law of the state to be considered an implicit constitutional right we must, therefore, consider in turn these two sources.

## A

### STATUTORY LAW

As a source of Connecticut legal history, our colonial statutes are perhaps a more accurate and complete statement of colonial law than the law stated in the written decisions of our early courts. As one commentator pointed out, Connecticut eschewed the idea that rules of law should be developed through a process of judicial decisions. L. Lewis, "The Development of a Common Law System in Connecticut," 27 Conn. B.J. 419, 421 (1953). Fearful that such a system might harken back to the common law injustices of England, and desiring to express their laws in explicit terms, the colonists exhibited "complete reliance on statute law." Id. Indeed, of all the colonies, Connecticut most clearly rejected the common law system. Id., 419. These early statutes, therefore, are an important and reliable source for understanding our legal tradition in Connecticut. W. Horton, The Connecticut State Constitution (1993) p. 4. We have consistently stated that rights established by statute prior to 1818 are an important source of rights recognized as implicit under our 1818 constitu-

tion. See, e.g., *Kelley Property Development, Inc.*, v. *Lebanon*, supra, 226 Conn. 331–33; *Dubay* v. *Irish*, supra, 207 Conn. 529; *Ecker* v. *West Hartford*, supra, 205 Conn. 234; *Gentile* v. *Altermatt*, supra, 169 Conn. 286.

The first codification of Connecticut statutes occurred in 1650, when the General Court of the colony of Connecticut adopted a systematic body of laws prepared by attorney Roger Ludlow.[21] This body of laws became known as the Ludlow Code.[22] Significantly, that Code included a provision for governmental assistance to the poor. This provision stated in pertinent part: "POORE. It is ordered by this courte and authority thereof, That the courte of magistrates shall have power to determine all differences about lawfull settling, and providing for pore persons, and shall have power to dispose of all unsettled persons, into such townes as they shall judge to bee most fitt, for the maintenance and imployment of such persons and familyes, for the ease of the countrye." The Code of 1650 of the General Court of Connecticut (S. Andrus pub. 1822) p. 80.

Twenty-two years later, the next codification of statutes included a provision imposing on Connecticut towns the duty to provide for their indigent residents. Book of the General Laws for the People Within the Jurisdiction of Connecticut (1672) p. 57.[23] This provision, which remained substantially unchanged through several revisions of the colonial statutes, *required* the towns to provide subsistence for the poor. See Acts and

---

[21] The General Court was the governing body of the colony. See W. Horton, The Connecticut State Constitution, supra, p. 3.

[22] Ludlow was an attorney who, as a legal scholar, had distinguished himself at Oxford University. L. Lewis, supra, 27 Conn. B.J. 421.

[23] The Book of the General Laws for the People Within the Jurisdiction of Connecticut (1672) p. 57, provides in pertinent part: "It is Ordered by the Authority of this Court; That every Town within this Colony, shall maintaine their own poor . . . ."

Laws of His Majesties Colony in Connecticut in New England (B. Green & J. Allen pubs. 1702) pp. 94–95. After the colony gained independence from English rule, the statute continued to require the towns to provide for the poor. See General Statutes (1784) p. 193.

The statute in effect at the time the 1818 constitution was adopted provided in pertinent part: "Be it enacted by the Governor and Council and House of Representatives in General Court assembled, that each town in this state shall take care of, support and maintain their poor . . . and the selectmen for the time being, or overseers of the poor (where any such are chose), shall have full power to expend or disburse out of the town stock or treasury, what they shall judge meet and necessary from time to time, for the relief, supply and support of any of the poor belonging to their town. . . ." General Statutes (1808 Rev.) tit. CXXX. This statute, in particular, demonstrates not only the historical obligation of Connecticut towns to provide minimal subsistence and the fundamental right of the poor to receive it, but the societal importance accorded to caring for the indigent. The language provided that each town had an affirmative obligation to provide for the poor, and granted to the selectmen of each town an open-ended authorization to disburse from the town resources any amount necessary to accomplish this purpose.

In sum, from the colony's first code adopted in 1650 through the adoption of the first formal constitution in 1818—a period of 168 years—the statutory law of the state was clear: the towns were required to provide for the basic needs of the poor.

After the ratification of the 1818 constitution, the state statutes were substantially updated in an effort to eliminate obsolete provisions that either were no

longer necessary or appropriate due to changes in custom or social sentiment or were contrary to the new constitution. E. Capen, The Historical Development of the Poor Law of Connecticut (1905) p. 97. Importantly, the resulting Code of 1821 perpetuated the statutory duty of the towns to provide for their indigent. Zephaniah Swift, a former chief justice of the Supreme Court of Errors who was charged with the responsibility of editing and reorganizing the Code of 1821,[24] wrote in its preface that the purpose of the revision was "to render the statutes conformable to the constitution." General Statutes (1821 Rev.) p. viii.

These early statutes are striking proof of our tradition in Connecticut, and of the obligation of the towns, to provide minimal subsistence to our poor and needy. The fundamental importance of these statutes is underscored by the statutory requirement during the early colonial period that each family purchase a copy of the code.[25] Indeed, these early statutes reveal that "[w]e have a continuous unbroken tradition in Connecticut

[24] Chief Justice Swift became a "victim of toleration" and was not reappointed to the Supreme Court after the constitutional convention. W. Horton, "Connecticut Constitutional History: 1776–1988," 64 Conn. B.J. 355, 359 (1990). He then devoted "his energy to reorganizing the General Statutes, which had not been revised since 1808. . . ." W. Horton, The Connecticut State Constitution, supra, p. 20. The result was the General Statutes (1821 Rev.).

General Statutes (1821 Rev.) title 73, chapter 1, provides in pertinent part: "Sect. 2. All poor and impotent persons, who have not estate sufficient for their support, and have no relations of sufficient ability, who are obliged by law to support them, shall be provided for, and supported, at the expense of the town where they belong. And it shall be the duty of every town to maintain and support all the poor inhabitants belonging to the town, whether residing in it, or in any other town in the state. . . ." See also *Doe* v. *Maher*, supra, 40 Conn. Sup. 412–13.

[25] The Public Records of the Colony of Connecticut from 1665 to 1678 (J. Trumbull ed., 1852) p. 190 ("It is ordered by this Court that our Lawes shall be printed as soone as may be conveniently . . . . It is allso ordered that every famely in the severall plantations in this Colony shall purchase one of our Law bookes, to keep for their use; and the constables of the severall plantations are to see that this order is duely attended . . . .").

dating back from the middle of the seventeenth century right down to the present that the public will be responsible for all the medical care and other needs of [the] poor in the State of Connecticut . . . ." *Doe* v. *Maher*, supra, 40 Conn. Sup. 412-13.[26]

---

[26] The majority attributes no significance to our 350 year statutory history of providing subsistence for the poor. It apparently takes this position for two reasons. First, although the majority acknowledges the statutory obligation of the government to provide for the poor, it states that no constitutional right exists because the statutes did not explicitly set forth a cause of action "that was judicially enforceable against the government by an indigent individual." The simple response to this argument, however, is that the statutes implicitly allowed the beneficiaries of the statute to enforce the rights they had been granted thereunder. Second, the majority concludes that "only 'statutory *common law* rights' are so enshrined" in the state constitution, and defines such a right as one that was already a part of the common law when it was codified in statutory form. See footnote 30 of the majority opinion. The case cited by the majority for this curious concept, *Kelley Property Development, Inc.* v. *Lebanon*, supra, 226 Conn. 331-33, and the precedents upon which *Kelley* is predicated, do not support it. Indeed, the phrase "statutory common law right" does not appear anywhere in the text of that opinion nor, as nearly as I can tell, in any of this court's other published opinions. Nevertheless, the right of the poor to minimal subsistence fits this mold. As I point out in the text of this dissent, the early colonists distrusted the English notion of judge made common law, choosing instead to codify all law in statutory form. The first statute recognizing the right of the poor to minimal subsistence was enacted at the very beginning of this process. The "common law" of Connecticut, as we know it, began to evolve much later. In a sense, therefore, statutes regarding the rights of the poor predated even our common law. Certainly, a statutory right that existed for more than 350 years and that evolved within a legal system that initially had rejected English common law is an implicit constitutional right that may be enforced pursuant to article first, § 10, of the state constitution. In addition, according to the traditions and customs of the people of this state, the right of the poor to the subsistence necessary for humane survival is a basic component of this society and the most fundamental of all constitutional rights.

The majority also characterizes the poor laws prior to 1818 as "broad, ambiguous, highly discretionary and provid[ing] little guidance as to the intent of the framers." Although the early statutes do not detail the parameters of the right to subsistence, common sense makes clear that the extent of the subsistence was at least that which was necessary for *humane survival*, and that is the only issue before this court.

## B

### COMMON LAW

Although our early statutes are very instructive in interpreting the legal traditions of Connecticut that are incorporated as rights in our state constitution, they are not the only source of these implied rights. "In Connecticut constitutional law, it is well established that several rights now denominated as constitutional law had well-recognized common law antecedents." E. Peters, "Common Law Antecedents of Constitutional Law in Connecticut," 53 Albany L. Rev. 259, 261 (1989). To gain a complete understanding of the meaning of our constitutional history, therefore, we must also examine the early common law of Connecticut.

Examining this common law, however, is not as simple as pulling a digest of decisions from the bookshelf. Although Connecticut was the first state to publish any of its judicial decisions,[27] "at no time until 1784 was it required that judicial decisions be in writing or that they be published in any manner, nor was either thing done." L. Lewis, supra, 27 Conn. B.J. 423. In 1784, however, the state legislature required all Superior Court judges to issue written decisions, and "the complete change from a system entirely of statute law to one of common law developed by judicial decisions becomes apparent." Id., p. 424. Despite this transformation, very few written decisions of Connecticut courts are available from the era prior to 1818. The decisions of the Superior Courts and the Supreme Court of Errors were first published in Kirby's Reports in 1789, a mere twenty-nine years before the adoption of the 1818 constitution. There is no official record of

---

[27] See E. Kirby, Kirby's Reports (1785–88); 4 American Legal Records, Superior Court Diary of William Samuel Johnson 1772–1773 (J. Farrell ed., 1942) p. vii (forward written by C. Clark).

judicial decisions for the preceding period of approximately 150 years.[28] In order to determine the common law in the state during that period, therefore, we must look not only to the sparse case law that is available but also to other sources. J. Root, 1 Root's Reports, p. ix (1789–93).

Superior Court Judge Jesse Root, a prominent member of the judiciary in the eighteenth and early nineteenth centuries, defined the common law in his introduction to the first of two volumes of court reports, which covered decisions rendered by the Superior Court and the Supreme Court of Errors between July, 1789, and June, 1793.[29] Judge Root defined the common law of this state to include (1) "the adjudication of the courts of justice and rules of practice"; (2) "usages and customs, universally assented to"; and (3) what could be loosely summarized as "natural law." Id., pp. ix–xiii. Judge Root's understanding of our early common law is particularly instructive on the issue of the incorporation of the common law into the open-ended preamble of the constitution of 1818. Not only was Judge Root one of the outstanding legal scholars of his day, but he was also a prominent delegate to the

[28] In addition to the published opinions in Kirby, Judge William Samuel Johnson's Superior Court diary illuminates Connecticut's early jurisprudence and serves as a historical record of early decisions of Connecticut courts. This diary, which spans the years 1772 and 1773, was edited and published in 1942 by the American Historical Association. See generally 4 American Legal Records, Superior Court Diary of William Samuel Johnson 1772–1773 (J. Farrell ed., 1942).

[29] Judge Root was the reporter of the two volumes of reports covering decisions rendered by the Superior Court and the Supreme Court of Errors from 1789 to 1798. In the second of these volumes, Judge Root explained that "[t]he author's inducement to continue these Reports, is to contribute what is in his power, to render stable, clear and consistent, the system of jurisprudence and the laws of the state, by publishing the adjudged cases in the highest courts of law in the state, for the term of years specified in said Reports; although accompanied with much care and trouble without any pecuniary advantage to himself." J. Root, 2 Root's Reports, preface (1793–98).

constitutional convention.[30] W. Horton, The Connect-
icut State Constitution, supra, p. 12. Each of Judge
Root's three identified sources of common law reveals
the tradition of this state of providing minimal subsis-
tence to its destitute inhabitants.

1

## Adjudication of the Courts

Judge Root recognized the difficulty of identifying
the common law as it had developed in decisions of Con-
necticut courts. He pointed out that "we have no trea-
tises upon the subject, and but one small volume of
reports containing a period of about two years only,
and a treatise lately wrote by Mr. [Zephaniah] Swift,
containing a commentary on the government and laws
of this state. . . ."[31] 1 J. Root, supra, p. xiii.

[30] Judge Root was one of the "two most reactionary members of the [con-
stitutional] convention [of 1818]." W. Horton, The Connecticut State Con-
stitution, supra, p. 12. Nevertheless, he was not willing to embrace the
ultraconservative common law of England. He acknowledged that "[w]e
learn from history, the constitutions of government and the laws of for-
eign countries, the adjudications and rules of practice adopted in their courts
of justice; but this will not give us the knowledge of our own, and although
we may seem to have borrowed from them, yet ours is essentially differ-
ent from all; in that, it is highly improved and ameliorated in its principles
and regulations, and simplified in its forms, is adapted to the state of our
country, and to the genius of the people, and calculated in an eminent man-
ner to improve the mind by the diffusion of knowledge, and to give effec-
tual security and protection to the persons, rights, liberties and properties
of the citizens; and is clothed with an energy, derived from a source, and
rendered efficacious by a power, unknown in foreign governments, (viz.)
the attachment of the citizens who rejoice in being ruled and governed by
its laws, for the blessings it confers. Let us, Americans then, duly appreci-
ate our own government, laws and manners, and be what we profess, an
independent nation; and not plume ourselves upon being humble imitators
of foreigners, at home and in our own country; but let our manners in all
respects be characteristic of the spirit and principles of our independence."
1 J. Root, supra, p. xiii.

[31] The "small volume of reports" was a reference to Kirby's Reports,
which, according to its title page, contained "reports of cases adjudged in
the Superior Court of the state of Connecticut from the year 1785, to May,

Notwithstanding the small number of published opinions of the courts, the only two legal scholars who wrote on the subject prior to 1818 clearly indicated that the poor had a right to minimal subsistence. Chief Justice Swift defined the law of Connecticut with respect to the rights of poor people in his 1795 treatise. His words are illuminating: "[E]ach town [is] obliged to take care of and maintain their own poor, [and] this [is] a principal part of the duty of the selectmen. The selectmen are bound to provide necessaries for all the inhabitants of the town, who are incapable of supporting themselves. Towns are obliged to support their respective inhabitants, whether living in the town to which they belong, or any other town, either with or without a certificate, who may need relief." 1 Z. Swift, A System of the Laws of the State of Connecticut (1795) p. 119.

Although Judge Root was a conservative member of the judiciary,[32] he, unlike the majority in this case, recognized government's obligation to the poor. In his introduction to the published cases of 1789 through 1793, Judge Root wrote that "[i]t is the duty of every government to protect and to provide for the poor; the laws of the state . . . ordain . . . that every town shall take care of, provide for and maintain, its own poor." (Internal quotation marks omitted.) 1 J. Root, supra, p. xxviii. Judge Root explained that "[t]he poor and indigent in all countries, call not only for private charity, but for *support and assistance from the government,* and to give scope to the exercise of benevolence, the most noble and godlike virtue . . . ."[33] (Emphasis added.) Id.

---

1788, with some determinations in the Supreme Court of Errors." The treatise to which Judge Root referred was Chief Justice Swift's "A System of the Laws of the State of Connecticut," the first American treatise on the law, which was published in 1795.

[32] See footnote 30 of this dissent.

[33] This section of Judge Root's commentary on the law is entitled, "On Supporting the Poor." The text of this section provides in pertinent part:

Moreover, Judge Root pointed out that Connecticut law required the government to provide a safety net of minimal subsistence for the poor even when state laws otherwise allowed towns to escape the financial burden of caring for the poor or when there was a dispute. Under state law, a town faced with supporting an indigent person who had recently arrived could ask him to leave. The town could warn such a person to depart within the first three months of that person's initial settlement in the town. Acts and Laws of the State of Connecticut (1786) p. 193. As Judge Root recognized, however, in such cases the town still was required to provide for the poor person, but the state

"The poor and indigent in all countries, call not only for private charity, but for support and assistance from the government, and to give scope to the exercise of benevolence, the most noble and godlike virtue; for God taketh the poor under his care, he heareth them when they cry; and the highest character given of any ruler on earth is, that he judgeth the people in righteousness, and the poor with judgment; that he delivereth the needy when they cry, and the poor that hath no helper; that he dealeth bread to the hungry, and delivereth him that is ready to perish.

"It is the duty of every government to protect and to provide for the poor; the laws of the state therefore humanely enact and ordain, 'that every person who shall become poor and impotent, unable to provide for him or herself, and hath no estate, shall be taken care of and provided for, by such of his or her relations as stand in the line and degree of father or mother, grandfather or grandmother, children or grandchildren, if they are of sufficient ability to do it.'

"It further ordains that every town shall take care of, provide for and maintain, its own poor. And the law points out particularly, how a right of settlement is acquired in a town, and the poor of each town are to be provided for by the selectmen, at the charge of the town; except where some person is by law bound to support them. Citizens of other states falling into want in any town in this state, may be sent by a constable to where they belong, or be provided for by the selectmen, at the expense of the town in the first instance, to be reimbursed by the person or by the relations, within certain degrees of kindred, if of ability, otherways, by the town, except where warning to depart was given, to the person within three months, in that case the charge is paid by the state. Foreigners who have no settlement in any town in the United States, falling into want, are provided for by the selectmen of the town, and the expense is to be allowed by the governor and council, and paid out of the treasury of the state." 1 J. Root, supra, pp. xxviii–xxix.

would reimburse the town for the costs it had incurred. 1 J. Root, supra, p. xxix. Indeed, even individuals who were not state residents were provided for by the town at the expense of the state. Id. In sum, our common law would not allow an indigent person to want for those items necessary for humane survival.

The majority makes much of the fact that no Connecticut case published prior to 1818 states in explicit terms that the poor have a right to minimal subsistence. There are several reasons, however, why this dearth of case law is not dispositive. First, this right of the poor had been so ingrained in the history of the Connecticut colony that, by the time the decisions of our courts were first published, no one questioned it. The Ludlow Code, which was published in 1650, memorialized the right in written form.[34] The colony did not begin to publish the decisions of its Superior Court and Supreme Court of Errors until 1784. The right, therefore, had been formally in existence for at least 134 years before the development of this state's case law. By that time, there was nothing left to litigate except disputes between the towns that were responsible for providing for the needs of a particular poor person.[35] Clearly, a right with so rich a history would not have been the subject of litigation in the late eighteenth and early nineteenth centuries. Moreover, as Judge Root pointed out and as I previously mentioned, very few cases were published between the years 1784 and 1818. The fact that none of the few cases that actually were published involved an action brought by a poor person to enforce the right cannot be dispositive of whether that right existed at all.

Second, I do not suspect that there was a Revolutionary War era equivalent of legal aid for the poor that

---

[34] See text accompanying footnote 22 of this dissent.
[35] See discussion to follow.

would have represented poor people who had been denied subsistence. Rather, it is more likely that a poor and impoverished resident would have sought aid from a selectman in his or her town, who was the person designated by statute to administer relief to the poor. This method of caring for the poor was prescribed by Sir Edmund Andros in 1687.[36] E. Capen, supra, p. 41. Andros and his council "made the selectmen overseers of the poor and authorized them, with the consent of any two justices of the peace . . . to levy a tax rate for the support of the poor." Id. The selectmen's duty to provide for the poor was perpetuated by statute and was described as follows: "The selectmen are overseers of the poor . . . and it is their duty to provide all articles necessary for their subsistence, for all paupers belonging to the town, and they must provide for such support as will insure good and sufficient food, clothing, comfortable lodgings, and suitable care and medical attendance in sickness . . . . This is the most important branch of the duties of selectmen, and should be discharged with a proper regard to economy or the interests of the town, and the claims of humanity in behalf of the indigent, the distressed, and the wretched . . . ." J. Joy, Connecticut Civil Officer (19th Ed. 1948) p. 322.

Third, even if a poor person had decided to sue a town to enforce his or her right to minimal subsistence, that person would not have brought the case to the Superior Court, but rather to the justices of the peace.[37]

[36] Andros claimed authority to govern New England, New York and New Jersey under a patent from Charles II of England. He remained in power for eighteen months until he was overthrown following the Glorious Revolution of 1689 in England. W. Horton, The Connecticut State Constitution, supra, p. 4.

[37] The office of justice of the peace was introduced in Connecticut between 1687 and 1689, when Andros reigned over the colony; 4 American Legal Records, Superior Court Diary of William Samuel Johnson 1772–1773 (J. Farrell ed., 1942) p. xiv; and was patterned after its English counter-

Indeed, early published decisions of this court make clear that, in accordance with English jurisprudence,[38] a local justice of the peace had jurisdiction to rule on cases involving poverty relief. In *Lyme* v. *East Haddam*, 14 Conn. 394 (1841), for example, this court con-

part. See H. MacDonald, "An Obituary Note on the Connecticut Justice of the Peace," 35 Conn. B.J. 411, 417 (1961). Indeed, the only important distinctions between the English and American justices of the peace were that (1) the American justices had more extended duties and authority as a matter of necessity because of the distances between communities and the lack of transportation, and (2) while the colonial justices were paid, the English justices were not. Id., p. 417. In addition, over time the English system was distinguished by its flexible adaptation to changed conditions. In contrast, the American system rigidly adhered to the structure adopted in the colonial period. Id., p. 418.

In 1698, as part of governmental reorganization, the Connecticut General Assembly declared that these officials were to be appointed to each county and "shall have full power throughout the respective counties, to act according to commission given by this Court and the lawes of this Colonie." 4 American Legal Records, supra, p. xiv. General Statutes (1808 Rev.) title XCV, chapter 1, § 4, provided that each county of the state was to have a commissioned justice of the peace, who was given broad judicial powers, including the power "to exercise and execute the office, duty, and trust to which they are or shall be appointed, commissioned, and sworn . . . to every purpose and intent according to the nature, end, and design of their respective offices, according to the laws of this State, for the common good and peace of the state, and the doing equal and speedy justice to the people therein." `

[38] English records from the eighteenth century reveal that a poor person in need of assistance had two sources of help available. First, the poor person was required to seek assistance from the local overseer. An overseer was empowered with duties equivalent to those of a colonial selectman, including the duty of providing for the poor. Second, if the overseer refused to help, the poor person could seek relief from a justice of the peace. See generally 3 R. Burn, The Justice of the Peace and Parish Officer (16th Ed. 1788) pp. 662–70. Indeed, it was not uncommon for a justice of the peace to rule on such requests. "As a matter of practice, it is certain, that nothing is more common at the sessions [of the justice of the peace] than applications for the maintenance of poor persons . . . . In some places this makes up almost half of the business of the sessions, even to a degree of ridicule among the unthinking part of mankind; as if magistrates could be better employed than in relieving the miseries of the distressed." Id., pp. 665–67 (recounting the case of *King* v. *North Shields*); see also id., pp. 662–63 (recounting the case of *King* v. *Woodflerton*, which held that justices possessed power to order parish officers to provide relief for poor residents).

sidered whether the justice of the peace of Colchester had had jurisdiction to decide a case brought by the town of East Haddam to recover the cost of supporting an indigent family. The justice of the peace had found in favor of East Haddam, and the defendant, the town of Lyme, appealed to the Superior Court, which affirmed the decision of the justice of the peace. On appeal to this court, the town of Lyme argued that the case should have been brought to a justice of the peace in a different town. This court concluded, however, that a justice of the peace located "within a county where one of the parties dwelt" had jurisdiction to decide the case. Id., 399–400. Similarly, in *Trumbull* v. *Moss*, 28 Conn. 253 (1859), the plaintiff, a ship owner who had supported an ill and indigent sailor, initially brought his action before a justice of the peace. The town of Stonington, which was held liable by the justice of the peace for the costs expended by the ship owner, appealed to the Superior Court, which reserved judgment while awaiting the advice of this court. Id., 254. This court agreed with the decision of the justice of the peace, and advised judgment for the plaintiff. Id., 256. Although the justices of the peace had initial jurisdiction to adjudicate claims regarding the poor, I know of no written opinions by these justices that we might peruse. Furthermore, I take judicial notice, with absolute certainty, that if these justices did issue written opinions, they were *not* published. Therefore, the absence of any published case law between 1637 and 1818 in which the right of the poor to subsistence was litigated is totally irrelevant to this court's analysis of the existence of such a right.

Furthermore, despite the lack of evidence of the existence of this right in the form of cases brought by the poor themselves, there are cases on record that involved the administration of this right. These cases typically

were disputes between towns—one town would sue another in an attempt to recover the costs it had incurred in caring for an indigent person or family who actually resided in the other town. See, e.g., *Trumbull* v. *Moss*, supra, 28 Conn. 253 (holding town of Stonington liable for support of indigent sailor who had been taken there); *New Milford* v. *Sherman*, 21 Conn. 101 (1851) (holding town of Sherman liable for costs incurred by New Milford in supporting indigent Sherman resident); *Salisbury* v. *Harwinton*, 2 Root (Conn.) 435 (1796) (holding that issue of whether town was liable for support of indigent person was question for jury); see also *Lyme* v. *East Haddam*, supra, 14 Conn. 394 (holding that justice of peace had proper jurisdiction to decide which town was liable for support of indigent and affirming judgment); *Lyme* v. *New London*, Superior Court, Norwich (March 23, 1773), reported in 4 American Legal Records, Superior Court Diary of William Samuel Johnson 1772–1773 (J. Farrell ed., 1942) p. 226 (American Legal Records); *East Windsor* v. *Wethersfield*, Superior Court, Hartford (December 22, 1772), reported in 4 American Legal Records, supra, p. 1. Significantly, however, even in these cases, the right of the poor to receive subsistence from the government was never in dispute. Indeed, these cases reveal that the towns had understood their obligation to provide subsistence to the needy and had done so.

Moreover, the majority acknowledges, as it must, that there are records of at least two persons who petitioned the General Assembly for aid—Mary Bate and John Pratt. In the case of Mary Bate, the legislature in 1717 directed that "the town of Haddam take care of [her] according to the direction of the law concerning the poor of the town."[39] In the case of John Pratt,

---

[39] Petition of Mary Bate of West Haddam, 6 C. Hoadly, The Public Records of the Colony of Connecticut from May, 1717, to October, 1725 (1872) p. 10.

the legislature in 1716 awarded sums for his subsistence "and cure of his lameness."[40]

The majority dismisses these petitions as mere "appeals to legislative grace," rather than as appeals to a court of law in an attempt to enforce a fundamental right. This characterization, however, ignores the fact that at this time in Connecticut history, there was only one branch of government—the legislature of early Connecticut was also its judiciary.[41]

## 2

## Usages and Customs

A second component of the common law, according to Judge Root, was the "usages and customs, universally assented to and adopted in practice by the citizens

---

[40] Petition of John Pratt of Seybrook, 5 C. Hoadly, The Public Records of the Colony of Connecticut from October, 1706, to October, 1716 (1870) p. 576.

[41] Indeed, the troublesome issue of separation of powers was one of the direct reasons for the constitutional convention of 1818 and the ensuing adoption of our first formal constitution. The issue came to a head after the murder trial of Peter Lung early in the nineteenth century.Chief Justice Swift had presided over the case, which resulted in a verdict of guilty. Lung, however, appealed his conviction to the state legislature, claiming that there had been irregularities in the grand jury proceedings. The legislature reversed Lung's conviction. See *Lung's Case,* 1 Conn. 428 (1815).

The legislature's meddling infuriated Chief Justice Swift, who urged adoption of a state constitution which would provide for separation of powers between the judicial and legislative branches of government. Chief Justice Swift made his arguments in an article entitled "A Vindication of the Calling of the Special Superior Court, at Middletown, on the 4th Tuesday of August, 1815, For the Trial of Peter Lung, Charged with the Crime of Murder. With Observations on the Constitutional Power of the Legislature to Interfere with the Judiciary in the Administration of Justice." J. Trumbull, Historical Notes on the Constitutions of Connecticut and on the Constitutional Convention of 1818 (1901) p. 43 n.2. Chief Justice Swift wrote that " '[i]t is true . . . we have no written constitution; our constitution is made up of usages and customs: but it has been always understood that there were certain fundamental axioms which were to be held sacred and inviolable, and which were the basis on which rested the rights of the people. . . .' " Id., p. 43.

at large." 1 J. Root, supra, p. xi. Judge Root wrote: "So these unwritten customs and regulations which are reasonable and beneficial, and which have the sanction of universal consent and adoption in practice, amongst the citizens at large or particular classes of them, have the force of laws under the authority of the people, and the courts of justice will recognize and declare them to be such, and to be obligatory upon the citizens as necessary rules of construction and of justice. The reasonableness and utility of their operation, and the universality of their adoption, are the better evidence of their existence and of their having the general consent and approbation, than the circumstance of its being forgotten when they began to exist." Id., pp. xii–xiii.

The practice of government to provide for the poor in this state is well documented in recorded history. "During the early colonial period [the principle that poor relief was a town matter] was so fully carried out in both the Connecticut and the New Haven colony, that in the town records are the earliest statements regarding poor relief. Thus in March, 1640 . . . the town of Hartford voted to set aside twenty acres on the east side of the Connecticut river 'for the accommodating of several poor men that the town shall think meet to accommodate there.'" E. Capen, supra, pp. 22–23. Indeed, the practice of this state of caring for the poor was documented for a period of at least 175 years before the adoption of the constitution of 1818.

Christopher Collier, the Connecticut state historian and a professor of history at the University of Connecticut, testified in the *Hilton* case with respect to our history of supporting the poor. According to Professor Collier, Connecticut was unique in placing this obligation on government. While other colonies and states allowed private charities to fulfill the basic needs of their poor, Connecticut did so as a matter of govern-

mental responsibility and obligation.[42] The history, usage and customs of Connecticut, therefore, imparted into our 1818 constitution an affirmative obligation on the part of the state and its towns to provide minimal subsistence for the poor.

### 3

### Natural Law

Finally, it is important to consider the third component recognized by Judge Root as a source of our early common law: the legal and philosophical theory known today as natural law.[43] Although this theory has fallen into disfavor since the era of Judge Root, we nevertheless must examine its tenets in order to determine what legal notions were in the minds and hearts of the drafters of our first formal constitution.

Natural law occupied a prominent position in our colonial jurisprudence. The Fundamental Orders were

---

[42] The majority, in refusing to recognize the existence of this right under our state constitution, relies heavily on the fact that no other state has found an implicit right to subsistence in its state constitution. Because Connecticut is unique among its sister states, however, their treatment of this issue is not dispositive. As Professor Collier pointed out, other colonies and states relied on private charities to care for the poor. Only Connecticut did so as a matter of governmental obligation. See, e.g., 1 Z. Swift, supra, p. 121 (regarding statutory requirement that government provide subsistence to poor, "[t]his liberal and general provision of the law, has in a great measure superseded the necessity of the exercise of the God-like virtue of charity"). For a discussion of the decisions of courts in other jurisdictions, see part III C of this dissent.

[43] Natural law is a theory of jurisprudence that contends that "law has its origin and justification in absolute standards of right and wrong, so that while its specific implementation may vary from time to time, and place to place, there is an underlying continuity arising from the conformity of the specific statutes and decisions to the absolute standard. It is a corollary of this theory that those specific laws which are not in conformity with the underlying general principles are not, strictly speaking, laws at all." W. Aspell, "Natural Law in the Connecticut Tradition," 31 Conn. B.J. 105 (1957).

premised on natural law,[44] as were the laws of the colony of Connecticut of 1672.[45] According to Professor Collier, "to Connecticut jurists, common law meant more than judicial precedent and case law; it included the natural law as well." C. Collier, "The Connecticut Declaration of Rights Before the Constitution of 1818: A Victim of Revolutionary Redefinition," 15 Conn. L. Rev. 87, 94 (1982); see also *Doe* v. *Maher*, supra, 40 Conn. Sup. 423. Indeed, many of our early decisions supported the legal principle that the government must be guided by fundamental notions of what is morally right. See, e.g., *Booth* v. *Woodbury*, 32 Conn. 118, 127 (1864) ("principles of natural justice"); *Welch* v. *Wadsworth*, 30 Conn. 149, 155 (1861) ("But the power of the legislature in this respect is not unlimited. They can not entirely disregard the fundamental principles of the social compact. Those principles underlie all legislation, irrespective of constitutional restraints, and if the act in question is a clear violation of them, it is our duty to hold it abortive and void."); *Goshen* v. *Stonington*, 4 Conn. 209, 225 (1822) ("vested rights").

Judge Root addressed the natural law obligation of the government to provide for the poor: "[T]he highest character given of any ruler on earth is, that he judgeth the people in his righteousness, and the poor with judgment; that he delivereth the needy when they cry, and the poor that hath no helper; that he dealeth bread to the hungry, and delivereth him that is ready to per-

---

[44] "And well knowing where a people are gathered together the word of God requires that to maintain the peace and union of such a people there should be an orderly and decent Government established according to God, to order and dispose of the affairs of the people at all seasons as occasion shall require." Fundamental Orders of 1638, reprinted in Conn. Register and Manual (1956) p. 24.

[45] "We have endeavored not only to ground our capital laws upon the Word of God, but also all other laws upon the justice and equity held forth in that Word, which is a most perfect rule." Laws of the Colony of Connecticut (1672), preface.

ish." 1 J. Root, supra, p. xxviii. Furthermore, in Judge Root's view, natural law of the late eighteenth and early nineteenth centuries "define[d] the obligations and duties between husbands and wives, parents and children, brothers and sisters, between the rulers and the people, *and the people or citizens towards each other*: This is the Magna Charta of all our natural and religious rights and liberties, and the only solid basis of our civil constitution and privileges—in short, it supports, pervades and enlightens all the ways of man, to the noblest ends by the happiest means, when and wherever its precepts and instructions are observed and followed—the usages and customs of men and the decisions of the courts of justice serve to declare and illustrate the principles of this law . . . ." (Emphasis added.) Id., pp. x–xi.

Indeed, the framers of our 1818 constitution incorporated this concept directly into that document. Article first, § 1, provides that "[a]ll men when they form a social compact, are equal in rights; and no man or set of men are entitled to exclusive government emoluments or privileges from the community." This social compact is deeply entrenched in this state's history. It first was articulated in the Fundamental Orders of 1639, and was repeated in the Declaration of Rights of 1650.

Professor Collier discussed the significance of this theory during his testimony in the *Hilton* case. He explained that the social compact not only establishes government, but defines and limits the authority of government. It is a contract, in fact, between the people and their government. The substance of this contract today, which has been carried forward from the Declaration of Rights in 1650, is set forth in article first, § 1, of the state constitution. According to Professor Collier, the affirmative obligation of the state to pro-

vide subsistence to the poor was part of the fabric of the social compact in Connecticut.[46]

## C

### THE APPROACHES OF SISTER STATES

As the foregoing analysis demonstrates, Connecticut has not only a rich constitutional history, but also a rich history of providing for its poor and impoverished citizenry. Because this history is unique to this state,[47] the holdings of courts in other jurisdictions, and the interpretations they have given to their own state constitutions, are of limited value in determining the contours of our own state charter of liberty. Nevertheless, because the majority places great significance upon the decisions of courts in sister states, it is necessary to address them. In an attempt to gather support for its conclusion that the Connecticut constitution does not include a right to minimal subsistence, the majority asserts that: (1) "Although only a few states have explicitly addressed the question, with one exception, other state courts unanimously have refused to recognize affirmative state constitutional rights to subsistence benefits, holding instead that any obligation to support the poor is entirely statutory"; (2) "This is true even in states with explicit constitutional provisions regarding care for the poor"; and (3) "[T]he courts of many states have indicated in dicta that the right to public assistance is wholly statutory." None of these three statements is completely accurate, and most of the cases relied on by the majority do not support the proposition asserted.

## 1

The majority initially states that, with the exception of New York, all state courts that have confronted the

---

[46] Professor Collier based his conclusion on the earliest recorded colonial practices, codes and common law of the state of Connecticut.

[47] See footnote 42 of this dissent.

issue "unanimously have refused to recognize affirmative state constitutional rights to subsistence benefits, holding instead that any obligation to support the poor is entirely statutory." The majority cites cases from three jurisdictions in support of this point. The assertion itself is incorrect, and does not accurately represent the holdings of those courts.

First, the assertion itself is incorrect. The majority suggests that no other state court has ever recognized a state constitutional right to minimal subsistence. The Supreme Courts of Alabama, Montana and Kansas, however, have done exactly that.

The Alabama Supreme Court recognized an affirmative state constitutional duty to provide for the poor in *Childree* v. *Health Care Authority*, 548 So. 2d 419 (Ala. 1989). In that case, the issue was who would pay for the hospital care of indigent citizens of Madison County. The county had referred indigents to Huntsville Hospital, which had incurred $700,000 in unpaid medical bills. As the Alabama Supreme Court recognized, the only question was "which of three entities— the State of Alabama, the Department of Mental Health, or Madison County—is financially responsible for the costs incurred . . . ." Id., 420. The court held that "the costs of private care of a person in the custody of the Department of Mental Health must be assessed against that person or his/her family, or, in the alternative, the county. In the instant case, these persons are financially incapable of defraying the costs involved for care and treatment. Ala. Const. 1901, Art. IV, § 88, states that '[i]t shall be the duty of the legislature to require the several counties of this state to make adequate provision for the maintenance of the poor'; this places on Madison County the *duty* of caring for its indigent citizens." (Emphasis added.) Id., 421.

In *Butte Community Union* v. *Lewis*, 229 Mont. 212, 745 P.2d 1128 (1987), the Montana Supreme Court also recognized such an affirmative duty of caring for the poor. In that case, the court was called on to determine the constitutionality of statutes strikingly similar to those in the case before us. The statutes limited able-bodied persons without dependent children to no more than two months of nonmedical general relief assistance within a twelve month period, and the plaintiffs challenged the scheme as unconstitutional. The Montana Supreme Court held that "the State Constitution *imposes upon the legislature a duty to provide necessary economic assistance* to inhabitants who need societal aid by reason of three disparate conditions over which they have no control, age, infirmity, or misfortune." (Emphasis added.) Id., 1129. The court then declared the revised statutes unconstitutional: "The legislature, by its finding, has completely eliminated from economic assistance misfortunate able-bodied persons who may have need for the aid of society. The finding, therefore, is in flat opposition to Art. XII, § 3 (3) of the Constitution, that *all* misfortunate persons who have need for the aid of society shall receive economic assistance through legislative action. The legislature cannot escape its constitutional duty by defining out the persons to whom the constitutional protection attaches. To allow such a finding to stand is tantamount to allowing the legislature to amend the Constitution by its own action . . . . On their face, the 1986 amendments do not meet the duty imposed on the legislature to provide for the misfortunate under Art. XII, § 3 (3) of the Montana Constitution." Id., 1130–31.[48]

In addition, the Supreme Court of Kansas has recognized such an affirmative duty. In *Caton & Starr* v. *Osborne County*, 110 Kan. 711, 714, 205 P. 341 (1922),

---

[48] Montana has subsequently amended its state constitution in order to eliminate this constitutional requirement.

a case not cited by the majority opinion, the Supreme Court of Kansas held that it is "the duty of the [town] overseer to care for the poor, and to see that they are given relief, and it is made the duty of the board of county commissioners to raise money and pay for such care and relief. . . . The constitution enjoins this care and commands that counties of the state shall provide for the poor and those who have claims upon the sympathy and aid of society. ([Kan. Const.] Art. 7, § 4). When an overseer of the poor finds a poor person in need of care, it is his duty to furnish him prompt and proper relief." (Citation omitted.)

Second, in addition to overlooking the holdings of these courts, the majority has either misread or misstated the holdings of the cases that it does cite. The majority cites cases from Illinois, Delaware and New Jersey. The Illinois case, *People* v. *Lyons*, 374 Ill. 557, 30 N.E.2d 46 (1940), was based on an interpretation of the Illinois constitution of 1870, which was in effect at the time of the court's decision in 1940. In 1970, however, Illinois adopted a new constitution. The new constitution includes a specific provision reciting that a purpose of the new document is to "eliminate poverty and inequality." Illinois Const., preamble. This language did not exist at the time of the court's decision in *Lyons*. As two constitutional commentators noted, "[t]he Preamble of the 1970 Constitution includes the provisions of the Preamble of the 1870 Constitution *and in addition emphasizes the State's role in eliminating poverty and inequality and assuring legal, social and economic justice."* (Emphasis added.) R. Helman & W. Whalen, Constitutional Commentary, reprinted in Ill. Ann. Stat. constitution, art. 1 (Smith-Hurd 1993) p. 26. The holding of the court in *Lyons*, which was based upon the 1870 document, is therefore not determinative of the meaning of the constitution now in effect in Illinois. Indeed, this holding of the *Lyons* decision

apparently has not been cited by any Illinois court for nearly forty years, or since the adoption of the new Illinois constitution.[49]

The Delaware case, *Tilden* v. *Hayward*, Docket No. 11297, 1990 LEXIS 140 (Del. Ch. Sept. 10, 1990), is a decision from a Delaware Court of Chancery, which held that the Delaware constitution does not provide a right to financial assistance for the purpose of securing housing. That case is distinguishable from this case for two reasons. First, the plaintiffs in *Tilden* only argued, and the court only considered, whether the due process clause of the state constitution provided a "substantive due process" right to financial assistance for housing. The court concluded that the prohibitive nature of that clause's language—which the court stated "is the equivalent of 'The State shall not' "; id.;—could not be interpreted as requiring affirmative action by the state. Id. The preamble of the Connecticut constitution, however, is phrased in affirmative terms and endows Connecticut citizens with certain rights. Second, the Delaware court expressly recognized that other state constitutions do, in fact, provide such a right, and noted that the language of a state constitution and its history are important factors to consider in determining whether such a state constitutional right exists. As I have indicated, the language and history of our Connecticut constitution reveal the undeniable existence of such a right.

Finally, the two New Jersey cases cited by the majority are not helpful. Both cases, *L.T.* v. *Dept. of Human Services*, 264 N.J. Super. 334, 624 A.2d 990 (1993), and *Franklin* v. *Dept. of Human Services*, 225 N.J. Super. 504, 543 A.2d 56 (1988), were decided by the Appellate Division, a mid-level appellate court in

---

[49] No court appears to have interpreted the "elimination of poverty" language included in the new constitution's preamble.

New Jersey.[50] On appeal in each case, the Supreme Court of New Jersey explicitly avoided the constitutional issue and decided the case on other grounds.[51] Indeed, in the later case, the Supreme Court, noting the despicable conditions facing the homeless, left open the question of whether a state constitutional right existed. *L.T.* v. *Dept. of Human Services*, 134 N.J. 304, 324, 633 A.2d 964 (1993).[52] It is far from clear, therefore, whether the New Jersey constitution does or does not protect a fundamental right to minimal subsistence.

[50] In *Franklin* v. *Dept. of Human Services*, supra, 225 N.J. Super. 515, a divided three judge panel of the Appellate Division held that the introductory clauses of the New Jersey state constitution did not impose on the state an affirmative obligation to provide the poor with certain necessities, including shelter. In *L.T.* v. *Dept. of Human Services*, supra, 264 N.J. Super. 342, the Appellate Division concluded that the same introductory clauses did not protect a right to government funded housing.

[51] In *Franklin* v. *Dept. of Human Services*, 111 N.J. 1, 17, 543 A.2d 1 (1988), the New Jersey Supreme Court affirmed the judgment of the Appellate Division, but explicitly stated that "we do not reach the constitutional issues addressed by the court below . . . ." In *L.T.* v. *Dept. of Human Services*, 134 N.J. 304, 323, 633 A.2d 964 (1993), the New Jersey Supreme Court reversed the judgment of the Appellate Division, but explicitly stated that "[t]he question before us is not whether the homeless have a constitutional right to shelter."

[52] The New Jersey Supreme Court cited a law review article; see C. Pascale, "Homeless People Have Rights Too," 156 N.J. Lawyer 18 (1993) (analyzing whether New Jersey has constitutional right to shelter); and went on to state: "We are aware of the great demands that are made on an agency of government like [the department of human services (department)]. Undoubtedly, [the department] wishes that it had more funds in order to supervise the far-flung operations of the [municipal welfare departments] that shelter the homeless, as well as more funds to feed the hungry, care for the children and elderly, and heal the sick, because all needy people are deserving of the agency's attention. However, although there are no rankings in the 'catalog of human suffering,' *Rodgers* v. *Gibson*, 218 N.J. Super. 452, 457, 528 A.2d 34 (App. Div. 1987), surely homelessness represents something uniquely devastating to the human spirit. As a society, we may be offended by the presence of homeless people among us; they are a silent rebuke to our way of life. 'Once pitied, [the homeless are] now censured.' Jill Smolowe, "Giving the Cold Shoulder," Time, Dec. 6, 1993, at 28, 30. But the consequences of their status cannot be denied. 'Reports abound documenting the gradual but inexorable disintegration of body and mind wrought by homelessness.' John C. Connell, "A Right to Emergency

Even if the holdings of the Appellate Division are viewed as a proper interpretation of the New Jersey constitution, however, they are of extremely limited value in helping us to interpret our own Connecticut constitution. The constitutional clauses in issue in the New Jersey case, which resemble portions of the Declaration of Independence, merely set forth vague ideals about individual rights, rather than acknowledging affirmative rights of the people. The preamble to the Connecticut constitution, on the other hand, states in concrete terms that that document is meant to enshrine "the liberties, rights and privileges which [the people of Connecticut] have derived from their ancestors . . . ." Moreover, there is no indication that New Jersey has the rich and lengthy history of providing for the poor that Connecticut does. Therefore, the mere fact that a mid-level appellate court in New Jersey has failed to recognize such a right in the New Jersey state constitution cannot be dispositive of whether this state's constitution protects such a right.[53]

Shelter for the Homeless Under the New Jersey Constitution," 18 Rutgers L.J. 765, 786 (1987) . . . ." *L.T.* v. *Dept. of Human Services*, supra, 134 N.J. 324.

The court, citing the same legal commentator's assessment of conditions facing the homeless, then addressed the actions of the New Jersey legislature. "The human costs of homeless living are unconscionable. Food is often acquired only from charity or from public trash. Public restrooms offer rare opportunities for practicing personal hygiene and cleanliness. Days are expended in aimless attempts to seek out minimal sustenance through jobs, welfare, and various means of self-help. Moments of rest are stolen in the most public places. Criminal and sexual victimization is common; companionship is rare. The indignities are insufferable, at least in the eyes of those not homeless. . . . We cannot help but believe that our lawmakers do not intend to bring about such results and do not intend that their general appropriations for human services not attend to such needs." (Internal quotation marks omitted.) Id.

[53] The majority also cites a West Virginia case, *Hodge* v. *Ginsberg*, 172 W. Va. 17, 303 S.E.2d 245 (1983). I do not understand the relevance of that case to the issue at hand. That case does not discuss whether the West Virginia state constitution requires that state to provide for the poor. Indeed,

## 2

The majority also contends that every state that has an explicit constitutional provision regarding the poor, with the exception of New York,[54] has declined to recognize an affirmative constitutional right to subsistence benefits. The majority cites the law of only one state, Kansas, for this sweeping proposition. As I pointed out in the previous subsection, the Supreme Courts of Alabama, Montana and Kansas have, in fact, given effect to affirmative constitutional provisions regarding care for the poor. The majority, therefore, is incorrect in asserting that no state except New York has done so.[55] Moreover, the majority has misinterpreted the only case upon which it relies.

the only issue in that case was whether administrative regulations, enacted by the state department of welfare under legislative delegation, went beyond the scope of the statutory grant of authority. See id., 22.

[54] Although the majority attempts to cast doubt upon the enforceability of the New York constitutional provision regarding care for the homeless, I note that the New York Court of Appeals recently put this very question to rest. In *Jiggets* v. *Grinker*, 75 N.Y.2d 411, 416, 553 N.E.2d 570, 554 N.Y.S.2d 92 (1990), a case the majority does not cite, New York's highest state court declared that "[t]he provision of assistance to the needy is not a matter of legislative grace but is specifically mandated by the New York State Constitution . . . ."

[55] "Unlike the United States Constitution, the constitutions of 22 states include in some manner a specific provision relating to the care of the needy or the protection of the health of the people. These constitutional provisions can be divided into three loosely described categories. The first category includes those that make a statement of principle regarding care of the less fortunate. The Preamble to the Illinois Constitution, for example, states that the Constitution is ordained and established among other reasons to 'eliminate poverty and inequality; assure legal, social and economic justice; [and] provide opportunity for the fullest development of the individual.' On a more general level, the Preamble to the Hawaii Constitution reaffirms a belief in government with 'an understanding and compassionate heart toward all the peoples of the earth.'

"A second category includes those provisions that authorize the state, or a local governmental entity, to provide for the poor or for the health of the citizens. The California Constitution, for example, states that the legislature and the people 'shall have power to provide for the administra-

In *Bullock* v. *Whiteman*, 254 Kan. 177, 865 P.2d 197 (1993), the Kansas Supreme Court explicitly avoided the holding that the majority attributes to it. At issue in that case were revisions to the state general assistance and medical assistance programs. The effect of the revisions was to eliminate an "elderly" classification of persons eligible for general assistance, to extend a requirement of disability from one to six months, and to reduce the types of medical benefits available. The plaintiffs claimed that the changes violated the state constitution.[56] The Kansas Supreme Court, noting that "this is a situation where the definition of needy has been altered, not a circumstance where an admittedly needy individual is denied assistance," held that the revisions did not violate the state constitution. (Inter-

---

tion of the relief of hardship and destitution, whether resulting from unemployment or from other cause. . . .' Similarly, the Oklahoma Constitution states that the legislature and the people through initiative are authorized 'to provide by appropriate legislation for the relief and care of needy, aged persons who are unable to provide for themselves, and other needy persons who, on account of immature age, physical infirmity, disability, or other cause, are unable to provide or care for themselves.'

"The final category includes provisions that do not merely authorize the state to provide for the poor, but instead refer to a governmental obligation to care for the needy or protect the health of all citizens. Such provisions are found in twelve state constitutions. The Alabama Constitution states that it 'shall be the duty of the legislature to require the counties to make adequate provision for maintenance of the poor.' The Alaska Constitution states simply but clearly that the legislature 'shall provide for public welfare.' As a further example, the North Carolina Constitution states: 'Beneficent provision for the poor, the unfortunate, and the orphan is one of the first duties of a civilized and a Christian state. Therefore the General Assembly shall provide for and define the duties of a board of public welfare.' " D. Braveman, Symposium, "After the War: Poverty Law in the 1980s: Children, Poverty and State Constitutions," 38 Emory L.J. 577, 595–96 (1989).

[56] Article seventh, § 4, of the Kansas constitution provides: "AGED AND INFIRM PERSONS; FINANCIAL AID; STATE PARTICIPATION. The respective counties of the state shall provide, as may be prescribed by law, for those inhabitants who, by reason of age, infirmity or other misfortune, may have claims upon the aid of society. The state may participate financially in such aid and supervise and control the administration thereof."

nal quotation marks omitted.) Id., 204. The court, however, expressly stated that "[t]he result reached herein does not mean that there is no point at which reduction in benefits and increases in eligibility requirements would ever be violative of Article 7, § 4 of the Kansas Constitution." Id., 206. This refusal to revisit the issue, therefore, left intact the Kansas Supreme Court's earlier holding in *Caton & Starr* v. *Osborne County*, supra, 110 Kan. 711, which held that the state constitution does require provision for the poor. The majority, therefore, is incorrect when it asserts that no state except New York has recognized an affirmative constitutional duty to provide for the poor.[57]

### 3

Finally, the majority cites several cases in support of its assertion that "the courts of many states have indicated in dicta that the right to public assistance is wholly statutory." To the credit of the majority, it recognizes that the language in these cases is merely dicta. Unfortunately, the majority apparently overlooks the fact that in several of these cases, the language quoted, even though dicta, has absolutely nothing to do with the state constitution or the scope of state constitutional requirements regarding care for the poor.

Several of the cases cited by the majority do not even mention the state's own constitution. See, e.g., *Orrington* v. *Bangor*, 142 Me. 54, 46 A.2d 406 (1946);

---

[57] Furthermore, I do not understand why the majority cites and quotes from the constitutions of Alabama, North Carolina or Wyoming in part II A of the majority opinion. As I have indicated, the Alabama Supreme Court has held that the legislature has an affirmative duty to provide for the poor. See *Childree* v. *Health Care Authority*, supra, 548 So. 2d 421. Thus, the majority's reference to Alabama law is directly contrary to its position. Moreover, I am bewildered by the majority's reference to the constitutions of Wyoming and North Carolina because, as the majority aptly notes, "whether [the] constitutional provision includes a right to minimal subsistence [is] undecided" in those states. Citing and quoting these uninterpreted constitutional provisions adds nothing to the debate.

*County of Lander* v. *Board of Trustees*, 81 Nev. 354, 403 P.2d 659 (1965); *New Hampshire Children's Aid Society* v. *Morgan*, 107 N.H. 246, 221 A.2d 238 (1966); *Merrimack* v. *Derry*, 107 N.H. 212, 219 A.2d 703 (1966); *Sioux Valley Hospital Assn.* v. *Bryan*, 399 N.W.2d 352 (S.D. 1987); *Strutz* v. *Perkins County*, 69 S.D. 270, 9 N.W.2d 500 (1943); *St. Johnsbury* v. *Granby*, 124 Vt. 367, 205 A.2d 422 (1964). To the extent that these cases discuss a state's obligation to support the poor at all, they do so in the context of comparing the statutory obligation to a common law obligation, such as one would vindicate by bringing a common law action in contract or assumpsit.[58]

---

[58] For example, in *Orrington* v. *Bangor*, supra, 142 Me. 54, the town of Orrington, Maine, sought to recover from the city of Bangor the value of supplies it had furnished to an indigent woman and her children. The pertinent statute provided that the city or town identified as the poor person's "pauper settlement" was required to pay for his or her support. Id., 55. The city of Bangor satisfied the statutory definition of "pauper settlement," but argued that the court needed to look beyond the terms of the statute because the indigent woman had been a party to a sham marriage that was designed to alter her town of settlement. Id., 56. The court rejected the argument, concluding that "[t]he obligation of towns and plantations in reference to [paupers'] support originates solely in statutory enactment and has none of the elements of a contract, express or implied. There are no equitable considerations out of which presumptions in favor of either party will arise." (Internal quotation marks omitted.) Id., 57. The court did not discuss the state constitution or any duty imposed by the constitution on the towns.

Similarly, the New Hampshire cases include language to the effect that any obligation to the poor is purely statutory. The source of this proposition, and its true meaning, can be traced back to two early cases of the New Hampshire Supreme Court. In each case, the plaintiff town had brought a common law action in assumpsit against another governmental body for reimbursement of costs incurred in supporting a pauper. In each case, the court rejected the plaintiff's claim, holding that the reimbursement statute had supplanted the common law remedy of assumpsit. *Plymouth* v. *Grafton County*, 68 N.H. 361, 363, 44 A. 523 (1895) ("There is no statute authorizing in terms or by implication the enforcement of such liability by a suit in assumpsit, or any common-law action. Hence, the defendants are not liable in an action of assumpsit."); *Meredith* v. *Canterbury*, 3 N.H. 80, 81 (1824) ("[a]s there is no obligation, which, independent of the statute,

Furthermore, several of the cases cited by the majority that mention a constitutional directive are very plainly referring to the *federal* constitution, not the state constitution. In *Kratzer* v. *Dept. of Public Welfare*, 85 Pa. Commw. 318, 481 A.2d 1380 (1984), for example, the Commonwealth Court of Pennsylvania relied on federal precedent for its assertion that there is no *federal* constitutional right to receive public assistance. The parties in that case apparently never argued that the state constitution guaranteed such a right, and the court, in deciding the case, never mentioned the state constitution. Similarly, although the Nebraska Supreme Court alluded to constitutional requirements in *Elliott* v. *Ehrlich*, 203 Neb. 790, 280 N.W.2d 637 (1979), the court's decision can only be read as standing for the proposition that, for purposes of the equal protection and due process clauses of the federal constitution, welfare benefits are not a fundamental right that would trigger strict scrutiny.[59] Furthermore, it is obvious that the court must

binds one town more than another to maintain a particular pauper, it has always been held, that, in order to charge a town, the statute must be strictly pursued").

[59] *Elliott* involved a challenge by two unmarried, minor sisters, both of whom were pregnant, to a Nebraska regulation that established standards of eligibility for benefits under the federal Aid to Families with Dependent Children program. The sisters argued that each of them and her unborn child should be regarded as separate two person "units" for purposes of receiving welfare benefits. The regulation, however, required that the sisters and their unborn children, together with the sisters' mother and brother, should be regarded as a single six person unit. The sisters contended that the regulation violated their equal protection and due process rights. *Elliott* v. *Ehrlich*, supra, 203 Neb. 792-93. The Nebraska Supreme Court, in determining what degree of scrutiny to apply to the regulation, stated that "[w]elfare benefits are not a fundamental right and neither the state nor the federal government is under any sort of constitutional obligation to guarantee minimum levels of support. *Lavine* v. *Milne*, 424 U.S. 577, 96 S. Ct. 1010, 47 L. Ed. 2d 249 [1976]." Id., 796.

It is clear, for two reasons, that this statement refers only to a right to welfare benefits under the federal constitution, and not under the state constitution. First, the court made this statement in the context of deter-

have been referring to the federal constitution in *Allen v. Graham*, 8 Ariz. App. 336, 446 P.2d 240 (1968), and *Division of Aid for the Aged* v. *Hogan*, 143 Ohio St. 186, 54 N.E.2d 781 (1944). In both of these cases, the court cited the decisions of other states for support of its dicta regarding a constitutional duty. If the court had been discussing its own state constitution, it is unlikely that it would have interpreted that document by referring exclusively to the holdings of courts in other states.[60]

Finally, in *Mary Lanning Memorial Hospital* v. *Clay County*, 170 Neb. 61, 65, 101 N.W.2d 510 (1960), the Nebraska Supreme Court noted only that the state constitution did not prohibit the legislature from *requiring* counties to provide for the poor. The court did not address the question of whether the state constitution prohibited the legislature from *eliminating* all assistance for the poor.

## D

To summarize, the right of the poor to minimal subsistence is firmly rooted in the statutory and common

mining what degree of scrutiny to apply under the federal due process and equal protection clauses. Indeed, the court's entire discussion in *Elliott* focused on federal precedent. Because regulations infringing fundamental rights protected by *the federal constitution* must survive strict scrutiny, the court needed to determine whether the federal constitution provided a fundamental right to receive welfare benefits. Second, the court in *Elliott* never conducted any independent state constitutional analysis. Although the court did conclude that the regulation "is invalid and unconstitutional under the United States and Nebraska Constitutions"; id., 798; it appears that the court did so solely on the basis that the due process and equal protection clauses under both constitutions are interpreted as having identical meaning. *Kirshen* v. *Kirshen*, 227 Neb. 479, 481, 418 N.W.2d 558 (1988) (due process); see *Meis* v. *Grammer*, 226 Neb. 360, 368, 411 N.W.2d 355 (1987) (equal protection).

[60] In addition, the majority cites the Illinois case of *Beck* v. *Buena Park Hotel Corp.*, 30 Ill. 2d 343, 196 N.E.2d 686 (1964). This case, although mentioning the Illinois state constitution, referred to the constitution adopted in 1870. As pointed out in the text of this dissent, Illinois has since adopted a new constitution that includes a specific reference to the elimination of poverty. See part III C 1 of this dissent.

law of this state prior to 1818. This right was implicitly incorporated into the constitution through the preamble of our 1818 constitution. The decisions of courts in sister states, to the extent they are relevant at all, do not cast doubt upon this proposition. In my view, the plaintiffs in these cases should be able to enforce their rights through article first, § 10.[61]

[61] Most fundamental rights, such as the right to privacy, the right to interstate travel and the right to marry, simply proscribe governmental interference. For several important rights, however, the constitution requires affirmative action on the part of the government. For example, both the federal and state constitutions require the government, either explicitly or implicitly, to provide indigent criminal defendants with counsel during court proceedings; see, e.g., *Gideon* v. *Wainwright*, 372 U.S. 335, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963); to provide indigent criminal defendants with counsel in criminal appeals; see, e.g., *Swenson* v. *Bosler*, 386 U.S. 258, 87 S. Ct. 996, 18 L. Ed. 2d 33 (1967); and to provide procedural due process. See generally *Fasulo* v. *Arafeh*, supra, 173 Conn. 473. In addition, the government must provide indigent defendants with counsel in paternity actions. *Lavertue* v. *Niman*, 196 Conn. 403, 493 A.2d 213 (1985). In *Doe* v. *Maher*, supra, 40 Conn. Sup. 394, the court held that under our state constitution, the state must pay for the medically necessary termination of pregnancy. Furthermore, the explicit language of the preamble of the state constitution, which provides for the preservation of our historic "rights and privileges," is not restricted merely to the preservation of *negative* rights and privileges. Rather, as the Chief Justice observes in part I B of her concurring opinion, unenumerated state constitutional rights may also include *affirmative* rights. I fully agree with the Chief Justice's analysis of this point.

Because there is no right more fundamental than the very right to humane survival, the state government must be charged with the affirmative obligation to provide what is necessary for the minimal subsistence of its citizens. As scholar Laurence Tribe noted with respect to the United States constitution, "[t]he day may indeed come when a general doctrine under the fifth and fourteenth amendments recognizes for each individual a constitutional right to a decent level of affirmative governmental protection in meeting the basic human needs of physical survival and security, health and housing, work and schooling. The time may come when constitutional law will answer the scholar's question, Why education and not golf? with a reply that is likely to make human sense—Because education is more important—and when this answer, however odd it will seem to some lawyers, will seem inescapable to those who take their lessons from life itself." (Internal quotation marks omitted.) L. Tribe, American Constitutional Law (2d Ed. 1988) p. 779.

## IV

### Constitutional Scrutiny

Judicial evaluation of a constitutional right, and of whether that right may have been infringed in a particular case, inevitably turns to a determination of what degree of "scrutiny" that right demands. Because of the nature of the right to minimal subsistence, and the facts of these cases, I believe this issue need not be decided here. The constitutional definition of this right is minimal subsistence—in other words, the minimum amount of shelter, food and essential medical care necessary for a human being to survive in a humane manner. This right does *not* require the government to supply the poor with a private apartment, but merely a simple cot sheltered from the elements. This right does *not* require the government to supply the poor with a nightly dinner of steak and potatoes, but merely a bowl of soup. Finally, this right does *not* require the government to provide the poor with cosmetic surgery, but only essential medical care. Framed in this manner, it becomes easy to understand, at least for the purpose of this case, why any particular degree of "scrutiny" is not relevant. Either the government has provided enough assistance for a human being to survive in a humane manner, or it has not.

This is not to say, however, that any condition the government attempts to attach to the right may not be the subject of scrutiny. Indeed, the type and degree of conditions which the state places upon this right may be the subject of future litigation. In these cases, however, the issue of whether the government properly required indigent persons to satisfy specific affirmative conditions is not before us. The plaintiffs here do not suggest that the towns must offer shelter, food and medical care to persons who are able-bodied and for

whom employment is readily available. They do not suggest that the towns are prohibited from conditioning the receipt of such benefits on participation in programs such as workfare or job training. The plaintiffs here simply argue that the towns may not refuse to help people who desperately need it, who are willing and able to satisfy all reasonable conditions in order to get it, and who cannot survive in a humane manner without it. Because the questions presented by the *Hilton* and *Moore* cases do not require us to engage in any form or degree of judicial scrutiny, we should leave this issue to another day.

Accordingly, I would conclude that Spec. Sess. P.A. 92-16 is unconstitutional insofar as it does not require towns to provide minimal subsistence to destitute, impoverished persons when they are in desperate need of it. Specifically, I would hold that Spec. Sess. P.A. 92-16 is unconstitutional to the extent that it: (1) allows towns to refuse to provide minimal subsistence after only nine months of a twelve month period, and (2) allows towns to refuse to provide adequate shelter to those individuals who need it in order to survive in a humane manner.

It always remains within the authority of the legislature, of course, to make available a greater level of benefits to the poor and needy in order to help them live a more humane existence. Indeed, as citizens of a civilized and relatively affluent society, we may demand that our elected officials provide something more than the very minimum degree of assistance. This, however, is a matter for the legislature. Our state constitution requires only that our towns not allow their residents to suffer from hunger, or from the bitter cold, or from a lack of essential medical care.

## V

### CONCLUSION

Connecticut has a rich and lengthy history of requiring the government to provide for the indigent. Our concern with providing assistance to this class of persons can be traced back to the earliest days of this colony in the middle of the seventeenth century. This history reveals that the government of Connecticut has an undeniable obligation to provide, and the poor have an undeniable right to receive, those things that are absolutely essential for humane survival: shelter, food and essential medical care.

This right to minimal subsistence is one of the "liberties, rights and privileges which . . . have [been] derived from [our] ancestors." As such, it is incorporated in the preamble of our state constitution and protected from infringement by article first, § 10, of that charter of liberty. Indeed, this right to minimal subsistence is a right so fundamental that without it no other guaranteed rights, explicit or implicit, can be enjoyed.[62] It is the right to life itself—the right to subsistence, sufficient for humane survival.

---

[62] Professor Charles L. Black, Jr., reminds us of the elemental importance of the right we are addressing. In arguing for a right to subsistence under the federal constitution, Professor Black recalled Justice Cardozo's explanation in *Palko v. Connecticut*, 302 U.S. 319, 326, 58 S. Ct. 149, 82 L. Ed. 288 (1937), as to why the first amendment's guarantee of freedom of speech applied not only against the federal government, but also against the states. "It was because, in his famous words, 'neither liberty nor justice would exist' if this right were lacking. 'Of that freedom,' he goes on, 'one may say that it is the matrix, the indispensable condition, of nearly every other form of freedom.' " C. Black, "Further Reflections on the Constitutional Justice of Livelihood," 86 Colum. L. Rev. 1103, 1110 (1986). Analogizing the importance of the right to subsistence to the right to free speech, Black added, "I would like to look Cardozo straight in his gentle eyes and ask him to consider whether the rights to freedom from gnawing hunger and from preventable sickness may not form 'the matrix, the indispensable condition, of nearly every other form' of freedom." Id.

Yet today the majority eviscerates the lifeline that the poor people of this state have depended upon for 350 years. No longer will the poorest of the poor have a safety net that will allow them to survive in a humane manner. No longer will these indigent persons be able to turn to their government for the protection of their well being. In one stroke of a pen, the majority dismantles our rich constitutional jurisprudence that Chief Justice Swift described in his 1795 treatise on the law: *"[T]he law has made provision for the support of the poor, so that every one may know where to call for his bread in the hour of want."* (Emphasis added.) 1 Z. Swift, A System of the Laws of the State of Connecticut, supra, p. 121.

The majority's holding is contrary to the clearly enunciated traditions and law of this state. To hold in this case that we, as a civilized society, are not obliged to offer any assistance as we watch our fellow human beings suffer and sometimes perish, is to ignore our history, our moral obligation, our humanity—and our state constitution.

I dissent.